IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UMB BANK, N.A., solely in its capacity as successor trustee for the Bonds,

Plaintiff,

v.

Case No. 2:21-cv-2504

D. JON MONSON; COMPASS COMMODITIES GROUP III, LLC; 11 WATER LLC; ONE10 HOTEL HRKC LLC; AND ONE10 HOTEL HOLDINGS LLC,

Defendants

---

**COMPLAINT**

UMB Bank, N.A. ("***UMB***"), not individually but solely in its capacity as successor Trustee[1] under the Trust Indentures by and between the City of Edwardsville, Kansas (the "***Issuer***") and Commerce Bank (the "***Prior Trustee***"), sues the Defendants D. Jon Monson ("***Monson***"), Compass Commodities Group III, LLC ("***Compass***" or "***Developer***"), 11 Water, LLC ("***11 Water***"), One10 Hotel HRKC, LLC ("***One10 HRKC***" or "***Owner***"), and One10 Hotel Holdings LLC ("***Holdings***") (each a "***Defendant***" and together the "***Defendants***"), and alleges:

---

[1] Use of the term "Trustee" is intended to have the same meaning as the term is defined in the Trust Indentures (hereinafter defined). To date, the Prior Trustee (hereinafter defined) and UMB have served as "***Trustee***" for the Trust Estates (hereinafter defined) established for the Bonds.

## INTRODUCTION

1. UMB is the duly appointed, qualified and acting successor trustee under the following three (3) trust indentures:

> (i) the *Trust Indenture* dated as of October 1, 2019 (the "***TGT Indenture***"), relating to that certain $10,655,000 Taxable Special Obligation Transient Guest Tax Revenue Bonds, Series 2019 (the "***TGT Bonds***");
>
> (ii) the *Trust Indenture* dated as of October 1, 2019 (the "***TIF Indenture***") relating to that certain $11,005,000 Special Obligation Tax Increment Revenue Bonds, Series 2019 (the "***TIF Bonds***"); and
>
> (iii) the *Trust Indenture* dated as of October 1, 2019 (the "***CID Indenture,***" and together with the TGT Indenture and TIF Indenture, the "***Trust Indentures***"), relating to that certain $745,000 Taxable Community Improvement District Revenue Bonds, Series 2019A, and that certain $875,000 Community Improvement District Revenue Bonds, Series 2019B (together, the "***CID Bonds***," and together with the TGT Bonds and TIF Bonds, the "***Bonds***").[2]

True and correct copies of the TGT Indenture, the TIF Indenture, and the CID Indenture are attached hereto as **Exhibits 1, 2,** and **3,** respectively. The trust estates created by the Trust Indentures are hereafter referred to as the "***TGT Trust Estate***," the "***TIF Trust Estate***," and the "***CID Trust Estate***," together the "***Trust Estates***." UMB holds legal title to property comprising the Trust Estates and, if requested in writing by Bondholders (hereinafter defined) and under other circumstances, may exercise all rights and remedies conferred to the Trustee under the Trust Indentures and any other available remedy in law or equity deemed expedient in the interests of the Bondholders, including those assigned by Bondholders.

2. The Issuer authorized and issued the Bonds with the intent to use the proceeds thereof to, *inter alia*, pay or reimburse Compass and its assigns, including One10 HRKC, costs incurred to acquire, construct, and equip a hotel to be branded as a Hard Rock Hotel (the "***Hotel***")

---

[2] All capitalized terms not separately defined herein shall have the same meaning as ascribed in the Trust Indentures.

and related event center facility (together with the Hotel, the "***Project***") in the City of Edwardsville, Kansas, to the extent such expenses were eligible for payment under that certain *Amended and Restated Development Agreement for Project Areas One, Two, and Three Village South at Edwardsville TIF District and CID*, dated November 1, 2018 (the "***Original Development Agreement***"), as amended by that certain *First Amendment to Amended and Restated Development Agreement* dated on August 26, 2019 (the "***First Amendment,***" and together with the Original Development Agreement, the "***Development Agreement***") and Kansas law. True and correct copies of the Original Development Agreement and First Amendment are attached hereto as **Exhibits 4** and **5,** respectively. Thereafter, Compass and One10 HRKC entered into that certain *Partial Assignment and Assumption of Development Agreement* dated October 30, 2019 (the "***Partial Assignment***"), in which Compass assigned to One10 HRKC all of its rights and obligations under the Development Agreement as they related to Project Area Two (as described in the Development Agreement) and the Project. A true and correct copy of the Partial Assignment is attached hereto as **Exhibit 6.** As assignee and owner of the Trust Estates created under the Trust Indentures together with an express assignment of enforcement rights therein, the Trustee may enforce all rights of the Issuer and Trustee and all obligations of the Developer or the Owner under the Development Agreement, as evidenced by the Affidavit of Tyler Ellsworth, Esq., attached hereto as **Exhibit 7**.

3. As explained more fully below, Defendants have engaged in fraudulent conduct to induce issuance and purchase of the Bonds and the payment of Bond proceeds to them by, *inter alia*, informing the Issuer that certain loan conditions precedent for issuing the Bonds had been met and knowingly making material misrepresentations in and omitting material facts from the Official Statements used by the Issuer to market and sell the Bonds to purchasers thereof (the

"***Bondholders***") and in the Financing Documents and certifications related to the Bonds including (a) failing to disclose to Bondholders that the Construction Loan Agreement executed by One10 HRKC prior to issuance of the Bonds was in the amount of $48,823,603, well below the $52,000,000 certified to by the Defendants as necessary to complete the Project, and was with a "warehouse lender" wholly reliant on an unverified third-party line of credit to fund advances under the Construction Loan Agreement; (b) failing to disclose to Bondholders that no Closing[3] on the Construction Loan had occurred, per the terms of the Construction Loan Agreement, prior to issuance of the Bonds, a major condition precedent to their issuance, because the Closing could not occur until a Down Payment Deposit was made in accordance with the Construction Loan Agreement, which deposit was not made until a month *after* issuance of the Bonds; (c) falsely certifying that one or more Defendants were not involved in or threatened with litigation when in fact they were involved in and under threat of lawsuits including those involving allegations of fraud and the inability or unwillingness to meet financial obligations; and (d) making false representations and certifications regarding the eligibility of certain expenses to be reimbursed when they were to be contributed by the Owner and/or Developer. Defendants were also negligent by, among other things, failing to secure approximately $3,000,000 of the Down Payment Deposit, which monies are now unavailable to fund the Project. In addition to being fraudulent, and negligent as to the Down Payment Deposit, these activities together with other breaches discussed below resulted events of default under the Development Agreement and Trust Indentures.

[3] As defined in the hereinafter defined Construction Loan Agreement.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff UMB Bank, N.A., is a national bank headquartered in Missouri with its principal place of business located at 1010 Grand Boulevard, Kansas City, Missouri 64106; however, the Trust Estates are administered at 120 South Sixth Street, Suite 1400, Minneapolis, Minnesota 55402.

5.      Defendant D. Jon Monson is an individual that, upon information and belief, resides at 20260 Lakeview Avenue, Excelsior, Minnesota 55331 and, therefore, is a resident of Minnesota.

6.      Defendant Compass is a Texas limited liability company. The managing member of Compass is 11 Water, a Minnesota limited liability company. 11 Water is owned directly or indirectly and controlled principally by Monson. All actions of Compass and 11 Water alleged in this Complaint were undertaken with the knowledge, consent and approval of Monson.

7.      Defendant One10 HRKC is a Delaware limited liability company. The sole member of One10 HRKC is Holdings, a Kansas limited liability company. Holdings is owned directly or indirectly and controlled principally by Monson and Anthony John Jacobsen, a California resident. All actions of One10 HRKC and Holdings as alleged in this Complaint were undertaken with the knowledge, consent and approval of Monson.

8.      The claims asserted herein arise under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and 17 C.F.R. 240.10b-5.

9.      The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10.     Venue is appropriate in this Court pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391. The real and personal property at issue in this action is situated in the District of Kansas and substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this

District. Moreover, section 1008 of the Original Development Agreement provides: "For any claims arising out of this Agreement, performance or non-performance under this Agreement, and for any request or demand for damages resulting from the breach or default under this agreement, the sole and exclusive venue for litigation shall be the District Court in Wyandotte County, Kansas or the U.S. District Court in Kansas City, Kansas."

## GENERAL ALLEGATIONS

### *A. The Bonds, Project, Use of Proceeds and Pledged Revenues*

11. The proceeds of the Bonds, together with Owner contributed infrastructure and predevelopment costs, Owner cash equity, and other loan proceeds, were to be used to acquire, construct, and equip the Project. More specifically, the TGT Bonds were to be used to pay a portion of the cost of constructing and equipping buildings, certain infrastructure improvements, and related soft costs; the proceeds of the TIF Bonds were to be used to pay a portion of the cost of land acquisition, certain infrastructure improvements, and related soft costs; and the proceeds of the CID Bonds were to be used to pay a portion of the cost of constructing and equipping certain buildings, certain infrastructure improvements, and related soft costs, in connection with the Hotel.

12. The Hotel was to consist of a ten-story structure featuring approximately 240 rooms, two restaurants (including a rooftop restaurant of 8,000 square feet, a portion of which will feature outdoor terraces), a coffee shop, a nightclub, a fitness center, a business center, retail outlets, and a lobby lounge. The adjacent event center of approximately 49,000 square feet was to include a rotunda lobby and reception area, banquet room, meeting rooms, restaurant, lounge and night club, spa and salon, indoor pool, body rock exercise space, and support space. A surface parking lot comprised of at least 450 parking spaces was to be constructed for the Hotel guests and event center guests. The Hotel was to be placed in service on or before April 1, 2021.

13.     In order to secure the Issuer's performance and observance of all the covenants, agreements and conditions contained in the Trust Indentures, in consideration of the acceptance by the Trustee of the trust created by the Trust Indentures, and in consideration of the purchase and acceptance of the Bonds by the Bondholders, the Issuer transferred in trust, pledged and assigned to the Trustee, property consisting of all transient guest taxes, sales tax revenues, and other incremental taxes generated from the Project area (the "***TGT Revenues***," "***TIF Revenues***" and "***CID Sales Tax Revenues***"), respectively; all moneys, investments, and securities from time to time held by the Trustee under the terms of the Trust Indentures; and all other property of every name and nature, from time to time by delivery or by writing mortgaged, pledged, delivered or hypothecated as and for additional security under the Trust Indentures by the Issuer or anyone on its behalf or with its written consent in favor of the Trustee.

14.     The Issuer also agreed that the Trustee, as assignee and owner of the security interests created by the Trust Indenture, in its name or in the name of the Issuer "may enforce all rights of the Issuer and the Trustee and all obligations of [Compass] and [Owner] under and pursuant to the Development Agreement and any other Financing Documents for and on behalf of the Bondholders …"

15.     The TGT Revenues, TIF Revenues, and CID Sales Tax Revenues are the sole source of revenues to pay the debt service on the Bonds. Each Official Statement issued in connection with the offering of the Bonds notes that "[t]he payment of the principal of, premium if any, and interest on the Bonds in a timely manner will depend upon the completion of construction and successful operation of the Hotel."

### *B. OTHER FUNDING SOURCES FOR PROJECT COMPLETION; COST CERTIFICATIONS*

16. The Bonds were not the sole or primary source of funding for the approximately $80,000,000 cost of developing and constructing the Project. Rather, the issuance of the Bonds was expressly conditioned on the closing by One10 HRKC of two (2) loans required to finance the Project on or prior to the date the Bonds were issued. These loans were to consist of a construction loan in the amount of $52,000,000 (the "***Construction Loan***") and a mezzanine loan in the amount of $3,100,000 (the "***Mezzanine Loan***").

17. In fact, the Bonds were not issued and delivered on the original date of issuance, October 15, 2019, because closings on the Construction Loan and Mezzanine Loan had not occurred by that date. The Bonds were issued only after "the Developer and Owner … informed the [Issuer] that the circumstances that precluded the closing of the Construction Loan and the Mezzanine Loan have been resolved …," a representation later determined to be patently false.

18. On or about October 30, 2019, One10 HRKC executed that certain *Loan Agreement* with AltosGroups, LLC, a Delaware limited liability company ("***Altos***"), for the Construction Loan (the "***Construction Loan Agreement***"). Upon information and belief, a true and correct copy of the Construction Loan Agreement is attached hereto as **Exhibit 8**.

19. In connection with the Construction Loan, One10 HRKC also executed a *Mortgage and Security Agreement, Assignment of Leases and Rents and Fixture Filing* (the "***Construction Mortgage***") in favor of Altos. The Construction Mortgage is an encumbrance on the real property denoted in the Development Agreement as "Project Area Two." Based on the *Allonge* and *Assignment of Mortgage and Security Agreement, Assignment of Leases and Rents and Fixture Filing* attached hereto as **Exhibits 9** and **10**, respectively, Compass has since become the secured party under the Construction Loan Agreement; however, Compass has neither been willing or able

to lend money to One10 HRKC in amounts necessary to complete the Project nor willing to release its security interest in the Project.

20.     On the same date that it entered into the Construction Loan, One10 HRKC also entered into a *Mezzanine Loan Agreement*, *Mezzanine Promissory Note* and *Mezzanine Pledge and Security Agreement* for the Mezzanine Loan (collectively, the "***Mezzanine Loan Agreement***") with Mutual Credit Corporation, a California corporation ("***MCC***"), copies of which are attached as **Exhibits 11, 12** and **13**, respectively. The Mezzanine Loan Agreement was in the amount of $3,100,000. Proceeds from the Mezzanine Loan were initially used, together with reimbursements from the Trustee, to fund the Down Payment Deposit referenced in the Construction Loan Agreement; however, while those monies have since been repaid to MCC, it has refused to release its security interest in the Project.

21.     Known to the Defendants, but undisclosed by them to the Issuer, Trustee and purchasers of the Bonds prior to issuance of the Bonds, was that the Construction Loan Agreement was for a principal amount of $48,823,603, well below the $52,000,000 Construction Loan condition precedent to issuance of the Bonds – and the amount represented by Compass and One10 HRKC as being necessary to complete the Project.

22.     Also known to the Defendants, but undisclosed by them to the Issuer, Trustee and purchasers of the Bonds prior to issuance of the Bonds, was that Altos had no funds to lend – Altos was a "warehouse lender" wholly reliant upon a third-party line of credit and conditions relating thereto – and that no "Closing," as defined in the Construction Loan Agreement, of the Construction Loan had in fact occurred.

23.     Further, under the Construction Loan Agreement One10 HRKC was required to make a Down Payment Deposit in the amount of $13,872,943.00 on or before Closing on the

Construction Loan and One10 HRKC did not satisfy the Down Payment Deposit until on or around November 25, 2019; therefore, no Closing under the Construction Loan Agreement occurred until almost a month *after* the Bonds were issued.

24. In anticipation of One10 HRKC making the third and final installment of the Down Payment Deposit and *after* the Bonds were issued, One10 HRKC and Altos entered into that certain *Down Payment Deposit Agreement* dated November 8, 2019 (the "***Deposit Agreement***") pursuant to which $3,000,674.00 of the Down Payment Deposit was allegedly made (the "***Final Deposit***"). Upon information and belief, a true and correct copy of the Deposit Agreement is attached hereto as **Exhibit 14**.

25. Monson in his personal capacity and as manager of Owner, Holdings and Compass certified to the matters described in his *Declaration of D. Jon Monson* ("***Monson Declaration***") attached hereto as **Exhibit 15**, which references to a related memorandum in support of Owner's application for temporary restraining order attached hereto as **Exhibit 16** (the "***One10 Memorandum***") filed in *One10 Hotel HRKC, et al., vs. AltosGroups, LLC, et al.*, (Case No. 2020-CV-00358) currently pending in the District Court of Wyandotte County, Kansas, including the facts referenced above in paragraphs 18, 23 and 24 (*see* paragraphs 6-10 of the One10 Memorandum, Exhibit 16).

26. The Defendants did not disclose to the Issuer, Trustee, and purchasers of the Bonds prior to issuance of the Bonds that no Closing had occurred on the Construction Loan under the terms of the Construction Loan Agreement. Further, after the Bonds were issued, Defendants and their representatives concealed the underlying fraud and continued to perpetuate same by making affirmative representations to representatives of the Issuer, UMB and Bondholders that Closing

under the Construction Loan Agreement had occurred, which fraud was only recently discovered upon reviewing Monson Declaration.

27.     Assuming One10 HRKC fully funded the Down Payment Deposit and met all other conditions precedent to funding under the Construction Loan Agreement on November 25, 2019, Altos was required to advance loan proceeds to One10 HRKC no later than February 24, 2020. However, by letter dated March 6, 2020, Altos informed One10 HRKC that it was "unable to advance funds under the [Construction Loan Agreement] …" Upon information and belief, a true and correct copy of the Altos letter is attached hereto as **Exhibit 17**.

28.     By letter dated March 9, 2020, One10 HRKC demanded that Altos return the Final Deposit deposited under the Deposit Agreement as well as other amounts; however, according to the One10 Memorandum, the Final Deposit to be deposited in an "Operating Account" with an account number ending in 7392 and, therefore, commingled with other Altos funds, not in that certain JPMorgan AltosGroups "Reserve" account ending in 2995 that was covered by the Deposit Agreement. One10 HRKC was negligent in ensuring the Final Deposit was deposited in the correct account and, therefore, adequately secured in the event Altos defaulted under the Construction Loan Agreement. Upon information and belief, to date, the Final Deposit has not been returned to One10 HRKC and, therefore, remains unavailable for use in completing the Project.

29.     On April 1, 2020, the Issuer, Trustee and Bondholders participated in a conference call during which they were informed by the Defendants that as early as June 2019 the Defendants were aware that Altos was a "warehouse lender" reliant on third-parties to fund the Construction Loan, that Altos had advised Defendants that it was unable to advance funds under the Construction Loan Agreement, and that Altos had not returned the Final Deposit; not mentioned

by the Defendants during the call was the fact the Construction Loan did not close prior to the Bonds being issued.

30.     Despite having personal knowledge that Altos was a "warehouse lender" reliant on third-parties to fund the Construction Loan and that the Construction Loan had not Closed, the Defendants informed the Issuer prior to the issuance of the Bonds that the Construction Loan had Closed by its very terms and, therefore, the financing condition precedent had been met.

31.     Further, Compass, 11 Water and Monson prepared, executed, and submitted *Certification of Expenditures No. 1* and documentation relating thereto (collectively "***Certification No. 1***"), in the amount of $12,547,892.08 (of which $7,541,979.91 was attributable to Project Area Two), in which they certified, among other things, that Compass was in compliance in all material respects with the Development Agreement. In reliance upon Certification No. 1, on October 30, 2019, the Prior Trustee disbursed $404,259.15, $7,714,144.47, and $1,165,070.41 from the Project Funds of the TGT Trust Estate, TIF Trust Estate and CID Trust Estate, respectively.  The foregoing payments would not have been made if Compass and One10 HRKC had not fraudulently informed the Issuer that the loan condition precedent had been met and had informed the Issuer, Trustee or Bondholders that the Construction Loan Agreement was with a "warehouse lender" reliant upon funding from third-parties and that the Construction Loan had not Closed under the Construction Loan Agreement. A true and correct copy of Certification No. 1 is attached hereto as **Exhibit 18**.

32.     One10 HRKC, Holdings and Monson also prepared, executed, and submitted *Certification of Expenditures No. 2* and documentation relating thereto (collectively, "***Certification No. 2***"), in the amount of $1,508,694.12, with the same certifications made in Certificate No. 1. In reliance upon Certification No. 2, in October 2019, the Prior Trustee disbursed $297,709.15, $62,114.56, and $1,191,869.62 from the Project Funds of the TGT Trust Estate, TIF

Trust Estate and CID Trust Estate, respectively. The foregoing payments would not have been made if Compass and One10 HRKC had not fraudulently informed the Issuer that the loan condition precedent had been met and had informed the Issuer, Trustee or Bondholders that the Construction Loan Agreement was with a "warehouse lender" reliant upon funding from third-parties and that the Construction Loan had not Closed under the Construction Loan Agreement. A true and correct copy of Certification No. 2 is attached hereto as **Exhibit 19**.

33.     The Defendants continued to submit cost certifications for reimbursement even *after knowing but before* telling the Issuer, Trustee and Bondholders that Altos was unable to fund under the Construction Loan Agreement. *Certification of Expenditures No. 3* ("***Certification No. 3***"), dated March 27, 2020, was prepared, executed and submitted in the amount of $829,247.32 ($195,543.94 paid from TIF Proceeds; and $633,703.38 paid from TGT Proceeds), with the same certifications made in Certification No. 1. A true and correct copy of Defendants' Certification No. 3, pre-dating the conference call on April 1, 2020, is attached hereto as **Exhibit 20**.

34.     In addition to the loan condition precedent, Compass and/or One10 HRKC were to contribute to the Project previously constructed/installed infrastructure and predevelopment work product costing $4,176,134 (the "***Predevelopment Contributions***") and Owner Cash Equity (as referenced in the Official Statements) in the amount of $1,493,670 (together, the "***Owner's Equity Contribution***"). The Predevelopment Contributions were not contributed and are no longer available to be contributed; in fact, the Defendants included the Predevelopment Contributions in Certification Nos. 1 and/or 2 and, therefore, were reimbursed for costs associated with the Predevelopment Contributions.

35.     After determining that the Defendants failed to disclose material information relating to the Construction Loan, including that the Construction Loan Agreement was for an

amount materially less than the $52,000,000 and that the lender was a "warehouse lender" relying on third-parties to fund under the Construction Loan Agreement and identifying previously reimbursed costs that were Predevelopment Contributions; Compass and One10 HRKC defaulting on its obligations under the Development Agreement; and the Defendants' inability to assure completion of the Project, the Trustee withheld payment of Certification No. 3. Thus, Compass and One10 HRKC have little more invested in the Project than the $829,247.32 reflected in Certification No. 3 – certainly not the Owner's Equity Contribution totaling $5,669,804 referenced in the Official Statements for the Bonds.

36. Bondholders would not have purchased the Bonds, as evidenced in the affidavits attached hereto as **Exhibit 21**, if they had known before their purchase of the Bonds that, among other things, the principal amount of the Construction Loan Agreement was for materially less than $52,000,000; the Construction Loan Agreement was with a "warehouse lender" reliant on third-parties to fund the Construction Loan; there was no Closing on the Construction Loan per the terms of the Construction Loan Agreement prior to issuance of the Bonds; and the Defendants had no intention of contributing the Owner's Equity Contribution, including the Predevelopment Contributions.

***C. DEFENDANTS' BOND CLOSING CERTIFICATES***

37. To comply with anti-fraud provisions codified in Federal law governing the initial offer of the Bonds, namely 17 C.F.R. 204.10b-5, the Issuer, in coordination with the Bond underwriter, prepared and issued the Official Statements in order to market and sell the Bonds. The Official Statements for the TGT Bonds, TIF Bonds and CID Bonds are attached hereto as **Exhibits 22, 23** and **24**, respectively**.**

38. Contemporaneously with the issuance of the Bonds, Compass executed and delivered the *Developer's Closing Certificates* attached hereto as **Exhibit 25** (signed by Monson, as Chief Manager of 11 Water, the managing member of Compass) in which Compass certified, in relevant part, the:

> The Developer Documents do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

§ 2.6 of the Developer's Closing Certificates.

> Official Statement is true in all material respects and as of the respective dates thereof did not, and as of the date hereof does not, contain any untrue statement of a material fact or omit any material fact … necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading; provided that such representation as to the accuracy and completeness of the … Official Statement shall be limited solely to statements or omissions in the Preliminary Official Statement: (a) prepared from information furnished by the Developer or its agents (including, without limitation, its attorneys, accountants, or consultants); (b) containing information about the Developer or the Developer's intended plans for the Project; (c) appearing in or pertaining to material appearing in the following captions: "INTRODUCTORY STATEMENT--The Hotel and the Owner," "THE HOTEL AND THE DEVELOPER AND OWNER" and "LITIGATION--The Developer and the Owner." As of this date, no event has occurred since the date of the Preliminary Official Statement or the Official Statement which is necessary to be disclosed in the Preliminary Official Statement or the Official Statement in order to make the statements and information therein not misleading in any material respect as of the date hereof.

§ 2.7 of the Developer's Closing Certificates.

39. The Developer's Closing Certificates further state:

> There are not pending, or to the knowledge of the undersigned threatened, any litigation or legal proceedings, or any basis therefor, material as to the Developer and to which the Developer is a party, or to which the property of the Developer is subject, which could (a) adversely affect the transactions described in the Developer Documents or any other document entered into by the Developer in connection with the Bonds (b) adversely affect the execution, issuance, delivery, validity or enforceability of the Bonds, the Developer Documents or any other document entered into by the Developer in connection with the Bonds, (c) in any way contest the due organization, corporate existence or powers of the Developer.

§ 3.1 of the Developer's Closing Certificates.

40. One10 HRKC also executed (by Monson, as Manager of Holdings, the sole member of One10 HRKC) and delivered its own *Owner's Closing Certificates* contemporaneously with the issuance of the Bonds, which are attached hereto as **Exhibit 26**, in which One10 HRKC provided similar certifications to those of the Compass referenced in paragraphs 38 and 39 above.

***D. MATERIAL OMISSIONS FROM AND MISSTATEMENTS IN THE OFFICIAL STATEMENTS***

41. After the April 1 conference call by and among the Defendants, Issuer, Trustee and Bondholders referenced above, the Trustee and Bondholders became aware that representations provided and certified to by Compass and One10 HRKC in relation to "THE HOTEL AND THE DEVELOPER AND OWNER" and "LITIGATION – The Developer and the Owner" sections of the Official Statements contained several materially untrue statements therein on which Bondholders relied and omissions of material fact therefrom that should have been disclosed to Bondholders in order for them to understand the risk of purchasing the Bonds.

42. For example, notwithstanding representations made by Compass and One10 HRKC to the Issuer about affirmatively complying with the loan condition precedent to issuing the Bonds and statements in the subsection entitled "Hotel Financing" of "THE HOTEL AND THE DEVELOPER AND OWNER" in the Official Statements that the "Senior Construction Loan" was in the principal amount of $52,000,000, (i) the Construction Loan Agreement was only for $48,823,603, a material misrepresentation and/or a material omission; (ii) the lender under the Construction Loan Agreement, Altos, was a "warehouse lender" reliant upon third-party lenders to fund advances under the Construction Loan Agreement, a material omission; and (iii) Closing of the Construction Loan under the Construction Loan Agreement *did not* occur prior to the Bonds being issued (nor did the Closing occur prior to Defendants submitting cost certifications for and

being paid $14,056,586.10 in Bond proceeds), a material omission and a reckless disregard for the loan condition precedent and the interests of the Trust Estates and Bondholders.

43. Further, under "Sources of Funds" of "THE HOTEL AND THE DEVELOPER AND OWNER" in the Official Statements Compass and One10 HRKC certified that "Contributed Infrastructure and Predevelopment Costs" would total $4,176,134 (*i.e.*, the Predevelopment Contributions) and "Owner Cash Equity" would total $1,493,670. However, Certification Nos. 1 and 2 remitted by the Defendants for payment reimbursed Compass and One10 HRKC for Predevelopment Contributions and Defendants. Therefore, at best, Compass and One10 HRKC knowingly and with reckless disregard materially misrepresented the Owner's Equity Contribution or, alternatively, fraudulently submitted Certification Nos. 1 and 2 for purposes of materially reducing its equity in the Project and to convert the funds for other use, including the payoff of a loan with Bridgewater Bank and to fund the Down Payment Deposit in order to affect Closing on the Construction Loan after the Bonds were issued.

44. One10 HRKC, Holdings (One10 HRKC's sole member), and Monson (Manager of Holdings) had personal knowledge regarding the Construction Loan Agreement and its terms including, but not limited to, the fact Altos was a "warehouse lender" reliant on third-parties to fund advances under the Construction Loan Agreement and that no Closing under the Construction Loan Agreement occurred prior to the Bonds being issued and Certification Nos. 1 and 2 were remitted for payment when they signed the Owner's Closing Certificates. Monson is the Manager of 11 Water which is the managing member of Compass and, therefore, Compass and 11 Water also had personal knowledge of the foregoing matters relating to the Construction Loan Agreement when they signed the Developer's Closing Certificates.

45. The "LITIGATION – The Developer and Owner" section of the Preliminary Official Statements and Official Statements provides that:

> There is not now pending or, to the knowledge of the Developer or the Owner, threatened against the Developer or the Owner any legal or governmental proceedings restraining or enjoining the issuance or delivery of the Development Agreement or the Owner Disclosure Agreement or questioning or affecting validity of the Development Agreement or the Owner Disclosure Agreement. Neither the creation, organization, or existence of the Developer or the Owner is being contested.

46. Despite the foregoing litigation representation and representations in the Developer's Closing Certificates and the Owner's Closing Certificate, since April 1, 2020, the Trustee and Bondholders have become aware of several omissions of material fact from the "LITIGATION--The Developer and the Owner" sections of the Official Statements relating significant litigation where Monson and 11 Water are defendants and claims against them include allegations of fraudulent transfers and loan and personal guaranty defaults. In relation thereto, references to the following cases were omitted from the Official Statements:

a. *In re Stone Rose, LP v. Berg, et al.*, Case No. 13-16410 (N.D. Ill.): Litigation initiated in 2015 by the bankruptcy trustee against, inter alia, Monson, Mary Monson (Monson's spouse); and The Landschute Group, Inc. ("Landschute," a Minnesota corporation wholly owned by Monson) in which it was alleged the foregoing received fraudulent transfers in excess of $500,000 from a real estate investment fund established by Monson's son-in-law, Matthew Stoen.[4]

b. *Cozen O'Connor v. Monson, et. al.*, Case No. 27-CV-20-8296 (Minn. 4th Jud. Dist.): After the Stone Rose litigation was settled in April 2017, the law firm of Cozen O'Connor continued its representation of Landschute, Monson and Monson family members in relation to matters ancillary thereto during the period of May 2018 to June 2019; however, Cozen

[4] Matthew Stoen, pleaded guilty for wire fraud and served time in Federal prison which act was, in part, the genesis of the bankruptcy trustee's claims against Monson, Monson's spouse and The Landschute Group, Inc.

O'Connor was not paid for the legal services and, therefore, filed the referenced lawsuit for payment.

c. *Minnesota Bank & Trust v. 11 Water LLC, Monson, et al*., Case No. 27-CV-20-574 (Minn. 4th Jud. Dist.): Minnesota Bank Trust ("MB&T") made a loan to 11 Water in 2015 on which Monson guaranteed the note. 11 Water defaulted. A forbearance agreement was entered into in December 2018, which 11 Water subsequently breached, and a second forbearance agreement was entered into in August 2019, which 11 Water also breached. MB&T filed suit and as of August 15, 2020, claimed that it was due: $3,167,940.02 in principal; accrued interest of $214,108.32; late fees of $49,579.53; legal fees of $65,491.50; court and collection costs of $4,342.41, and accruing interest at $483.990836 per day. On September 21, 2020, the court entered summary judgment in favor of MB&T and against Defendants 11 Water and Monson.

47. The Stone Rose matter referenced above involves allegations of fraudulent transfers benefitting Monson, his wife and his company, and the related Cozen O'Connor matter involves Monson's inability/unwillingness to pay debt obligations incurred in defending himself, his family and his company in the Stone Rose matter. The MB&T litigation is against 11 Water, which is the sole member of Compass and Monson is the manager of 11 Water, and involves loan defaults and forbearances, as well as a personal guaranty in relation to same, that preceded and were outstanding on the date the Bonds were issued.

48. Contemporaneously with the Bond issuance, Monson executed the Guaranty Agreement attached hereto as **Exhibit 27** (the "***Guaranty***") wherein Monson, together with his co-guarantor, stated, *inter alia*, "the Guarantors expect to benefit financially from the issuance of the Bonds and certain related transactions and acknowledge that it is a condition precedent to the issuance of the Bonds that Guarantors execute and deliver this Guaranty." The Guaranty further provides that the Guarantors "unconditionally and irrevocably guarantee to the Trustee for the benefit of the Bondholders the maintenance of the Debt Service Reserve Requirement ($892,404.36) in the Debt Service Reserve Fund," "[e]ach Guarantor agrees that … its obligations

… shall be unconditional, irrespective of the validity, regularity or enforceability of the Bonds or Indenture" and "this Guaranty shall not be discharged except by complete performance of the Obligations contained in this Guaranty." Defendants' failure to disclose the loan default by 11 Water in the litigation referenced above and Monson's guaranty regarding same was significant; if disclosed, such information would have been important to Bondholders in their determination of whether or not Monson would/could perform under the Guaranty and Bondholders would not have purchased the Bonds if such information had been known to them prior to their purchase. *See* **Exhibit 21.**

49. 11 Water's default on a loan of more than $3.1 million dollars and Monson's undisclosed personal guaranty would have served as a red flag to the Bondholders and the Trustee as to the ability of Monson and Compass to perform their respective and collective obligations under the Development Agreement and Financing Documents.

50. None of the above referenced litigation, or the basis therefor, involving significant allegations of prior fraud and as well as an inability or unwillingness of 11 Water and Monson to perform in accordance with their individual and collective financial obligations, was disclosed in the Official Statements. Bondholders would not have purchased the Bonds if the foregoing litigation, or the basis therefor, had been disclosed at or prior to the Issuer's closing on the sale of the Bonds. *See* **Exhibit 21.**

51. Monson and 11 Water as parties to the referenced litigation indisputably had personal knowledge regarding such litigation, the loan default, loan forbearance and Guaranty. Monson is the Manager of 11 Water and Compass, and the Manager of Holdings, which is the sole member of One 10 HRKC. Therefore, all Defendants had personal knowledge of the foregoing

litigation when the Developer's Closings Certificates and Owner's Closing Certificates were respectively executed.

### *E. EVENTS OF DEFAULT UNDER THE DEVELOPMENT AGREEMENT*

52. Events of Default have occurred and are continuing under the Development Agreement.

53. As a preliminary matter, issuance of the Bonds as contemplated by the Development Agreement was predicated on certain conditions being met by the Compass and One-10 HRKC, namely Closing on a Construction Loan in the amount of $52,000,000 and the truth and completeness of statements in the Official Statements provided and certified to by Compass and One10 HRKC. As discussed above, Compass and One10 HRKC knowingly and recklessly failed to satisfy either precondition. Therefore, Compass and One10 HRKC were in default under Section 902(a)(iv) of the Development Agreement the very day the Bonds were issued due to their breach of representations and warranties in the Development Agreement regarding available financing for the Project and their ability to pay for same without financing.

54. Further, immediately following issuance of the Bonds, Compass and One10 HRKC remitted for payment Certifications Nos. 1 and 2 which including reimbursements for Predevelopment Contributions, which costs were not eligible for reimbursement under the Development Agreement.

55. Thereafter, on or about March 18, 2020, One10 HRKC provided notice via the Municipal Securities Rulemaking Board's online Electronic Municipal Market Access system ("***EMMA***") that Altos had notified One10 HRKC that it was "unable to fund" the Construction Loan and that "construction on the Project has been suspended" as a result. One10 HRKC has not

found a new lender since. A true and correct copy of this EMMA notice is attached hereto as **Exhibit 28.**

56. Regardless of whether the Compass and One10 HRKC were able to obtain financing in an amount necessary to complete the Project, they were obligated to complete the Project in accordance with the terms of the Development Agreement and within the "Performance Milestones" as set forth therein. In fact, the definition for "Permitted Delays" in the Development Agreement expressly excludes "failure of a party to obtain necessary financing" and Section 401 of the Development Agreement obligates Compass and One10 HRKC to "be responsible for funding (or causing to be funded) the Project." Both Compass and One10 HRKC, as Compass' assignee under the Partial Assignment, have failed to fulfill this requirement.

57. On May 15, 2020, counsel for the Trustee transmitted to counsel for Compass and One10 HRKC correspondence advising that they were in breach of certain covenants under the Development Agreement and demanded they be cured. *See* **Exhibit 29**. The breaches became Events of Default pursuant to Section 902 of the Development Agreement when the Developer failed to commence to cure the breach within fourteen (14) days of receipt of written notice. Notice of the Events of Default were provided to the Developer and the Issuer on June 19, 2020 (see **Exhibits 30** and **31**, respectively).

58. Not only have the Defendants failed to cure the Events of Default, but recent activity on the real property designated for the Project indicates that they have no intention of or ability to doing so. As of 2020, agricultural and farming activities such as seeding, planting, cutting, and baling of hay were occurring on the property and, with the express authorization of the Owner as evidenced in **Exhibit 32** attached hereto, an application was filed to change the property appraiser's land use classification from active construction site to agricultural. Further,

contractor and material supplier liens have been recorded against real property underlying the Project and related litigation initiated against one or more of the Defendants filed by Ascent Development Ltd. and Fogel Anderson Construction Co., a breach under Section 501 of the Original Development Agreement.

### *F. RIGHTS AND ENFORCEMENT AUTHORITY OF THE TRUSTEE*

59. The Trust Indentures identify the rights of the Trustee and assignments, pledges, covenants and obligations of the Issuer; whereas, the Development Agreement identifies the rights of the Trustee, as assignee, and covenants and obligations of Compass and One10 HRKC.

60. The Trust Indentures also provide the Trustee with enforcement authority. They provide at Section 807 that:

> The Issuer agrees that the Trustee, as assignee, transferee, pledgee, and owner of a security interest under this Indenture in its name or in the name of the Issuer may enforce all rights of the Issuer and the Trustee and all obligations of the Developer or the Owner under and pursuant to the Development Agreement and any other Financing Documents for and on behalf of the Bondowners, whether or not the Issuer is in default hereunder.

61. Financing Documents, as defined in the Trust Indentures, means the Trust Indentures, the Bonds, the Development Agreement, the Continuing Disclosure Agreements, the Bond Purchase Agreement, the Tax Compliance Certificate, the Official Statements relating to the Bonds, and any and all other documents or instruments that evidence or are a part of the transactions referred to in the Trust Indentures.

62. Additionally, the Trust Indentures provide in Section 903 that the Trustee "may pursue any available remedy at law or in equity . . . to enforce or preserve any other rights or interests of the Trustee under this Indenture with respect to any of the Trust Estate or otherwise existing at law or in equity." Section 903 also specifically provides that the "Trustee shall have the

power to institute and to maintain such proceedings as it may deem expedient to prevent any impairment of the Trust Estate by any acts which may be unlawful or in violation of this Indenture and to protect its interest and the interests of the Bondowners in the Trust Estate."

63. Also, Section 903(b) states that "[i]f requested in writing to do so by the owners of not less than a majority in principal amount of Outstanding Bonds . . . the Trustee shall be obligated to exercise such one or more of the rights and remedies conferred by this Article as the Trustee shall deem most expedient in the interests of the Bondowners." Accordingly, Bondholders representing a majority of the principal amount of each series of the Bonds have directed UMB as Trustee to pursue the claims herein on their behalf in addition to any other rights and remedies the Trustee may have under the Financing Documents. An affidavit regarding the assignment of rights and direction to sue the Defendants, along with the form of Bondholder Direction, is attached hereto as **Exhibit 33.**

### *G. NO SAFE HARBOR*

64. The statutory safe harbor that provides for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements were not identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this complaint that actual results "could differ materially from those projected." For example, the Closing on a Construction Loan in the amount of $52,000,000 was a condition precedent to the Bonds being issued; Compass and One10 HRKC personally knew that the Construction Loan Agreement, signed prior to the Bond issuance, was for materially less than $52,000,000, the lender, Altos, was a "warehouse lender" reliant upon third-parties to fund advances under the Construction Loan Agreement, and that the Construction Loan Agreement had not Closed per its terms; Compass and

One10 HRKC knowingly made false representations to the Issuer and Bondholders regarding the closing on the Construction Loan and the nature of the loan; the Defendants knowingly failed to disclose prior and existing litigation in which Monson and 11 Water were parties; and the Defendants knowingly failed to discuss the prior default and existing forbearance agreement and Guaranty relating to the MB&T loan; and the Bondholders relied upon the representations and certifications of the Defendants to their detriment, namely by purchasing the Bonds, and the Trustee relied upon the representations and certifications to the detriment of the Trust Estates by paying Certification Nos. 1 and 2.

65. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the particular Defendant when made.

### *H. SCIENTER ALLEGATIONS*

66. Scienter is strongly supported by, *inter alia*, the Defendants' personal knowledge regarding the loan condition precedent to issuing the Bonds, the Official Statements, the closing certificates executed by the Defendants contemporaneously with the Bonds being issued, the terms of the Construction Loan Agreement, and litigation involving Monson and 11 Water; and Defendants' own admissions in pleadings and affidavits filed in other litigation relating to the Project.

67. With personal knowledge that the Construction Loan Agreement was for an amount materially less than $52,000,000 and had not Closed per its terms (*e.g.*, the Down Payment Deposit not having been made), Defendants knew or recklessly disregarded the fact that issuance of the Bonds was predicated on Compass or One10 HRKC Closing on the Construction Loan in the amount of $52,000,000 before the Bonds were to be issued. However, in order to affect the issuance, Defendants knowingly and recklessly informed the Issuer that the loan condition precedent had been met and executed the Owner's and Developer's Closing Certificates certifying to information regarding the "Hotel Financing" on which the Issuer and Bondholders relied.

68. Moreover, the Defendants had personal knowledge of litigation in which Monson and 11 Water were defendants and the claims made involved significant allegations of fraud and loan/personal guaranty defaults and that a second forbearance agreement relating to 11 Water's default on the MB&T loan – the principal amount of which was more than $3.1 million – was signed a mere two (2) months prior to issuance of the Bond. *See* **Exhibits 34** and **35** attached hereto.

69. Defendants acted with scienter in that Defendants knew that the Official Statements disseminated to potential purchasers of the Bonds were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere in detail, Defendants had personal knowledge as to facts indicating that the Project was not economically viable at the time of issuance and dissemination of the Official Statements. As also set forth elsewhere in detail, Defendants, at the time of the issuance of the Official Statements and at the time of the execution of the Developer's Closing Certificate and the

Owner's Closing Certificate, had personal knowledge of existing or threatened litigation against them involving significant allegations of prior fraud and the inability or unwillingness to perform in accordance with financial obligations. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves statements known to be false at the time of the issuance of the Official Statements.

70. Defendants were motivated to make these false statements in order to induce the Issuer to issue and the Bondholders to purchase the Bonds, and the Trustee to pay Certification Nos. 1 and 2, for their own financial gain including paying off other loans, materially reducing their equity and therefore financial risk in the Project to nearly nothing, and securing the Construction Loan. Ultimately, the goal of Defendants was developing the Project with no actual investment or risk therein, all of which would be borne by the Trust Estates, Bondholders and other lenders.

**I. The Trust Estates and the Bondholders Have Suffered Damages**

71. The Defendants' materially untrue statements in and omissions from the Official Statements and Certification Nos. 1 and 2 as set forth above had the intended effect of causing the Issuer to issue, the Bondholders to purchase, and the Trustee to disburse monies from the Trust Estates for the Bonds, which would not have occurred but for Defendants' fraud.

72. However, the Defendants never made the Owner's Equity Contribution and did not obtain the $52,000,000 construction loan as represented to the Bondholders. There was never a Construction Loan Agreement in the amount of $52,000,000. Further, the Construction Loan

Agreement was entered into with an entity that Defendants knew had no funds to lend and the Construction Loan was unfunded from the outset.

73.     Due to these failures in the Funding Sources for the Project caused by Defendants One10 HRKC was unable to fund the Project. Construction on the Project was suspended as of March 2019 and has never resumed.  Thus, the pledged streams of revenue from the TGT Revenues, TIF Revenues, and CID Revenues, the sole source of revenues to pay the debt service on the Bonds, have never materialized. As a result, there is no revenue to pay the debt service on the Bonds to the Bondholders.

74.     The Bonds were issued in the following amounts: $10,655,000 – Series 2019 TGT Bonds; $11,005,000 – Series 2019 TIF Bonds; $745,000 – Series 2019A CID Bonds; and $875,000 – Series 2019B CIB Bonds. Thus, the principal amount due to the Bondholders is the sum of $23,280,000. The amounts remaining in the Trust Estate at the time of the suspension of the Project are: $8,480,051.66 – Series 2019 TGT Bonds; $2,185,425.38 – Series TIF Bonds; $102,909.77 – Series 2019A CID Bonds; and $118,642.99 – Series 2019B CID Bonds. As of November 1, 2021, accrued interest on the Bonds totals $561,111.98, while additional interest in the amount of $1,865.97, $257.84, and $1,616.93 for the TGT Bonds, CID Bonds and TIF Bonds, respectively, will accrue per day. Therefore, the total damages to the Trust Estate caused by Defendants, as of the date of this Complaint, is more than $13,000,000, with that amount increasing every day due to the accruing interest due Bondholders.

## CAUSES OF ACTION

***Count I***
***Violation of Section 10(b) of the Securities and Exchange Act/Rule 10b-5***
***(against all Defendants)***

75. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

76. Section 10(b) of the Securities Exchange Act of 1934 (the "***Securities Act***") makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of Securities and Exchange Commission rules. Pursuant to Rule 10b-5 promulgated thereunder ("***Rule 10b-5***"), it is unlawful: "(a) To employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Defendants knowingly provided the Developer's and Owner's Closing Certificates, respectively, for purposes of facilitating compliance with the foregoing provisions.

77. Defendants, directly and indirectly, singly and in concert, in connection with the offering and sale of the Bonds, recklessly, knowingly or with an intention to defraud, made one or more misrepresentations and/or omissions of material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made, in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-

5] promulgated thereunder. Material facts personally known but undisclosed by the Defendants with the intent to defraud Bondholders include, *inter alia*, that the Construction Loan Agreement executed prior to issuance of the Bonds was with "warehouse lender" reliant on third-parties to fund the Construction Loan; the Construction Loan Agreement was for an amount materially less than the amount represented by Defendants as necessary to complete the Project; the Construction Loan had not Closed under the terms of the Construction Loan Agreement; prior and outstanding litigation involving Monson and 11 Water involving fraudulent transfers and loan defaults; and the MB&T loan default, forbearance agreement and related Monson Guaranty. Further, the Defendants knowingly misrepresented their intent to make Predevelopment Contributions for the benefit of the Project.

78.     The circumstances of such statements are set forth in the above allegations and below.

*Senior Construction Loan*

79.     On and around October 30, 2019, Compass and One10 HRKC falsely represented in the Official Statements that the "Senior Construction Loan" was in the principal amount of $52,000,000.

80.     In truth and in fact, and as Compass and One10 HRKC well knew, the Construction Loan Agreement was for $48,823,603.

81.     Compass and One10 HRKC's false representation that the "Senior Construction Loan" was in the principal amount of $52,000,000 was a material misrepresentation or omission.

*Warehouse Lender*

82.     On and around October 30, 2019, and for a reasonable time period before and after, Compass and One10 HRKC had a duty to disclose that the lender under the Construction Loan

Agreement, Altos, was a "warehouse lender" reliant upon third-party lenders to fund advances under the Construction Loan Agreement.

83. Compass and One10 HRKC did not disclose that fact until April 1, 2020, despite knowing that Altos was a warehouse lender since at least June 2019.

84. Compass and One10 HRKC's failure to timely disclose that Altos was a warehouse lender was a material misrepresentation or omission.

*Closing of the Construction Loan*

85. On and around October 30, 2019, Compass and One10 HRKC falsely represented that it had complied with all loans condition precedent to issuing the Bonds.

86. One loan condition precedent of the Bonds was the Closing of the Construction Loan under the Construction Loan Agreement.

87. In truth and in fact, and as Compass and One10 HRKC well knew, the Closing had not occurred on or before October 30, 2019, the date the Bonds were issued, or even by the time Compass and One10 HRKC submitted (and were paid for) their first and second cost certifications.

88. Compass and One10 HRKC's false representation that it had complied with all loan conditions—which included that the Closing of the Construction Loan had occurred—was a material misrepresentation or omission.

*Owner Equity in the Project*

89. On and around October 30, 2019, Compass and One10 HRKC falsely represented that its "Contributed Infrastructure and Predevelopment Costs" would total $4,176,134 (*i.e.*, the Predevelopment Contributions) and "Owner Cash Equity" would total $1,493,670.

90. However, Certification Nos. 1 and 2 remitted by the Defendants for payment on the Project reimbursed Compass and One10 HRKC for their Predevelopment Contributions, thereby immediately reducing the amount Compass and One10 HRKC had invested in the Project.

91. On information and belief, Defendants falsely represented that its Predevelopment Contributions would total $4,176,134, knowing full well that Defendants had the intention of immediately recouping such contributions via cost certifications.

92. This representation was false and misleading in that it misrepresented the amount of “skin in the game” that the Defendants would have in the Project, which is a material consideration for investors when deciding whether the person running the Project will be incentivized to produce economic gains on a project.

93. Compass and One10 HRKC’s false representation that their Predevelopment Contributions would total $4,176,134 was a material misrepresentation or omission.

94. In the alternative, and on information and belief, Defendants fraudulently submitted Certification Nos. 1 and 2 for purposes of materially reducing its equity in the Project and to convert the funds for other use, including the payoff of a loan with Bridgewater Bank and to fund the Down Payment Deposit in order to affect Closing on the Construction Loan after the Bonds were issued.

*Pending or Threatened Litigation*

95. On August 29 and October 30, 2019, Compass and One10 HRKC falsely represented in the Preliminary Official Statements and Official Statements that:

> There is not now pending or, to the knowledge of the Developer or the Owner, threatened against the Developer or the Owner any legal or governmental proceedings restraining or enjoining the issuance or delivery of the Development Agreement or the Owner Disclosure Agreement or questioning or affecting validity of the Development Agreement or the Owner Disclosure Agreement. Neither the creation,

organization, or existence of the Developer or the Owner is being contested.

96.     In truth and in fact, and as Defendants well knew, there were significant lawsuits in which Monson and 11 Water are defendants, containing allegations of fraudulent transfers and loan and personal guaranty defaults against them. For example:

      a.     *In re Stone Rose, LP v. Berg, et al*., Case No. 13-16410 (N.D. Ill.).

      b.     *Cozen O'Connor v. Monson, et. al*., Case No. 27-CV-20-8296 (Minn. 4th Jud. Dist.).

      c.     *Minnesota Bank & Trust v. 11 Water LLC, Monson, et al*., Case No. 27-CV-20-574 (Minn. 4th Jud. Dist.).

97.     Defendants' false representation related to a lack of litigation was a material misrepresentation or material omission.

98.     Due to the Defendants' failure to disclose material facts and making of material misrepresentations necessary to make the Official Statements not misleading in light of the circumstances under which the Official Statements were prepared and used to market and sell the Bonds, the Issuer issued and the Bondholders purchased the Bonds, which would not have occurred had the omitted facts been known to the Issuer and Bondholders. The Issuer in issuing the Bonds and the Bondholders in purchasing the Bonds relied upon the Defendants' misrepresentations in, and omissions from, the Official Statements.

99.     As a direct and proximate result of the hereinabove-alleged violations of the Section 10b-5 of the Securities Act and Rule 10b-5, the Bondholders have suffered significant damages including, but not limited to, the principal amount of the TGT Bonds, TIF Bonds and CID Bonds presently outstanding in the amount of $10,665,000.00, $11,005,000.00, and $1,620,00.00, respectively, less any moneys remaining in the Trust Estate for each if and when such moneys are available to pay principal and accrued interest on the date of redemption. Pursuant to Section 903

of the Trust Indentures and Bondholder Directions received from Bondholders representing $7,655,000, $8,470,000, and $745,000 of the outstanding principal amount of the TIF Bonds, TGT Bonds, and CID Bonds, respectively, UMB has received assignment of and direction to pursue the Bondholders' claims relative to this count.

***Count II***
***Violation of Section 20(a)of the Securities and Exchange Act***
***(against all Defendants)***

100. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

101. 11 Water and Monson directly or indirectly controlled the above alleged activities of Compass (particularly the conduct described in paragraphs 77-97) that constitute violations of Section 10(b) of the Securities Act and Rule 10b-5 within the meaning of Section 20(a) of the Securities Act [15 U.S.C. § 78t(a)]. 11 Water is the managing member of Compass and 11 Water is directly or indirectly owned and controlled by Monson.

102. Holdings and Monson directly or indirectly controlled the above alleged activities of One10 HRKC that constitute violations of Section 10(b) of the Securities Act and Rule 10b-5 within the meaning of Section 20(a) of the Securities Act [15 U.S.C. § 78t(a)]. Holdings is the sole member of One10 HRKC and Holdings is directly or indirectly owned and controlled by Monson.

103. As a direct and proximate result of the above alleged violations of Section 20(a) of the Securities Act, the Bondholders have suffered significant damages including, but not limited to, the principal amount of the TGT Bonds, TIF Bonds and CID Bonds presently outstanding in the amount of $10,665,000.00, $11,005,000.00, and $1,620,00.00, respectively, less any moneys remaining in the Trust Estate for each if and when such moneys are available to pay principal and accrued interest on the date of redemption. Pursuant to Section 903 of the Trust Indentures and

Bondholder Directions received from Bondholders representing $7,655,000, $8,470,000, and $745,000 of the outstanding principal amount of the TIF Bonds, TGT Bonds, and CID Bonds, respectively, UMB has received assignment of and direction to pursue the Bondholders' claims relative to this count.

***Count III***
***Fraudulent Inducement***
***(against all Defendants)***

104. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

105. The Defendants knowingly and recklessly failed to disclose material facts and made material misrepresentations for purposes of fraudulently inducing the Issuer to issue and the Bondholders to purchase the Bonds, which would not have occurred had the omitted and misrepresented facts been known to the Issuer and Bondholders. Material facts personally known but undisclosed by the Defendants with the intent to defraud the Issuer and Bondholders include, *inter alia*, that the Construction Loan Agreement executed prior to issuance of the Bonds was with "warehouse lender" reliant on third-parties to fund the Construction Loan; the Construction Loan Agreement was for an amount materially less than the amount represented by Defendants as necessary to complete the Project; the Construction Loan had not Closed under the terms of the Construction Loan Agreement; prior and outstanding litigation involving Monson and 11 Water involving fraudulent transfers and loan defaults; and the MB&T loan default, forbearance agreement and related Monson Guaranty. Further, the Defendants knowingly misrepresented their intent to make Predevelopment Contributions for the benefit of the Project. The foregoing facts were omitted from and misrepresented in the Offering Statements, Developer's Closing Certificates, and Owner's Closing Certificates, as well as in other documents and oral

representations made by Defendants in advance of and contemporaneously with issuance of the Bonds. *See* Paragraphs 77-97.

106.    Defendants made false or untrue representations as statements of existing and material facts to the Bondholders and Issuer.

107.    Defendants knew such representations were false or untrue or made such representations without knowledge concerning them.

108.    The Defendants intentionally made such false representations for the purpose of fraudulently inducing the Issuer to issue and the Bondholders to purchase the Bonds, which would not have occurred had the omitted and misrepresented facts been known to the Issuer and Bondholders.

109.    The misrepresentations were so substantial as to influence the Bondholders and Issuer.

110.    The Bondholders and Issuer were reasonable in relying on Defendants' false representations and did, in fact, act on the false representations as the Issuer issued the Bonds and the Bondholders purchased the Bonds.

111.    In addition or in the alternative, Defendants had knowledge of material facts which the Issuer and Bondholders did not have and which they could not have discovered by the exercise of reasonable diligence.

112.    Defendants were under an obligation to communicate the material facts to the Issuer and Bondholders.

113.    Defendants intentionally failed to communicate to the Issuer and Bondholders the material facts.

114. In addition or in the alternative, Defendants had no intention of performing their promises at the times they made them.

115. Defendants did not perform their promises as they represented they would.

116. Defendants made the promises with the intent to deceive and for the purpose of inducing the Issuer and Bondholders to act upon the promises.

117. Issuer and Bondholders reasonably relied and acted upon the promises.

118. As a direct and proximate result of the Defendants knowingly and recklessly failing to disclose material facts and making material misrepresentations as described in the preceding paragraphs, and in reasonable reliance upon the Developer's and Owner's Closing Certifications, the Issuer issued and the Bondholders purchased the Bonds and resulting in the Trust Estates and the Bondholders suffering significant damages including, but not limited to, amounts necessary to repay the Bonds, plus accrued interest but less amounts on deposit in the Trust Estates, as of the date of repayment. Pursuant to Section 903 of the Trust Indentures and Bondholder Directions received from Bondholders representing $7,655,000, $8,470,000, and $745,000 of the outstanding principal amount of the TIF Bonds, TGT Bonds, and CID Bonds, respectively, UMB has received assignment of and direction to pursue the Bondholders' claims relative to this count.

***Count IV***
***Negligent Misrepresentation***
***(against all Defendants)***

119. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

120. The Defendants negligently and without exercising reasonable care or competence failed to disclose material facts and made material misrepresentations that influenced the Issuer to issue and the Bondholders to purchase the Bonds, which would not have occurred had the omitted

and misrepresented facts been known to the Issuer and Bondholders. Material facts personally known but negligently undisclosed by the Defendants include, *inter alia*, that the Construction Loan Agreement executed prior to issuance of the Bonds was with "warehouse lender" reliant on third-parties to fund the Construction Loan; the Construction Loan Agreement was for an amount materially less than the amount represented by Defendants as necessary to complete the Project; the Construction Loan had not Closed under the terms of the Construction Loan Agreement; prior and outstanding litigation involving Monson and 11 Water involving fraudulent transfers and loan defaults; and the MB&T loan default, forbearance agreement and related Monson Guaranty. Further, the Defendants negligently and without exercising reasonable care or competence misrepresented their intent to make Predevelopment Contributions for the benefit of the Project which also influenced the Issuer and Bondholders relative to their issuance and purchase of the Bonds, respectively. The foregoing facts were omitted from and misrepresented in the Offering Statements, Developer's Closing Certificates, and Owner's Closing Certificates, as well as in other documents and oral representations made by Defendants in advance of and contemporaneously with issuance of the Bonds, which documents and oral representations were made for the Issuer and the Bondholders benefit and guidance. *See* Paragraphs 77-97.

121. Defendants were acting in the course of their profession and in the course of a transaction in which they had a pecuniary interest.

122. Defendants supplied false information for the guidance of Issuer and Bondholders in the course of their business transactions.

123. Defendants failed to exercise reasonable care or competence in obtaining or communicating the false information.

124. Issuer and Bondholders are persons and groups of person for whose benefit the information was supplied.

125. The damages suffered by Issuer and Bondholders were in a transaction that Defendants intended to influence.

126. As a direct and proximate result of the Defendants negligently and without exercising reasonable care or competence in failing to disclose material facts and making material misrepresentations as described in the preceding paragraphs, and in reasonable reliance upon the Developer's and Owner's Closing Certifications, the Issuer issued and the Bondholders purchased the Bonds and resulting in the Trust Estates and the Bondholders suffering significant damages including, but not limited to, amounts necessary to repay the Bonds, plus accrued interest but less amounts on deposit in the Trust Estates, as of the date of repayment. Pursuant to Section 903 of the Trust Indentures and Bondholder Directions received from Bondholders representing $7,655,000, $8,470,000, and $745,000 of the outstanding principal amount of the TIF Bonds, TGT Bonds, and CID Bonds, respectively, UMB has received assignment of and direction to pursue the Bondholders' claims relative to this count.

***Count V***
***Fraudulent Inducement as to Cost Certifications***
***(against all Defendants)***

127. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

128. The Defendants knowingly and recklessly failed to disclose material facts and made material misrepresentations for purposes of fraudulently inducing the Prior Trustee to disburse $701,968.30, $7,776,259.03, and $2,356,940.03 from the TGT Trust Estate, TIF Trust Estate and

CID Trust Estate, respectively, which disbursements would not have occurred had the omitted and misrepresented facts been known to the Issuer and Prior Trustee.

129.    Material facts personally known but undisclosed by the Defendants with the intent to defraud the Trust Estates, on behalf of whom UMB acts under the Trust Indentures, include, *inter alia*, that the Construction Loan Agreement executed prior to issuance of the Bonds was with "warehouse lender" reliant on third-parties to fund the Construction Loan; the Construction Loan Agreement was for an amount materially less than the amount represented by Defendants as necessary to complete the Project; the Construction Loan had not Closed under the terms of the Construction Loan Agreement; prior and outstanding litigation involving Monson and 11 Water involving fraudulent transfers and loan defaults; and the MB&T loan default, forbearance agreement and related Monson Guaranty. Further, the Defendants knowingly misrepresented their intent to make Predevelopment Contributions for the benefit of the Project and/or that the expenses reimbursed in Certification Nos. 1 and 2 included those that were to constitute Predevelopment Contributions. The foregoing facts were omitted from and misrepresented in the Offering Statements, Developer's Closing Certificates, Owner's Closing Certificates, and Certification Nos 1 and 2, as well as in other documents and oral representations made by Defendants in relation thereto. *See* Paragraphs 77-97.

130.    Defendants made false or untrue representations as statements of existing and material facts to the Prior Trustee and Issuer.

131.    Defendants knew such representations were false or untrue or made such representations without knowledge concerning them.

132.    The Defendants intentionally made such false representations for the purpose of fraudulently inducing the Prior Trustee and Issuer to approve and pay out cost certificates, which would not have occurred had the omitted and misrepresented facts been known to them.

133.    The misrepresentations were so substantial as to influence the Prior Trustee and Issuer.

134.    The Prior Trustee and Issuer were reasonable in relying on Defendants' false representations and did, in fact, act on the false representations.

135.    In addition or in the alternative, Defendants had knowledge of material facts which the Prior Trustee and Issuer did not have and which they could not have discovered by the exercise of reasonable diligence.

136.    Defendants were under an obligation to communicate the material facts to the Prior Trustee and Issuer.

137.    Defendants intentionally failed to communicate to the Issuer and Prior Trustee the material facts.

138.    In addition or in the alternative, Defendants had no intention of performing their promises at the times they made them.

139.    Defendants did not perform their promises as they represented they would.

140.    Defendants made the promises with the intent to deceive and for the purpose of inducing the Prior Trustee and Issuer to act upon the promise.

141.    Issuer and Prior Trustee reasonably relied and acted upon the promise.

142.    As a direct and proximate result of the Defendants knowingly and recklessly failing to disclose material facts and making material misrepresentations as described in the preceding paragraphs, and in reasonable reliance upon the Certification Nos. 1 and 2, the Prior Trustee

disbursed $701,968.30, $7,776,259.03, and $2,356,940.03 from the TGT Trust Estate, TIF Trust Estate and CID Trust Estate, respectively, constituting damages to the respective Trust Estates for the benefit of which UMB acts as the successor trustee under the Trust Indentures.

***Count VI***
***Negligent Misrepresentation as to Cost Certifications***
***(against all Defendants)***

143. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

144. The Defendants negligently and without exercising reasonable care or competence failed to disclose material facts and made material misrepresentations that influenced the Prior Trustee to disburse monies from the Trust Estates, which would not have occurred had the omitted and misrepresented facts been known to the Prior Trustee. Material facts personally known but negligently undisclosed by the Defendants include, *inter alia*, that the Construction Loan Agreement executed prior to issuance of the Bonds was with "warehouse lender" reliant on third-parties to fund the Construction Loan; the Construction Loan Agreement was for an amount materially less than the amount represented by Defendants as necessary to complete the Project; the Construction Loan had not Closed under the terms of the Construction Loan Agreement; prior and outstanding litigation involving Monson and 11 Water involving fraudulent transfers and loan defaults; and the MB&T loan default, forbearance agreement and related Monson Guaranty. Further, the Defendants negligently misrepresented their intent to make Predevelopment Contributions for the benefit of the Project and/or negligently prepared, executed and submitted to the Prior Trustee for payment Certifications Nos. 1 and 2 that included Predevelopment Contributions. The foregoing facts were negligently omitted from and misrepresented in the Offering Statements, Developer's Closing Certificates, Owner's Closing Certificates and

Certification Nos 1 and 2, as well as in other documents and oral representations made by Defendants in relation thereto. *See* Paragraphs 77-97.

145. Defendants were acting in the course of their profession and in the course of a transaction in which they had a pecuniary interest.

146. Defendants supplied false information for the guidance of Issuer and Prior Trustee in the course of their business transactions.

147. Defendants failed to exercise reasonable care or competence in obtaining or communicating the false information.

148. Issuer and Prior Trustee are persons and groups of person for whose benefit the information was supplied.

149. The damages suffered by Issuer and Prior Trustee were in a transaction that Defendants intended to influence.

150. As a direct and proximate result of the Defendants' negligence and failure to exercise reasonable care or competence in failing to disclose material facts and making material misrepresentations as described in the preceding paragraphs, and in reasonable reliance upon the Developer's and Owner's Closing Certifications, the Prior Trustee disbursed monies from the Trust Estates thus resulting in the Trust Estates and the Bondholders suffering significant damages including, but not limited to, no longer having $701,968.30, $7,776,259.03, and $2,356,940.03 still on deposit in the TGT Trust Estate, TIF Trust Estate and CID Trust Estate, respectively, that could have been used to repay the Bonds and accrued interest thereon on the date of repayment.

***Count VII***
***Breach of the Development Agreement***
***(against Developer and Owner)***

151. UMB incorporates by reference and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

152. The Issuer and Compass entered into the Development Agreement and Compass, in turn, executed the Partial Assignment for purposes of assigning to One10 HRKC all of its rights and obligations under the Development Agreement as they related to Project Area Two (as described in the Development Agreement) and the Project.

153. The Development Agreement was entered into on the basis of sufficient consideration by and among the parties thereto including agreements on the part of the Issuer to use its authority to levy and pledge certain revenues and issue bonds, which in fact occurred, and agreements and covenants on the part of the Developer and Owner to acquire, construct and operate the Project.

154. The Issuer was not restricted in the Development Agreement in its ability to assign its rights under the Development Agreement, and in Trust Indentures did so assign such rights to the Trustee as security for the repayment of the Bonds. UMB, in its capacity as successor trustee under the Trust Indentures, is authorized to enforce all rights of the Issuer and the Trustee and all obligations of Compass and One10 HRKC for the benefit of the Trust Estates and Bondholders.

155. The Issuer fully performed its obligations under the Development Agreement by including, but not limited to, issuing the Bonds and levying and pledging to the Trustee the property comprising the Trust Estates, including the tax guest taxes, tax increments and CID sales taxes.

156. The Developer and Owner have breached the Development Agreement by, among other things, immediately upon the issuance of the Bonds being unable to complete the Project (no Construction Loan and inadequate personal financial resources); fraudulently and/or negligently submitting Certification Nos. 1 and 2 inclusive of Predevelopment Contributions; fraudulently and/or negligently failing to disclose material facts regarding the Construction Loan, litigation history of certain Defendants, and the Monson Guaranty; allowing liens to be recorded and remain against real property underlying the Project; failing to meet the Performance Milestones in the Development Agreement; and suspending efforts to acquire, construct and equip the Project.

157. The Developer and Owner were provided with notice and an opportunity to cure certain of the breaches identified in the preceding paragraphs; however, the breaches were never cured and, therefore, events of default occurred under the Development Agreement.

158. In addition to the express obligations under the contract, the Developer and Owner assumed an implied obligation of good faith and fair dealing that imposed on the Developer and Owner the implied duty to do nothing destructive to the rights of others under the contract, and to do everything the contract required the Developer and Owner to do to accomplish its purpose.

159. By the misrepresentations and omissions as described in paragraphs 77-97, the Developer and Owner have breached the implied obligation of good faith and fair dealing. Because of these conscious and deliberate acts, construction on the project has been suspended which has led to the destruction of the purpose of the Development Agreement and Partial Assignment along with the deprivation of the Issuer, the Trustee, the Trust Estates, and the Bondholders of the benefits of the Development Agreement and Partial Assignment.

160. As a direct and proximate result of the Developer and Owner knowingly and recklessly failing to disclose material facts; making material misrepresentations as described in

paragraphs 77-97; and their breaching the Development Agreement, and in reasonable reliance upon the Certification Nos. 1 and 2, the Prior Trustee disbursed $701,968.30, $7,776,259.03, and $2,356,940.03 from the TGT Trust Estate, TIF Trust Estate and CID Trust Estate, respectively, constituting damages to the respective Trust Estates for the benefit of which UMB acts as the successor trustee under the Trust Indentures.

**WHEREFORE**, UMB prays for relief and judgment, as follows:

1) Awarding compensatory damages in favor of UMB against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

2) Awarding UMB its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

3) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

UMB hereby demands a trial by Jury.

Respectfully submitted,

SPENCER FANE LLP

/s/ Kersten L. Holzhueter

Kersten L. Holzhueter KS#24885
Angus W. Dwyer KS#26995
Blake D. Smith D.Kan.#78813
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64106
(816) 474-8100
kholzhueter@spencerfane.com
adwyer@spencerfane.com
bsmith@spencerfane.com

ATTORNEYS FOR UMB BANK, N.A.