## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UMB BANK, N.A.,

        *Plaintiff/Counter-Defendant,*

  vs.

D. JON MONSON; COMPASS
COMMODITIES GROUP III, LLC; 11
WATER LLC; ONE10 HOTEL HRKC LLC;
and ONE10 HOTEL HOLDINGS LLC,

        *Defendants/Counter-Plaintiffs,*

vs.

COLLIERS SECURITIES, LLC; and
COLLIERS MORTGAGE, LLC,

        *Third-Party Defendants.*

Case No. 21-cv-2504-EFM-KGG

## MEMORANDUM AND ORDER

Before the Court is Plaintiff/Counter-Defendant UMB Bank, N.A. ("UMB")'s Motion to

Dismiss each of Defendants/Counter-Plaintiffs' eight counterclaims (Doc. 152).  Defendants are

D. Jon Monson ("Monson"), Compass Commodity Group III, LLC ("Compass"), 11 Water LLC

("11 Water"), One10 Hotel HRKC LLC ("One10 HRKC"), and One10 Hotel Holdings LLC

("One10 Holdings").  This case arises from the parties' failed attempt to construct a Hard Rock

Hotel and event center in Edwardsville, Kansas.  UMB first sued Defendants, who then brought their own counterclaims en masse against UMB.  Now, UMB seeks dismissal of each of Defendants' claims.  For the reasons set forth below, the Court grants UMB's Motion in part and denies it in part.

## I.      Factual and Procedural Background[1]

### A.      Background facts

On November 1, 2018, the City of Edwardsville, Kansas, and Compass entered into the Amended and Restated Development Agreement (the "DA") with the goal of opening a Hard Rock Hotel and adjacent events center (the "Project") by April 1, 2021. The projected cost of the Project totaled approximately $80,000,000.  The Project was to be funded by a construction loan in the amount of $52,000,000 ("the Construction Loan"), a mezzanine loan in the amount of $3,100,000 ("the Mezzanine Loan"), and bonds issued by the City of Edwardsville in the amounts of $10,655,000 ("the TGT Bonds"), $11,005,000 ("the TIF Bonds"), and $1,620,000 ("the CID Bonds") (collectively, "the Bonds").

On October 1, 2019, the City and Commerce Bank entered into the TIF Trust Indenture, the CID Trust Indenture, and the TGT Trust Indenture.  These Indentures purported to assign Commerce Bank many of the City's rights and obligations under the DA to Commerce Bank, which took on the role of "Bond Trustee."  The City, however, retained control in determining whether to reimburse expenses to the "Owner"—defined as One10 HRKC in the Indentures— from the Bonds' proceeds.  Commerce Bank later assigned its rights and duties as the Bond Trustee under the Indentures to UMB.

---

[1] The facts are taken from Defendants' Counterclaims and are considered true for the purposes of this Order.

On October 30, 2019, Compass entered into a partial assignment with One10 HRKC. Compass remained the "Developer" and One10 HRKC became the "Owner" of the Project. The same day, One10 HRKC executed a loan agreement with AltosGroups, LLC ("Altos") for the Construction Loan, paying $15,000 in title and closing costs for the loan. At some point, One10 HRKC requested reimbursement of the $15,000 from the City in its Cost Certification 2, a request which both the City and UMB approved.

Under the loan agreement, Altos was required to advance loan proceeds to One10 HRKC no later than February 24, 2020. But on March 6, 2020, Altos informed One10 HRKC that it was unable to complete the Construction Loan. Eager to continue with the Project despite this major setback, Defendants spent $1,000,000 of their own money and obtained over $1,500,000 in interim financing to allow construction to continue, all the while searching for replacement financing for the Construction Loan. The City agreed to allow Defendants to continue construction in the interim while reimbursing further expenses from the Bonds' proceeds.

On March 27, Defendants submitted Cost Certification 3 to the City, seeking reimbursement of $799,366.45 in eligible costs and expenses. The City approved Cost Certification 3, and forwarded it to UMB for disbursement of funds. UMB, however, refused to disburse funds for Cost Certification 3. UMB stated that one of the items listed, builder risk insurance premiums, "does not appear to [be] eligible for reimbursement from the TGT Project Fund." However, these builder risk insurance premiums were interim taxes and insurances expenses, and—Defendants allege—thus reimbursable under the terms of the DA.

Throughout this time, Defendants frantically tried to obtain alternate financing for the Project. When Defendants approached UMB with possible alternative financing options, UMB refused to agree to any of them. Combined with UMB declining to reimburse Cost Certification

3, UMB's refusal to consider alternative financing options effectively ground construction on the Project to a halt. The lack of continued work on the Project precluded the possibility of Defendants obtaining the necessary funding to complete it.

On May 15, UMB sent One10 HRKC a notice of default under the DA (the "Notice"). In the Notice, UMB claimed that One10 HRKC had defaulted under the DA and issued three demands for Defendants to cure the default. These were:

> [1] the return of $15,000 together with any other monies paid to or for the benefit of AltosGroups, LLC, and its senior loan, for re-deposit into the Project Fund for the TIF Bonds; [2] demand release of any encumbrances affecting land, improvements and materials relating to the Project Area 2, including the non-performing senior loan; [3] [that] the Owner respond in full to prior requests for documentation and information necessary for the Trustee to evaluate the Owner's compliance with the terms of the Development Agreement to date and confirm the Owner clearly and unequivocally is willing and able to perform in accordance the [sic] Development Agreement, including the current Performance Milestones, as they relate to the Project Area 2 Redevelopment Project.

After Defendants failed to comply with its demands, UMB filed suit against all the Defendants on November 1, 2021. Defendants filed a Third-Party Compliant against Colliers Securities, LLC, and Colliers Mortgage, LLC (collectively "Colliers") on February 16, 2023, before bringing their Counterclaims against UMB on April 11, 2023.

In total, Defendants allege eight separate counterclaims. Count I alleges tortious interference with the DA by UMB. Count II alleges breach of the DA by UMB. Count III and IV allege breach of contract and breach of the duty of good faith and fair dealing as to the TGT Guaranty. Counts V–VIII allege breach of contract and breach the duty of good faith and fair dealing as to the TIF and TGT Indentures.

**B.**     **Summary of contractual provision at issue**

Defendants' claims stem largely from the various contracts entered into by the parties in anticipation of completing the Project.  Relevant here are: (1) the DA itself; (2) the TGT Guaranty; and (3) the TIF and TGT Indentures.  Because of the complexity and interwoven nature of the different contracts, the Court will summarize the relevant provisions here before discussing them in its analysis below.

*1.     Relevant provisions of the DA*

Under the DA, the following events constitute an "Event of Default":

(i) Subject to the extensions of time set forth in Section 908, failure or delay by either party to perform any term or provision of this Agreement, after receiving written notice and failing to cure, as set forth in subsection (b) below;

(ii) Assignment or transfer of the Developer's rights or title to the Project and/or this Agreement ( or any portion thereof) in violation of the terms and conditions set forth in Article VIII;

(iii) Filing by Developer of a voluntary petition under any bankruptcy law or filing of an involuntary petition under any bankruptcy law against Developer in a court having jurisdiction and said petition is not dismissed within thirty (30) days; assignment by Developer for the benefit of its creditors; appointment or retention of a custodian, trustee or receiver to take charge of and manage any substantial part of the assets of Developer and such appointment is not dismissed within sixty (60) days; or issuance of any execution or attachment against Developer whereupon the TIF District, or any part thereof, or any interest therein of Developer under this Agreement shall be taken and the same is not released prior to judicial sale thereunder ( each of the events described in this subsection being deemed a default under the provisions of this Agreement); or

(iv) Breach by Developer of the representations and warranties set forth in this Agreement and failure to cure or correct same as set forth in subsection (b) below.

For its part, Section 902(b) prevents any party from taking action for a perceived breach of the DA

if the other party within fourteen (14) days from receipt of such written notice, with due diligence, commences to cure, correct or remedy such failure or delay and shall complete such cure, correction or remedy within forty-five (45) days from the date of receipt of such notice or, if such cure, correction or remedy by its nature cannot

be effected within such forty-five (45) day period, such cure, correction or remedy
is diligently and continuously prosecuted until completion thereof.

Section 902(b) goes to state that only "[i]n the event the breaching party refuses or is unable to

cure, correct or remedy such breach within the time limits" can "such failure [] be deemed an Event

of Default . . . ."

The DA also sets out the procedures by which Defendants were to receive reimbursements

for expenses on the Project. Section 501(d) requires One10 HRKC to submit Certifications of

Expenditures to the City identifying eligible expenses for which One10 HRKC seeks

reimbursement.  Section 503 references Exhibit F as listing which expenses are eligible for

reimbursement under the DA.  Eligible items are marked by an "X."  Included in eligible expenses

is "Interim Taxes & Insurance."  Section 501(f) allows the City to determine whether expenses are

in fact eligible and deny reimbursement for ineligible expenses.  It also states that the "City's

identification of any ineligible costs shall not delay the City's approval of the remaining costs on

the Certification of Expenditures that the City determines to be eligible."

Tangentially, Section 805 of the DA states "[n]otwithstanding anything to the contrary

contained herein, there shall be no restriction on, and City approval shall not be required for . . .

the granting of any security interest provided to secure indebtedness to any construction or

permanent lender."

    2.    *Relevant provisions of the TGT Guaranty*

Before—and as a precondition to—receiving the Bonds, Monson and Anthony John

Jacobson[2] executed the TGT Guaranty.  The TGT Guaranty was executed "for the benefit of" the

---

[2] Anthony John Jacobson is not a party to this litigation.

Bond Trustee but also stated in Section 1 that "the Guarantors [Monson and Jacobson] expect to benefit financially from the issuance of the Bonds and certain related transactions."

Through the TGT Guaranty, Monson personally guaranteed "the maintenance of the Debt Service Reserve Requirement ($892,404.36) in the Debt Service Reserve Fund under the Indenture from the date of issuance of the Bonds through and including the later of: (i) the fifth anniversary of the date the Hotel is placed in service; or (ii) the first date that Excess TGT Revenues are calculated as exceeding thirty-five percent (35%) of the Debt Service Requirements under the Indenture for the then current calendar year."   Section 7 states Monson "agree[s] to make immediate payment to the Trustee of all Obligations owing or payable upon receipt of a demand for payment therefor by the Trustee to Guarantors in writing."   And finally, Section 16 states Monson "shall pay on demand by the Trustee any and all reasonable costs, fees and expenses (including, without limitation, reasonable legal fees on a solicitor and client basis) incurred by the Trustee, its agents, advisors and counsel or any of the Bondholders in enforcing any of their rights under this Guaranty."

UMB has used and continues to use funds from the TGT Bonds and the Debt Service Reserve Fund to cover all the expenses from *each* of the Bonds, not just the TGT Bonds, and to finance its litigation against Monson.  Allegedly, UMB's use of the funds in this manner place Monson on the hook for a much larger amount than anticipated by the parties or contemplated by the terms of the TGT Guaranty.

3.     *Relevant provisions of the Indentures*

Only the TIF and TGT Indentures are at issue in UMB's Motion.  The Indentures contain substantially identical provisions, distinct only because they relate to separate bonds.  Thus, the Court will address their provisions together.

Relevant to UMB's Motion, Section 1505 of the TIF and TGT Indentures states:

Benefit of Indenture. This Indenture shall inure to the benefit of and shall be binding upon the [City] and the Trustee and their respective successors and assigns, subject, however, to the limitations contained herein. With the exception of the rights expressly conferred in this Indenture, nothing in this Indenture or in the Bonds, express or implied, shall give to any Person, other than the parties hereto and their successors and assigns, any separate trustee, co-trustee appointed under 21 Section 1010 and the Owners of the Outstanding Bonds, any benefit or legal or equitable right, remedy or claim under this Indenture.

Furthermore, Section 403(b) provides:

The Trustee shall disburse moneys on deposit in the Project Fund from time to time to pay or as reimbursement for payment made for the TIF Eligible Expenses (other than Costs of Issuance), in each case within three Business Days after receipt by the Trustee of written disbursement requests of the Owner properly completed in all respects and in substantially the form of Exhibit D hereto, signed by the Authorized Owner Representative and approved by the Authorized Issuer Representative, following satisfaction of all requirements of the Development Agreement for disbursal.

## II.    Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[3] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[5] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature

---

[3] Fed. R. Civ. P. 12(b)(6).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

of claims as well the grounds on which each claim rests.[6]  Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[7]  Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8]  If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' " [9]

When ruling on a Rule 12(b)(6) motion to dismiss, courts may "consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."[10]  Should a conflict exist between allegations in a complaint and an attached exhibit, the exhibit controls.[11]

### III.    Analysis

**A.    Tortious interference with the DA—Count I.**

*1.    The Court dismisses Count I as brought by all Defendants except One10 HRKC.*

As an initial matter, UMB argues that only One10 HRKC has standing to bring this claim because One10 HRKC was the only Defendant who was a party to the DA.  Defendants counter by pointing to their allegations that each of the Defendants expected to benefit economically from the fulfilment of the DA.  While the Court takes this assertion as true, it also recognizes that a

---

[6] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[7] *Iqbal*, 556 U.S. at 678–79.

[8] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[9] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[10] *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (further citations and quotations omitted).

[11] *Id.* at 1105.

tortious interference with a contract claim requires more than an expectation of future economic benefit.

Under Kansas law, "[t]he elements of the claim of tortious interference with an existing contract are (1) the existence of a contract between the plaintiff and a third party; (2) knowledge of the contract on the defendant's part; (3) intentional interference with known contract rights without legal justification; and (4) resulting damage to the plaintiff."[12]  Interference with the expectation of future economic benefit relates to the fourth element, and the Court assumes without deciding that this alleged injury is sufficient to confer standing on Defendants.  However, none of the Defendants—besides One10 HRKC based on the assignment by Compass to it[13]—can establish the first element because none were parties to DA.  The Court, therefore, grants UMB's Motion on Count I as to each Defendant except One10 HRKC.

        2.      *The Court cannot determine at this time whether UMB was a party to the DA.*

Turning to the substantive issues of Count I, One10 HRKC alleges a claim for tortious interference with the DA by UMB.  UMB's primary argument for dismissal of this claim is that, as an assignee of the DA through the Indentures, it cannot be held liable for tortious interference with its own contract.

If UMB's version of the facts is accepted, then its argument is sound.  After all, "a person or entity cannot tortiously interfere with its own contract or expectancy."[14]  However, whether a valid assignment occurred in this case is an issue the Court has already found inappropriate for

---

[12] *CoBank, ACB v. Reorganized Farmers Coop. Ass'n*, 334 F. Supp. 2d 1273, 1278 (D. Kan. 2004), *aff'd sub nom. Cobank, ACB v. Reorganized Farmers Co-op. Ass'n*., 170 F. App'x 559 (10th Cir. 2006).

[13] Defendants do not argue that Compass is still a party to the DA.  Thus, the Court concludes that they concede that issue for the purposes of this Order.

[14] *Stead v. Unified Sch. Dist. No. 259, Sedgwick Cnty.*, 92 F. Supp. 3d 1088, 1111 (D. Kan. 2015).

adjudication at the motion to dismiss stage.[15]  Under Kansas law, "[a]n assignment passes all the assignor's title and interest to the assignee and divests the assignor of all right of control over subject matter of the assignment."[16]  One 10 HRKC, however, has pleaded facts that, if accepted as true, demonstrate "Plaintiff's actions after-the-fact are inconsistent with total assignment."[17]  Namely, One 10 HRKC alleges that the City retained the same rights for itself under the DA that it purportedly assigned to UMB and the assignment materially changed the duties owed by One 10 HRKC.

The Court acknowledges that the contractual language clearly addresses UMB as an "assignee."  But One 10 HRKC's factual assertions make the ultimate determination of this question inappropriate for this stage of the case.  Thus, the Court will not dismiss One10 HRKC's tortious interference claim on this ground.

### 3.   One10 HRKC has sufficiently alleged malice.

Next, UMB turns to the individual elements of a tortious interference claim, arguing that One 10 HRKC fails to allege that UMB acted with malice.  To be sure, "[t]ortious interference with a contract is predicated on malicious conduct by the defendant."[18]  But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[19]  Because this is a factual inquiry, inferring "the presence or absence of malice are typically questions for the

---

[15] *See UMB Bank, N.A. v. Monson*, 2022 WL 3910467, at *6 (D. Kan. 2022).

[16] *Chamberlain v. Farm Bureau Mut. Ins. Co.*, 36 Kan. App. 2d 163, 137 P.3d 1081, 1090 (2006) (citing *Bolz v. State Farm Mut. Auto. Ins. Co.*, 274 Kan. 420, 52 P.3d 898, 904 (2002)).

[17] *UMB Bank, N.A. v. Monson*, 2022 WL 3910467, at *6.

[18] *L&M Enterprises, Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000) (quoting *Dickens v. Snodgrass Dunlap & Co.*, 255 Kan. 164, 872 P.2d 252, 257 (1994)).

[19] Fed. R. Civ. Proc. 9(b).

jury."[20]  While malice would appear under Kansas law to be necessary for a tortious interference claim,[21] the actual elements require intentionality and lack of justification, impliedly defining "malice" as it relates to this claim.[22]  Recently, this Court addressed the necessary requirements to generally plead malice for a tortious interference claim.[23]  The Court found sufficient the plaintiff's allegations "that Defendants 'intentionally acted to do a harmful act without reasonable justification or excuse.'"[24]

Here, One10 HRKC alleges that UMB was "wanton, willful, intentional, and without justification" in failing to reimburse Cost Certification 3 after the City approved it, thus preventing the City and One10 HRKC from fulfilling their respective obligations under the DA.  The Court finds this is sufficient to generally allege malice for the purposes of surviving UMB's Motion.

4.   *As pleaded by One10 HRKC, no Event of Default had occurred before UMB refused to reimburse Cost Certification 3.*

UMB argues that should the Court conclude that Defendant adequately alleged malice its actions were nevertheless justified "by the clear terms in the Indentures."  Nowhere in its Motion does it identify the contractual language it relies on for this statement.[25]  It appears, however, that

---

[20] *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 77 P.3d 130, 152 (2003) (listing seven factually intensive factors to examine when determining whether a defendant's conduct is improper).

[21] *See Goldman v. Univ. of Kan.*, 477 P.3d 277 (table), 2020 WL 7635985, at *11 (Kan. Ct. App. 2020).

[22] *See Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 872 P.2d 252, 257 (1994); *see also Goldman*, 2020 WL 7635985, at *11 (defining malice as "actual evil-mindedness or specific intent to injure") (further citations and quotations omitted).

[23] *See TP ST Acquisition v. Lindsey*, 2021 WL 1750872, at *11 (D. Kan. 2021)).

[24] *Id.*

[25] In the argument section of its Motion, UMB states "The Trustee's right to deny reimbursement for cost certifications is set forth in Section III, supra."  Section III comprises the facts section of its Motion.  But the only information Section III has regarding UMB's right to deny reimbursement is the following sentence: "Under the clear terms of the Indentures, the Trustee exercised its discretion and refused to reimburse One10 for the costs incurred in Cost Certification 3."  This is not at all helpful.

-12-

UMB intends to claim by way of "justification" that One10 HRKC defaulted under the DA prior to submitting Cost Certification 3.  UMB does not clarify in its Motion what allegations in Defendants' Counterclaims it relies on to show default.[26]

The DA, however, limits what may be considered "Events of Default."  Section 902(a) of the DA lists only four occurrences which constitute events of default.  UMB does not specify which of these occurrences applies to Defendants' conduct and renders them in breach.  Logically, one would expect UMB's "Notice of Default" to detail which of Defendants' actions rendered them in default.  However, none of the three demands in UMB's Notice of Default relate to an Event of Default as defined under Section 902(a) and (b).

UMB's first demand was for "the return of $15,000 together with any other monies paid to or for the benefit of Altos."  This implies that the distribution of that $15,000 to One10 HRKC was not an eligible expense and that One10 HRKC misrepresented the same.  This would be an appropriate Event of Default under Section 902(a)(iv).  However, One10 HRKC alleges that the $15,000 *was* an eligible expense because it was a "Title & Closing Cost."  Taking all One 10 HRKC's pleaded facts as true for the purpose of this Order, One10 HRKC did not trigger an Event of Default by receiving funds to cover the $15,000 in closing costs to Altos.

The second of UMB's demands was that One10 HRKC obtain the "release of any encumbrances affecting land, improvements and materials relating to the Project Area 2."  It is not immediately apparent which of Section 902(a)'s "Events of Default" this demand could relate to.  Furthermore, Section 805 of the DA states "[n]otwithstanding anything to the contrary contained

---

[26] Notably, UMB fails to address the reason it gave at the time for refusing Cost Certification 3—that the "builder risk insurance premium" was not an eligible expense.  As pleaded by Defendants, it *was* an eligible expense under "Interim Taxes & Insurance" in Exhibit F of the DA.  Accordingly, the Court does not consider UMB's stated reason to be a justification for refusing to reimburse Cost Certification 3 for the purposes of this Order.

herein, there shall be no restriction on, and City approval shall not be required for . . . the granting of any security interest provided to secure indebtedness to any construction or permanent lender." Thus, the Court concludes for the purposes of this Order that this was not a valid Event of Default.

Finally, UMB's third stated reason for default demanded that One10 HRKC "respond in full to prior requests for documentation and information necessary for the Trustee to evaluate the [Developer's] compliance with the terms of the DA to date and confirm the [Developer] clearly and unequivocally is willing and able to perform in accordance the [sic] Development Agreement." This demand does not fall under any of the potential "Events of Default" in Section 902.

Thus, for the purposes of this Order, the Court finds that UMB cannot point to facts showing that One10 HRKC had defaulted under the DA such that it was relieved from its duty to disburse moneys for Cost Certification 3. Accordingly, the Court denies UMB's Motion as to Count I as brought by One10 HRKC.

## B.       Breach of the DA—Count II

Count II of Defendants' Counterclaims alleges that UMB breached the DA. In essence, this count is an alternative claim should the Court find that UMB through the Indentures was a proper assignee of the City's rights under the DA. And as found above, that issue is not decidable at this time. Therefore, the Court will proceed to examine Defendants' Count II on its own merits without reference to Count I.

### 1.       *The Court dismisses Count II as brought by all Defendants except One10 HRKC.*

UMB asserts that only One10 HRKC has standing to bring this claim. Defendants do not respond. The Court, therefore, presumes that all Defendants except One10 HRKC intended to

abandon Count II.[27]   Accordingly, the Court grants UMB's Motion as to all Defendants except One10 HRKC.

####    2.      *Law governing Count II.*

Count II asserts a single claim—breach of contract—on two theories: (1) direct breach of the DA's provision and (2) breach of the implied duty of good faith and fair dealing arising therefrom.   The elements for a breach of contract under Kansas law are: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[28]

Premising a breach of contract claim on the duty of good faith and fair dealing is slightly more complicated.   Kansas law creates:

> [A]n implied undertaking in every contract on the part of each party that he will not intentionally and purposefully do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of another party to receive the fruits of the contract.[29]

This "implied undertaking" is known as the covenant of good faith and fair dealing.[30]   In essence, "the law implies a counter promise against arbitrary or unreasonable conduct on the part

---

[27] *See Benge v. United Parcel Serv., Inc.*, 2022 WL 7484632, at *4 (D. Kan. 2022) (summarizing caselaw holding a party abandons a claim by failing to substantively respond to a motion to dismiss).

[28] *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013).

[29] *Waste Connections*, 298 P.3d at 266 (further citations and quotations omitted).

[30] *See id.*

of the promisee."[31]   In practice, the covenant forces parties to perform consistent with their intentions and expectations that are expressly or impliedly included in the terms of the agreement.[32]

However, "essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing."[33]   This is because "the purpose of requiring good faith and fair dealing in contracts is to protect the reasonable expectations of the parties—not to rewrite contracts."[34]

Accordingly, to state a claim for breach of the covenant of good faith and fair dealing under Kansas law, the plaintiff must "(1) plead a cause of action for breach of contract, not a separate cause of action for breach of duty of good faith, and (2) point to a term of the contract which the defendant allegedly violated by failing to abide by the good faith spirit of that term."[35]

### 3.       One10 HRKC properly alleges Count II with respect to UMB's failure to reimburse Cost Certification 3.

Here, One10 HRKC alleges that UMB breached the DA by failing to reimburse One10 HRKC for Cost Certification 3, not accepting the alternative financing proposals, and initiating litigation against One10 HRKC.   The last two proposed bases for this claim are easily dealt with. One10 HRKC points to nothing in the DA that requires UMB (or the City) to accept alternative financing proposals to ensure the construction of the Hard Rock Hotel.   Likewise, One10 HRKC

---

[31] *Id.* (further citations and quotations omitted).

[32] *Id.* at 1179.

[33] *Id.* (further citations and quotations omitted).

[34] *Pizza Hut, Inc. v. Koch Indus.*, 2001 WL 37132182, *8 (Kan. Ct. App. 2001) (citing *Flight Concepts Ltd. P'ship  v. Boeing Co.*, 38 F.3d 1152, 1155 (10th Cir. 1994)).

[35] *Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006) (quoting *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996)); *see also Steven Volkswagen, Inc. v. Zurich Am. Ins. Co.*, 2020 WL 2615764, at *7 (D. Kan. 2020) ("Breach of the implied covenant of good faith and fair dealing is not a separate claim, but rather a 'legal argument related to a breach-of-contract claim.' ") (quoting *Classico, LLC v. United Fire & Cas. Co.*, 386 P.3d 529 (table), 2016 WL 7324451, at *5 (Kan. Ct. App. 2016)).

fails to point to any prohibition against litigation for perceived breaches of the DA. Thus, One10 HRKC cannot plead a breach of contract claim or state a claim for breach of the duty of good faith and fair dealing for either of these alleged breaches.

In contrast, One10 HRKC refers to Sections 501(d), 501(f), 503, and Exhibit F of the DA as contract terms which UMB breached by refusing to disburse funds for Cost Certification 3. As stated in the facts section above, Section 501(d) requires One10 HRKC to submit Certifications of Expenditures to the City identifying eligible expenses for which One10 HRKC seeks reimbursement. Section 501(f) allows the City to determine whether expenses are in fact eligible and deny reimbursement for ineligible expense. It also states that the "City's identification of any ineligible costs shall not delay the City's approval of the remaining costs on the Certification of Expenditures that the City determines to be eligible." Section 503 sets out what expenses are "eligible" for reimbursement—those with "an 'X' in the column labeled 'TIF Eligible,' 'TGT Eligible,' and/or 'CID Eligible' on Exhibit F." Exhibit F relevantly marks "Title & Closing Costs" with an "X" in all three categories.

One10 HRKC alleges that all the costs included in Cost Certification 3 were eligible for reimbursement. Thus, UMB—through its assignment of the City's duties—had the obligation to disburse moneys to reimburse One10 for those costs. Failure to do so would put UMB in breach of the DA. Therefore, for the purposes of this Order, One10 HRKC states a claim that UMB's failure to disburse funds for Cost Certification 3 was a breach of the DA.

Once again, UMB tries to salvage its Motion by arguing that One10 HRKC was already in default under the DA. As determined above for the purposes of this Order, that was not the case.[36]

---

[36] See supra, section A, 4.

-17-

Thus, UMB's argument is unavailing.  The Court denies UMB's Motion as to Count II with regard to One10 HRKC.

**C.      Counts III and IV**

Next, UMB moves to dismiss Defendants' Counts III and IV, breach of contract and breach of the implied duty of good faith and fair dealing with respect to the TGT Guaranty.  The Court recognizes that a claim for breach of the duty of good faith and fair dealing is merely a different facet of a breach of contract claim.  In essence, Defendants allege the same claim twice.  But since Defendants are using Count III to refer to direct breach of contract and Count IV to refer to breach of contract by way of breach of the duty of good faith and fair dealing, the Court will employ the same nomenclature.

*1.      The Court dismisses this counterclaim as to all Defendants except Monson.*

Before reaching any substantive issues, UMB argues that Monson is the Defendant who is a party of the TGT Guaranty, and thus the only party with standing to bring these claims. Defendants do not respond to this argument.  The Court concludes that Defendants have waived any argument as to this issue and grants UMB's Motion as to all Defendants besides Monson for this reason.

*2.      Monson cannot state a direct claim for breach of contract.*

Turning to UMB's substantive argument, several sections of the TGT Guaranty are relevant to Monson's claims.  Under Section 2, the TGT Guaranty requires Monson to "unconditionally and irrevocably guarantee to the Trustee for the benefit of the Bondholders the maintenance of the Debt Service Reserve Requirement ($892,404.36) in the Debt Service Reserve Fund under the [TGT] Indenture."  Section 7 states Monson "agree[s] to make immediate payment to the Trustee of all Obligations owing or payable upon receipt of a demand for payment therefor by the Trustee

to Guarantors in writing."  And finally, Section 16 states Monson "shall pay on demand by the Trustee any and all reasonable costs, fees and expenses (including, without limitation, reasonable legal fees on a solicitor and client basis) incurred by the Trustee, its agents, advisors and counsel or any of the Bondholders in enforcing any of their rights under this Guaranty."

Monson alleges in his Counterclaims that he was forced to enter the TGT Guaranty as a prerequisite for receiving the Bonds.  He also alleges that UMB improperly used the TGT Debt Service Reserve Fund to cover costs related to other bonds, including legal costs incurred in this action and others, thus increasing Monson's liability under the TGT Guaranty.

UMB is correct that no provision explicitly prevents them from using the TGT Funds for whatever purpose they choose.  Thus, on this technicality, Monson cannot directly state a breach of contract claim.[37]  Accordingly, the Court dismisses Count III.  This dismissal, however, in no way impacts Monson's ability to proceed with his breach of contract claim by way of breach of the duty of good faith and fair dealing as alleged in Count IV.

*3.*     *Monson has sufficiently stated a claim for breach of the duty of good faith and fair dealing as to the TGT Guaranty.*

Moving on to Count IV, there can be no serious doubt that using TGT Funds and the Debt Service Reserve Funds to pay expenses from other Bonds runs counter to the spirit of the TGT Guaranty.  UMB argues to the contrary, stating that Monson has waived any objection to how UMB uses the funds by unconditionally guaranteeing the Debt Service Reserve Fund.  Applying UMB's interpretation, however, means it could continually use the Debt Service Reserve Fund for whatever it desired while demanding Monson reimburse them.  In essence, it would transform the

---

[37] The Court realizes that Monson claims that UMB's expenses were not "reasonable," meaning Monson would not have to reimburse UMB for those expenses.  This, however, is not relevant to his own breach of contract claim but rather a defense to UMB's breach of contract claim.

TGT Guaranty into a bottomless money well for UMB, something clearly unintended by the parties.

This is exactly the sort of situation where the duty of good faith and fair dealing becomes important.  Furthermore, the provisions themselves support implying that duty to UMB.  Sections 2, 7, and 16 require Monson to immediately and unconditionally pay UMB for *any* deficits in the Debt Service Reserve Fund.  Thus, the spirit of these terms restricts UMB from using the Debt Service Reserve Fund for whatever end it chooses.  This duty of good faith and fair dealing also arises from Section 1, which provides that Monson "expect[s] to benefit financially from the issuance of the Bonds and certain related transactions."  Monson could have no reasonable expectation of financial benefit if the parties' expectation was for UMB to use the Fund to cover any and all expenses it chooses, thus becoming an unending and unassailable drain on Monson's finances.

By alleging that UMB used TGT Funds to cover expenses of other Bonds and for the enforcement of the alleged rights of other Bonds, Monson has properly stated a claim for a breach of the duty of good faith and fair dealing.  The Court denies UMB's Motion as to Count IV.

## D.    Counts V–VIII

The last four Counts of Defendants' counterclaims all stem from UMB's alleged breach of the TIG and TGT Indentures (collectively the "Indentures").  Once again, Defendants plead claims for both breach of contract and breach of the duty of good faith and fair dealing for each of these agreements.  Since the Indentures' provisions are substantially identical, the Court will address them together.  Also, since the parties in their briefs do not distinguish between direct breach of contract and breach of contract through breach of the duty of good faith and fair dealing, the Court will address them together.

*1.      One10 HRKC is a third-party beneficiary to the Indentures and may enforce them.*

Defendants admit that the Indentures are contracts between the City and UMB, a point UMB stresses in its Motion.  However, the parties dispute whether Defendants were third-party beneficiaries to the Indentures, and thus capable of enforcing the Indentures.  The Court concludes that, as a matter of law and contractual interpretation, One10 HRKC is an intended third-party beneficiary.

The normal rules of contract interpretation apply when determining whether a party has third-party beneficiary status under the contract.[38]  Thus, courts should construe and consider the contract in its entirety.[39]

Two types of third-party beneficiaries exist: intended beneficiaries and incidental beneficiaries.[40]  Only the former may sue for breach of contract.[41]  The party asserting third-party beneficiary status bears the burden of establishing that it is an intended beneficiary.[42]  To do so, the party "must show the existence of some provision in the contract that operates to their benefit."[43]  This is because "[p]arties are presumed to contract for themselves, and their intent that a third person receive a direct benefit must be clearly expressed in the contract."[44]  However, there

---

[38] *Kincaid v. Dess*, 48 Kan. App. 2d 640, 298 P.3d 358, 647 (2013).

[39] *Id.*

[40] *Id.*; *see also Cornwell v. Jespersen*, 238 Kan. 110, 708 P.2d 515, 522 (1985) (listing three types of third-party beneficiaries under Kansas law: (1) donee beneficiaries; (2) creditor beneficiaries; and (3) incidental beneficiaries—and holding only done and creditor beneficiaries have standing to enforce contracts).

[41] *Kincaid*, 298 P.3d at 647.

[42] *Id.*

[43] *Id.* at 647–48.

[44] *Bookter v. Knisley*, 504 P.3d 1088 (table), 2022 WL 655904, at *3 (Kan. Ct. App. 2022), *review denied* (2022).

is no requirement that the party be specifically named in the contract.[45]  Likewise, the intended

beneficiary need not be the only one benefiting from the contract.[46]  Rather, "[t]he contract may

also benefit the contracting parties as well."[47]

> In its Motion, UMB points to Section 1505 of the TIF and TGT Indentures, which states:
>
> Benefit of Indenture. This Indenture shall inure to the benefit of and shall be binding upon the [City] and the Trustee and their respective successors and assigns, subject, however, to the limitations contained herein. With the exception of the rights expressly conferred in this Indenture, nothing in this Indenture or in the Bonds, express or implied, shall give to any Person, other than the parties hereto and their successors and assigns, any separate trustee, co-trustee appointed under 21 Section 1010 and the Owners of the Outstanding Bonds, any benefit or legal or equitable right, remedy or claim under this Indenture.

From this language, UMB argues that the Indentures exclude any possibility that they operate to

benefit a third party, i.e., One10 HRKC.

UMB's interpretation, however, both ignores the language of the provision and reads

Section 1505 in isolation instead of construing the Indentures as a whole.  First, the Indentures

operate to shift many of the duties owed to One10 HRKC by the City onto UMB.  Second, One10

HRKC rightfully emphasizes that Section 1505 disclaims benefits to others "[w]ith the exception

of rights expressly conferred in this Indenture."  One10 HRKC then points to Section 403(b),

which provides:

> The Trustee shall disburse moneys on deposit in the Project Fund from time to time to pay or as reimbursement for payment made for the TIF Eligible Expenses (other than Costs of Issuance), in each case within three Business Days after receipt by the Trustee of written disbursement requests of the Owner properly completed in

---

[45] *Kincaid*, 298 P.3d at 648.

[46] *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 107 P.3d 1219, 1231 (2005) (further citations omitted).

[47] *Id.* (further citations and quotations omitted); *see also Tri-State Truck Ins., Ltd. v. First Nat. Bank of Wamego, Kan.*, 535 F. App'x 653, 661 (10th Cir. 2013) (applying Kansas law to hold that "it was the specificity of the provision granting [the third-party beneficiaries] a certain benefit that conferred their third-party right to enforce the receipt of that benefit").

all respects and in substantially the form of Exhibit D hereto, signed by the Authorized Owner Representative and approved by the Authorized Issuer Representative, following satisfaction of all requirements of the Development Agreement for disbursal.

The Indentures define "the Owner," as One10 HRKC.

On its face, this provision operates for the explicit benefit of One10 HRKC. It *requires* UMB disburse funds to One10 HRKC once the prerequisites are met. Reading the Indentures as a whole makes clear that through them, the City shifted many of its duties owed to One10 HRKC under the Bonds Agreements to UMB, conferring on One10 HRKC status as an intended beneficiary.

UMB tries to avoid this fact by claiming that Section 403(b) does not provide a "right," and thus does not fall under Section 1505's exception language. However, Section 403(b) states that UMB "shall disburse moneys." It is a provision which operates to benefit One10 HRKC. True, there are prerequisites to UMB's obligation under this provision, such as One10 HRKC submitting "properly completed" written disbursement requests. However, once One10 HRKC met these prerequisites, UMB's duty was clear—it "*shall* disburse moneys" to One10 HRKC.[48] It is difficult to conceive clearer rights-giving language. Thus, the Court concludes that Section 403(b) operates to make One10 HRKC an intended beneficiary, conferring a right to have moneys disbursed by UMB upon completion of necessary prerequisites. As such, it falls under the "rights expressly conferred" exception in Section 1505. Accordingly, One10 HRKC has standing as an intended third-party beneficiary to enforce a breach of the Indentures.

---

[48] Emphasis added.

-23-

      *2.*     *One10 HRKC properly states a claim for breach of the Indentures by UMB.*

UMB next argues that even if One10 HRKC has standing, it fails to state a claim under any of the alleged Counts.  According to UMB, Section 403(b) relieves it of the duty to disburse moneys if the written disbursement requests are not "properly completed" by the Owner.  One10 HRKC counters by arguing that only the City could determine that a written disbursement request was properly completed and the requests were properly completed in any case.

Although never stated explicitly, the Indentures appear to allow UMB to arrive at its own conclusion as to whether the written disbursement requests were "properly completed."  Section 403(b) states that UMB is not "required to make any independent investigation" as to whether the written disbursement requests were properly completed.  Instead, it "may rely" on the City's certification and statements by the Owner.  This permissive language implies that UMB *may* also do the opposite—meaning that UMB *can* investigate and does not have to rely on the City's assessment that the written disbursement requests are properly completed.

Thus, the question becomes whether UMB was correct in concluding that the written disbursement requests were *not* "properly completed."  The term "properly completed" is not defined by the Indentures.  Exhibit D, however, is provided an as example of which the written disbursements requests must be in substantially the same form.  In arguing Cost Certification 3 was not properly completed, UMB points to a provision in Exhibit D which states that "No Event of Default under the Development Agreement has occurred and is continuing and no event or condition has occurred which, with notice or passage of time or both, would constitute an Event of Default under the Development Agreement."

Ultimately, this is the same argument regarding default that UMB raised when arguing to dismiss One10 HRKC's other claims.  Construing the facts alleged in One10 HRKC's favor, the

Court for the purposes of this Order does not find that an Event of Default had occurred under the DA prior to Cost Certification 3. Thus, One10 HRKC properly alleges that UMB failed to perform its obligations under Section 403(b) to benefit One10 HRKC as the intended third-party beneficiary. Accordingly, UMB's Motion as to Counts V–VIII is denied as to One10 HRKC.[49]

**IT IS THEREFORE ORDERED** that UMB's Motion to Dismiss (Doc. 152) is **GRANTED in part** and **DENIED in part.**

**IT IS FURTHER ORDERED** that Count III is dismissed in its entirety.

**IT IS FURTHER ORDERED** that Counts I, II, V, VI, VII, and VIII are dismissed as brought by all Defendants except One10 HRKC.

**IT IS FURTHER ORDERED** that Count IV is dismissed as brought by all Defendants except Monson.

**IT IS SO ORDERED.**

Dated this 13th day of September, 2023.

*Eric F. Melgren*
ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[49] Because UMB makes no separate argument as to Defendants' claims for breach of the duty of good faith and fair dealing, the Court will not address Counts VI and VII separately.