## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UMB BANK, N.A., solely in its capacity
as successor trustee for the Bonds,

    *Plaintiff*,

v.

    Case No. 21-CV-2504-EFM

D. JON MONSON, et al.,

    *Defendants*.

## MEMORANDUM AND ORDER

Before the Court are two Motions to Dismiss (Docs. 248 & 250). The first motion to dismiss (Doc. 248) is brought by Defendants D. Jon Monson; Compass Commodity Group III LLC; 11 Water LLC; ONE10 Hotel Holdings LLC; Matthew Stoen; The Landschute Group; Big Sand LLC; HFF Texas LLC; Grayley Fiduciary Management Corporation; Jaren Johnson, as Trustee of the CBB Trust; D. Jon Monson, as Trustee of the CBB Trust; D. Jon Monson, as Trustee of the CBB 1 Trust; D. Jon Monson, as Trustee of the CBB 2 Trust; D. Jon Monson, as Trustee of the CBB 3 Trust; and ONE10 Hotel HRKC, LLC (collectively, the "Monson Defendants"). The Monson Defendants ask this Court to dismiss Counts I, II, and XII of Plaintiff UMB Bank's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and 9(b).

The second partial motion to dismiss (Doc. 250) is brought by Defendants Anthony Jacobson; Robert Boyer; Vernal Bay Capital Group LLC; Vernal Bay Investments LLC; Howard Yu, solely as trustee of the Anthony J. Jacobson Trust; Peak Trust Company, solely as trustee of the Anthony J. Jacobson Trust; and Mutual Credit Corporation (collectively, the "Vernal Bay

Defendants"). The Vernal Bay Defendants ask this Court to dismiss Counts I, II, VI, VII, VIII, and XII of Plaintiff UMB Bank's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and 9(b). For the reasons stated below, the Court denies both Motions to Dismiss.

## I.    Factual and Procedural Background[1]

This dispute centers on an unsuccessful construction project. In 2016, the City of Edwardsville, Kansas (the "City") created the Village South at Edwardsville Redevelopment District, which contained several project areas. In 2018, Defendant Compass Commodity Group III ("Compass") agreed to build a Hard Rock Hotel in "Project Area Two," along with a business center, event center, retail area, and restaurants (together, the "Project").

On August 26, 2019, Compass and the City entered into a Development Agreement. Under this Agreement, the City would raise funds by issuing bonds and reimburse Compass for eligible expenses; Compass would fund, construct, and operate the Project. Compass was also obligated to contribute nonrefundable "Predevelopment Equity" totaling $4,176,134 and "Owner Cash Equity" totaling $1,493,670 to the Project. If Compass did not have this cash up front, then it could secure financing through loans. Proof of financing was required before the City would issue or disburse bonds. For refundable expenses, Compass could receive reimbursement by submitting Cost Certifications with supporting documentation.

In October 2019, the City issued several types of bonds with the intent that sale proceeds would be used to reimburse Compass under the Development Agreement. The bond proceeds were held in trust by Commerce Bank (the "Prior Trustee").

---

[1] The facts in this section are taken from Plaintiff's Amended Complaint unless otherwise cited.

Various investors joined the Project throughout 2018 and 2019—including Anthony Jacobson and Robert Boyer, who helped facilitate Project loans from Vernal Bay Capital and Vernal Bay Investments. Jacobson is the beneficiary of the AJJ Trust, whose trustees are Howard Yu and Peak Trust Co. (the "AJJ Trustees").

On October 1 and 25, 2019, Monson, Stoen, Jacobson, Boyer, Compass, 11 Water, One10 Holdings, One10 HRKC, and the AJJ Trustees (collectively, the "Bank Fraud Defendants") submitted Cost Certifications Nos. 1 and 2, requesting a total of $14,056,586.20 in reimbursement for Project-related costs, including land acquisition, utility easements, surveying, appraisal, architecture, engineering, etc. These certifications falsely asserted compliance with the Development Agreement whilst concealing that the requisite construction loan had not closed.

On October 30, 2019, Compass sold and assigned the Project to One10 Hotel HRKC, LLC. Jon Monson was the authorized representative, manager, and founder of Compass and One10 Hotel Holdings. However, Jacobson and Boyer bought out Monson's interest in One10 Hotel Holdings, although Monson still held a managerial role. On that same day, One10 Hotel Holdings—the sole member of One10 Hotel HRKC—entered into a Mezzanine Loan Agreement with Mutual Credit Corporation for $3,100,000. The purpose of this loan was to secure equity financing for the construction of the Project. Notably, the developer named in the Mezzanine Loan Agreement is not Compass or One10 Hotel HRKC, but an entity named Landschute Group, Inc. ("Landschute").

Landschute employed an individual named Matthew Stoen. Stoen had a history of defrauding real estate investors. In 2014, he pled guilty to wire fraud, was sentenced to federal prison, and ordered to pay restitution. Through his employment with Landschute, Stoen began

managing the development of the Project as a "contract developer." He also operated as an "authorized agent" for Landschute, Compass, and One10 Hotel HRKC.

Relying on the Bank Fraud Defendants' October representations that they were "in a position to close" on the construction loan, the Prior Trustee distributed the requested funds on October 30, 2019—nearly a month before the loan actually closed, despite loan closing being a condition precedent to disbursement. The closings were delayed solely because the Bank Fraud Defendants failed to pay the requisite $13 million Down Payment Deposit—a condition they did not satisfy until November 25, 2019, making that day the effective closing date. The Bank Fraud Defendants paid the construction loan's Down Payment Deposit with the proceeds from the mezzanine loan together with disbursements from the cost certifications. Had the true status of the loan been disclosed, the Prior Trustee would not have approved the disbursements, and the Bank Fraud Defendants would have had no basis for seeking future reimbursements.

Other misrepresentations include the Bank Fraud Defendants' application for an agricultural tax exemption and marketing the Project site for sale, both of which undermine the Project's purpose, which was to develop the land.

Around October 30, 2019, Defendant Monson and the AJJ Trustees jointly and severally executed a Guaranty Agreement for the benefit of the Prior Trustee. The Guaranty Agreement required that these Defendants maintain a minimum balance of $892,404.36 as a Debt Service Reserve. This Reserve was designed to provide bondholders with security for debt service payments on the bonds. However, neither Monson nor the AJJ Trustees funded the reserve. In fact, Monson never had the financial means to fund his obligation, and although the AJJ Trustees had the means to fund their obligation, they never intended to do so.

On November 21, 2019, UMB Bank, N.A. ("UMB") acquired Commerce Bank's corporate trust business and became the new trustee tasked with holding and administering the trust estates for the benefit, security, and protection of all bondholders.

Unbeknownst to UMB, the Monson Defendants and the Vernal Bay Defendants (collectively, the "RICO Defendants") intentionally devised and implemented a comprehensive scheme to defraud UMB of the money held in trust and fraudulently transfer the property on which the Project was supposed to be built. Among other things, the RICO Defendants concealed (1) Stoen's control, management, and financial interest in the Project; (2) allegations against Landschute and Monson, among others, of having received fraudulent transfers in relation to Stoen's prior criminal activities; (3) Monson's indebtedness to creditors and defaults thereon; (4) preexisting loan defaults and related litigation involving Compass and Monson; and (5) undercapitalization of One10 Hotel HRKC.

Between December 2019 and March 2020, construction on the Project was suspended. Architects, engineers, and the general contractor all stopped work due to payment problems and shifted their workers to other projects. Realizing they were out of money, on March 27, 2020, the Bank Fraud Defendants submitted a third Cost Certification in the amount of $829,247.32.

On April 1, 2020, a conference call was conducted among representatives of the City, UMB, bondholders, the RICO Defendants, and others. Following the call, UMB undertook due diligence to confirm, among other things, that the RICO Defendants had contributed Predevelopment Equity to the Project. During the due diligence process, Jacobson and others on behalf of Compass and One10 HRKC made false and fraudulent representations and concealed material information regarding the Predevelopment Equity. Specifically, the RICO Defendants used Cost Certification Nos. 1 and 2 to obtain reimbursement for their Predevelopment Equity,

which was explicitly designated as nonrefundable under the Development Agreement. As a result, the RICO Defendants made no financial contributions of their own to the Project.

By mid-May, One10 HRKC itself had publicly announced the lack of construction loan funding and its suspension of construction, which were both "Material Events" under the Development Agreement that would warrant default. UMB reviewed Cost Certification No. 3 and the written requests for Project funds and, in consultation with bondholders, concluded that One10 HRKC had not only failed to make proper submissions, but without a construction loan, was in default. As such, in May 2020, UMB denied disbursement of bond proceeds in response to Cost Certification No. 3.

On May 14, 2020, Defendants Monson, Stoen, and others discussed Project demobilization expenses, indicating immediate financial concerns following the denial of Cost Certification No. 3. The next day, UMB issued a "Notice of Default" on the Project to One10 HRKC, asserting breaches of the Development Agreement and demanding a cure. This notice was sent at the direction of the bondholders, and UMB also informed the City of Defendants' default.

On May 29, 2020, One10 HRKC responded to UMB's notice by denying its right to enforce the Development Agreement, refuting the breach allegations, and requesting payment of Cost Certification No. 3. The situation escalated when, on June 19, 2020, UMB reiterated the default claims, noting an unauthorized encumbrance on the Project's property and declaring the principal of the bonds immediately due and payable. In late June, One10 HRKC sued UMB in Missouri state court for wrongfully denying its written requests for Project funds, and UMB subsequently filed a trust-instruction petition in Minnesota state court asking the court for instructions and an action to declare rights.

On November 1, 2021, UMB filed suit before this Court. UMB claims that the Monson and Vernal Bay Defendants are liable for several reasons, but relevant to this Order: RICO violations, RICO civil conspiracy, and civil conspiracy. In addition, UMB alleges that the Vernal Bay Defendants are liable for fraudulent inducement, fraudulent concealment, and negligent misrepresentation. On August 16, 2024, the Monson and Vernal Bay Defendants filed Motions to Dismiss. Timely responses and replies were filed. The matters, now fully briefed, are ripe for the Court's ruling.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[2] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[3] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[4] "[T]he elements of each alleged cause of action help to determine whether [the p]laintiff has set forth a plausible claim."[5]

The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[6] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need

---

[2] Fed. R. Civ. P. 12(b)(6).

[3] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[5] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012); *see also Iqbal*, 556 U.S. at 675 ("[W]e begin by taking note of the elements a plaintiff must plead to state a claim.").

[6] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

not afford such a presumption to legal conclusions.[7] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[9]

Certain types of pleadings, such as fraud or mistake, require a heightened pleading standard.[10] For instance, Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." This requires plaintiffs to "set forth the time, place[,] and contents of [any] false representation[s], the identity of the part[ies] making the false statements[,] and the consequences thereof."[11] These strictures apply here because the claims at issue are predicated on fraud.

### III.    Analysis

### A.    RICO Claim (Count I)

The RICO Defendants argue that UMB has failed to plausibly allege every element of a civil RICO claim with the requisite particularity. In contrast, UMB claims that, at this stage in the litigation, it has alleged the RICO elements sufficiently to avoid dismissal.

The Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO") makes it illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

---

[7] *Iqbal*, 556 U.S. at 678–79.

[8] *See id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[9] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[10] *See* Fed. R. Civ. P. 9.

[11] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citation omitted).

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[12] Therefore, to state a RICO claim, a plaintiff must set forth four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."[13]

The Monson Defendants argue that UMB failed to establish the "enterprise," "pattern," and "racketeering activity" elements because its allegations are too generic. The Vernal Bay Defendants likewise attack the "pattern" element for lacking specificity. UMB argues that it has sufficiently alleged all the required elements for a RICO claim.

Racketeering activity is frequently described as "predicate acts" which consist of the federal and state crimes identified in 18 U.S.C. § 1961(1). UMB presents facts supporting Defendants' involvement in several qualifying predicate acts listed under 18 U.S.C. § 1961—namely wire fraud and financial institution fraud. "RICO broadly defines enterprise as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[14] UMB alleges the collective participation of individuals, corporations, and other legal entities (such as trusts) to further the fraudulent scheme. As such, the Court determines that UMB has sufficiently alleged the racketeering activity element and the existence of an enterprise. Therefore, the only element left for this Court to analyze is the "pattern" element.

To state a "pattern" of racketeering activity, the plaintiff must allege "at least two acts of racketeering activity . . . which occurred within ten years."[15] Moreover, "a RICO pattern requires

---

[12] 18 U.S.C. § 1962(c).

[13] *Garrett v. Selby, Connor, Maddux, & Janer*, 425 F.3d 836, 838 (10th Cir. 2005) (citation omitted).

[14] *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1182 (10th Cir. 2019) (quoting *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017).

[15] 18 U.S.C. § 1961(5).

that the racketeering predicates relate to each other and amount to a threat of continued racketeering activity. No pattern exists without this 'continuity plus relationship.'"[16]

### 1.    Relationship

As to the relationship requirement, predicate acts satisfy this element when they make up one common scheme.[17] Racketeering predicates relate to each other if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."[18] "The relationship test is not a cumbersome one for a RICO plaintiff."[19]

Here, UMB alleges that the RICO Defendants engaged in several related predicate acts—specifically wire fraud and financial institution fraud, which are recognized as racketeering activities under the statute.[20] Specifically, UMB alleges that the RICO Defendants devised and implemented a complex scheme amongst themselves to defraud UMB (and the Prior Trustee) of project funds and revenue, and fraudulently transfer the Project's property, based on false and fraudulent pretenses, representations and promises, and concealment or omission of material facts. These allegations contain at least two predicate acts which happened within ten years of each other, and they are sufficiently related given that they share the same participants and victims and accomplish similar purposes. As such, the Court finds that UMB has adequately pled the relationship prong of the pattern element.

---

[16] *Johnson v. Heath*, 56 F.4th 851, 858–59 (10th Cir. 2022) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

[17] *See Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990).

[18] *H.J. Inc.*, 492 U.S. at 240.

[19] *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) (quoting *Boone v. Carlsbad Bancorp., Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992)).

[20] 18 U.S.C. § 1961(1)(B) (defining racketeering activity as any act which is indictable under certain provisions of 18 U.S.C., including § 1343 (relating to wire fraud) and § 1344 (relating to financial institution fraud)).

2.      *Continuity*

Next, the Court turns to the continuity requirement. Under this prong, a plaintiff must allege that the acts amounted to or threaten continued racketeering activity.[21] This standard is more difficult to meet than the relationship standard.[22] Either "open-ended" or "closed-ended" continuity can satisfy the continuity prong. Because UMB only alleges closed-ended conduct, the Court will only evaluate this type of continuity. "[C]losed-ended continuity consists of a closed period of repeated, related racketeering acts that do not necessarily threaten future repetition."[23] However, "[w]ithout a threat of continued illegal activity, a single scheme rarely supports finding continuity. And a single scheme even less likely supports a continuity finding when the scheme targets only one discrete goal."[24] To state closed-ended continuity, the plaintiff must allege (1) duration and (2) extensiveness.[25]

a.      Duration

Duration is satisfied by a series of related racketeering acts over a "substantial period of time."[26] Here, UMB alleges that the racketeering acts began around the time of the bond issuance date, which was October 30, 2019. UMB contends that the racketeering activities continued at least until January 17, 2023. This means that the scheme lasted more than three years. Though no minimum time-period exists, the Tenth Circuit has regarded a period of 7–18 months as long

---

[21] *See H.J. Inc.*, 492 U.S. at 239.

[22] *Bixler*, 596 F.3d at 761 (citation omitted).

[23] *Johnson*, 56 F.4th at 860.

[24] *Id.* at 862 (internal citation omitted).

[25] *Id.* at 860.

[26] *Id.*

enough to establish continuity.[27] Therefore, UMB has plausibly alleged a duration sufficient to support closed-ended continuity.

> ### b.     Extensiveness

Next, the Court considers the extensiveness of the alleged racketeering scheme. Extensiveness turns on the number of victims, the number and variety of racketeering activities, the distinctness of the injuries' causes, the complexity and size of the scheme, and the nature of the enterprise.[28] When evaluating complexity, the Tenth Circuit considers "the number of perpetrators involved, the extent of the planning required to perform the scheme, the extent of the management required to run the scheme, the sophistication of products involved in running the scheme, and the amount of money involved."[29] No factor is required or dispositive; instead, the factors are meant to guide "a natural and commonsense result."[30]

In this case, UMB alleges that the financial institutions and bondholders who funded the public financing for the Project were victimized by the RICO Defendants' scheme. There were over a dozen perpetrators—including individuals, trusts, and companies—who collaborated to coordinate and execute false certifications, conceal important information, and misrepresent financials.

The racketeering activities varied but included mail fraud, wire fraud, and financial institution fraud, among other things. UMB claims that it has records containing the dates, persons, and content of 134 wire communications spanning almost two years, which were used to further the scheme. To execute the scheme, the Defendants used sophisticated means, including bonds

---

[27] *Id.* (citing *Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1544 (10th Cir. 1993)).

[28] *Id*.

[29] *Id.* at 861.

[30] *Id.* at 860–61 (quoting *Resol. Tr Corp.*, 998 F.2d at 1544).

and trust indentures, development agreements and obligation assignments, cost certifications, fund requests, guaranty agreements, construction and mezzanine loans, and agricultural tax exemptions. The cost certifications disbursed over $10,000,000 and the Debt Service Reserve Fund shortfall totaled over $397,000, which has since grown to over $892,000.

Lastly, although the scheme need not necessarily threaten future repetition, it is difficult to support continuity without it. Here, UMB alleges that fraudulent transfers were effectuated even after UMB filed this litigation, which is sufficient to infer a threat of future criminal activities.[31] Moreover, even though UMB's Complaint centers on a single failed development, its allegations of fraud and fraudulent concealment extend beyond just that project. For example, UMB alleges that Stoen and Monson have a history of wire fraud, indebtedness, default, and related litigation; and their actions in this case mirror their prior acts. Thus, allegations of essentially the same scheme perpetrated on prior parties may be alleged to support a claim of closed-ended continuity.[32]

Having considered the extensiveness factors, the Court finds that UMB has plausibly alleged that the RICO Defendants were engaged in a complex and extensive scheme. The Amended Complaint outlines a series of related fraudulent acts involving multiple parties and spanning a significant period, which collectively suggest a coordinated effort to defraud the financial institutions and manipulate the Project for financial gain. The repeated nature of the acts and the involvement of various entities indicate a pattern of racketeering activity rather than a single, discrete goal. As such, the Court finds that UMB has sufficiently alleged an extensive scheme to warrant a finding of closed-ended continuity. Consequently, UMB has plausibly alleged

---

[31] *See Hansen v. Native Am. Refinery Co.*, 2007 WL 1108776, at *7 (D. Utah Apr. 10, 2007).

[32] *See SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006).

that the RICO Defendants were engaged in a pattern of racketeering, and therefore has met the pleadings requirements to overcome Defendants' Motion to Dismiss Count I.

## B.     RICO Civil Conspiracy Claim (Count II)

The RICO Defendants ask the Court to Dismiss the RICO Civil Conspiracy claim against them because, without a viable RICO claim under § 1962(c), the RICO conspiracy claim necessarily fails.[33] Defendants do not provide any other explanation for why the RICO Conspiracy claim independently fails. Therefore, given that the Court found that UMB adequately pled the RICO claim, the reasons to dismiss the RICO Civil Conspiracy claim fail. As such, the Court denies Defendants' Motion to Dismiss Count II.

## C.     Fraud Claims (Counts VI, VII, & VIII)

UMB brings claims of fraudulent inducement (Count VI), fraudulent concealment (Count VII), and negligent misrepresentation (Count VIII) against Defendants Monson, Yu, and Peak Trust Co. (collectively, the "Guaranty Defendants"). The Guaranty Defendants seek dismissal on the basis that these allegations lack the requisite specificity required by Rule 9(b). Specifically, the Guaranty Defendants criticize the Complaint for failing to allege what false statements Defendants made, how any such statements related to material facts, and how UMB could not discover these facts through reasonable diligence.

Under Kansas law, the elements of fraudulent inducement are:

(1) [t]he defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon

---

[33] *Tal v. Hogan*, 453 F.3d 1244, 1270 (10th Cir. 2006) (citations omitted) ("If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law.").

them; (4) the other party reasonably relied and acted upon the representations; (5) the other party sustained damages by relying upon the representations.[34]

In contrast, the elements for fraudulent concealment are:

(1) the defendant had knowledge of material information the plaintiff did not have and could not have discovered through the exercise of reasonable diligence; (2) the defendant had a duty to communicate that information to the plaintiff; (3) the defendant deliberately failed to communicate the information to the plaintiff; (4) the plaintiff justifiably relied on the defendant to communicate the information; and (5) the plaintiff was injured by the defendant's failure to communicate information.[35]

UMB contends that it has met the pleadings requirements by alleging that the Guaranty Defendants represented that they were able to fund their obligations under the Guaranty Agreement when, in actuality, they had no means to fund their obligation and no intention to comply with their obligations. Through these representations, the Guaranty Defendants were able to convince the Prior Trustee to disburse over $10,000,000 based on Cost Certifications Nos. 1 and 2. However, these disbursements would not have been made had the Prior Trustee known the Guaranty Defendants could not maintain the Debt Service Reserve Requirement under the Guaranty Agreement. UMB's allegations—that Defendants knowingly misrepresented their financial ability and intention to meet their obligations, and that the Prior Trustee relied on those misrepresentations to its detriment—support a plausible claim for fraudulent inducement and fraudulent concealment.

Although the negligent misrepresentation claim is based on the same underlying facts as the fraud claim, the pleadings standards are lower since this claim is not subject to Rule 9(b).[36] To state a claim for negligent misrepresentation under Kansas law, a plaintiff must allege that "(1)

---

[34] *BD Med. Supplies LLC v. Bluestem Mgmt. Advisors, LLC*, 685 F. Supp. 3d 1062, 1077 (D. Kan. 2023) (quoting *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1096 (2013)).

[35] *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 910 (10th Cir. 2005) (citing *Miller v. Sloan, Listrom, Eisenbarth, Sloan, & Glassman*, 267 Kan. 245, 978 P.2d 922, 932 (1999)).

[36] *See Graphic Techs., Inc. v. Pitney Bowes Inc.*, 998 F. Supp. 1174, 1178 (D. Kan. 1998).

defendant failed to exercise reasonable care in obtaining or communicating false information, (2) plaintiffs relied on the information that defendant supplied for their benefit and guidance, and (3) plaintiffs suffered damages in a transaction that defendant intended to influence."[37]

The Guaranty Defendants' only argument for dismissal on this count is found in a footnote. They say, "the same reasons the fraud claims aren't adequately pleaded, the negligent misrepresentation claim isn't either." Given that UMB has adequately pled fraudulent inducement and fraudulent concealment under a heightened pleading standard, it has necessarily met the substantially lower pleading threshold required for negligent misrepresentation. As such, the Court denies the Guaranty Defendants' Motion to Dismiss Counts VI, VII, and VIII.

**D.    Civil Conspiracy (Count XII)**

Just as the RICO Defendants argued that the RICO Civil Conspiracy claim should be dismissed for lacking an actionable RICO predicate, they similarly argue that the common law Civil Conspiracy claim is subject to dismissal for lacking an actionable, predicate tort claim. Likewise, Defendants offer no other reason why the common law Civil Conspiracy claim fails on its own. Given that the Court has since found that UMB did plausibly allege the underlying torts of fraudulent inducement and concealment, the Court cannot dismiss UMB's Civil Conspiracy claim on that basis. Accordingly, the Court denies the RICO Defendants' Motion to Dismiss Count XII.

**IT IS THEREFORE ORDERED** that the Monson Defendants' Motion to Dismiss (Doc. 248) is **DENIED**.

---

[37] *Florez v. Ginsberg*, 57 Kan. App. 2d 207, 449 P.3d 770, 776–77 (2019) (citing *Stechschulte*, 298 P.3d at 1098).

 **IT IS FURTHER ORDERED** that the Vernal Bay Defendants' Partial Motion to Dismiss

(Doc. 250) is **DENIED**.

 **IT IS SO ORDERED.**

Dated this 4th day of June, 2025.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE