## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UMB BANK, N.A., solely in its capacity as
successor trustee for the Bonds,

        *Plaintiff/Counter-Defendant*,

v.

D. JON MONSON, et al.,

        *Defendants/Counter-Plaintiffs*,

v.

COLLIERS SECURITIES, LLC, et al.,

        *Third-Party Defendants.*

Case No. 21-2504-EFM-BGS

---

HOWARD YU, solely in his capacity as
trustee of the estate of Anthony John
Jacobson Trust,

        *Plaintiff/Counter-Defendant*,

v.

UMB BANK, N.A., solely in its capacity as
successor trustee for the Bonds,

        *Defendant/Counter-Plaintiff.*

## MEMORANDUM AND ORDER

Before the Court is Plaintiff/Counter-Defendant UMB Bank, N.A. ("UMB")'s Motion for

Partial Summary Judgment (Doc. 287). UMB seeks summary judgment in its favor on Counts I,

II, V, VI, VII, and VIII of the Counterclaim brought by Defendant/Counter-Plaintiff One10 Hotel

HRKC LLC ("One10 HRKC"). UMB also seeks summary judgment on Count IV of the

Counterclaim brought by Defendant/Counter-Plaintiff D. Jon Monson ("Monson"); the sole count

in the Second Amended Complaint[1] brought by Defendant/Counter-Plaintiff Howard Yu, solely as trustee of the Anthony J. Jacobson Trust ("AJJ Trust"); and Counts X and XI in UMB's own Amended Complaint (collectively "the Guaranty Claims") against Monson and AJJ Trust. For the reasons stated below, the Court grants UMB's Motion in part and denies it in part.

## I.    Factual and Procedural Background[2]

This lengthy and complex case arises out of the failure of an estimated $80 million development project to build a Hard Rock Hotel and adjacent events center (the "Project") in the City of Edwardsville, Kansas (the "City") by April 1, 2021. Numerous contracts detail the numerous parties' obligations to complete the Project. One contract relevant to UMB's Motion includes the Development Agreement (the "DA"). The DA sets forth various terms for the City to issue certain revenue bonds to finance the Project. One term requires that One10 HRKC obtain a private construction loan before the City issues the bonds.

After One10 HRKC represented that it had secured a $50 million construction loan, the City issued several bonds: $10,655,000 in special obligation transient guest tax revenue bonds ("TGT Bond"); $11,005,000 in special obligation tax increment revenue bonds ("TIF Bond"), and a combined $1,620,000 in two series of community improvement district revenue bonds ("CID Bond") (collectively the "Bonds"). The City issued the Bonds under three trust indentures: the TGT, TIF, and CID Trust Indentures (collectively the "Indentures"), respectively. The trustee of

---

[1] This case was consolidated with *Yu v. UMB Bank, N.A. et al.*, Case No. 23-cv-2441-DDC-GEB on August 2, 2024, for all purposes. *See* Doc. 244. AJJ Trust's Second Amended Complaint is at Doc. 17 in 23-cv-2441-DDC-GEB.

[2] In accordance with summary judgment procedures, the Court has laid out the uncontroverted material facts. The facts, where controverted, are noted as such.

the Indentures holds and administers Trust Estates created by the Indentures, which includes the proceeds from the sale of the Bonds and tax revenues levied with the Project ("Project Fund"), for the benefit of the bondholders. Both the DA and Indentures are now largely between UMB as the trustee and One10 HRKC as the developer.[3] Additionally, Monson and AJJ Trust executed a Guaranty Agreement as guarantors to UMB related to the TGT Indenture.[4]

UMB's Motion against One10 HRKC concerns the claims resulting from a dispute under the DA and Indentures, specifically surrounding UMB's non-payment of One10 HRKC's request for reimbursement under these contracts in "Cost Certification 3." UMB's Motion against Monson and AJJ Trust concerns the claims resulting from a dispute under the Guaranty Agreement and TGT Indenture, specifically about Monson and AJJ Trust's obligation to replenish funds into the TGT Indenture's Debt Reserve Service Fund. The Court lays out the background facts of the Cost Certification 3 dispute and the Debt Reserve Service Fund dispute in turn.

**A.    The Cost Certification 3 Dispute Under the DA and Indentures**

*1.    Background Facts*

As part of the Project, One10 HRKC is eligible under the Indentures to obtain reimbursement for certain eligible expenses it incurs. To obtain reimbursement, the DA requires One10 HRKC to submit a Certification of Expenditure ("Cost Certification") to the City for

---

[3] The DA was originally entered into by the City and Compass Commodity Group III, LLC ("Compass"). The Indentures were originally entered into by the City and Commerce Bank, where the City largely assigned its rights and obligations under the DA to Commerce Bank. Compass and Commerce Bank later assigned their rights and obligations under the DA and Indentures to One10 HRKC and UMB, respectively.

[4] Monson and Anthony John Jacobson formed One10 HRKC to develop the Project. The Guaranty Agreement was originally entered into by Monson and AJJ Trust as guarantors and Commerce Bank as trustee. Commerce Bank later assigned its rights and obligations under the Guaranty Agreement to UMB.

approval. The City approves the Cost Certification by signing it and a Project Fund Written Request, which is prepared by One10 HRKC. The City then sends the Cost Certification and Project Fund Written Request to UMB to distribute the funds.

Immediately after the Bonds were issued via the Indentures, One10 HRKC successfully submitted Cost Certifications 1 and 2 for approval and obtained reimbursement. But on March 6, 2020, the lender for the $50 million construction loan formally informed One10 HRKC in writing that it was unable to advance any of the funds on the loan. On March 17, 2020, a voluntary notice was issued on behalf of the City to the public that One10 HRKC was seeking alternative financing, which was confirmed by One10 HRKC in an April 1, 2020, call between UMB, One10 HRKC, and the City. One10 HRKC never secured alternative financing.

Regardless, One10 HRKC submitted Cost Certification 3 on April 28, 2020, for reimbursement of $829,247.32 total expenses, which the City approved and sent to UMB. But UMB refused to distribute funds arguing that, without a construction loan in place, One10 HRKC was in default and could not truthfully certify the requirements were met for distribution of funds under the DA. Subsequently, UMB issued a written Notice of Default under the DA and made certain demands of One10 HRKC. On June 19, 2020, UMB advised One10 HRKC that a majority of the Indentures' bondholders directed UMB to declare principal and interest be immediately due and payable.

UMB initiated this suit on November 1, 2021, against multiple Defendants, including One10 HRKC. One10 HRKC filed a Counterclaim against UMB on April 11, 2023, alleging several claims based, in part, on UMB's refusal to distribute funds under Cost Certification 3 (Counts I, II, V, VI, VII, and VIII).

-4-

2.      *The Minnesota Judgment*

Before One10 HRKC filed its Counterclaim against UMB, UMB filed a Trust Instruction Proceeding ("TIP") in the District Court for the State of Minnesota on June 22, 2020, seeking confirmation that UMB was not required to make disbursements under Cost Certification 3. UMB also requested an instruction that its conduct "shall not subject UMB Bank, N.A., individually or as trustee, to liability."[5]

One10 HRKC appeared in the TIP, filed an objection, and participated in the multi-day bench trial. One10 HRKC also filed a motion in limine to exclude evidence relating to alleged events of default unidentified by UMB's petition. At trial, One10 HRKC introduced evidence related the parties' obligations for Cost Certification 3. For example, One10 HRKC argued that Section 403(b) of the Indentures required UMB to distribute funds under Cost Certification 3 upon the City's approval. But One10 HRKC asserts that it was unable to present certain liability related evidence because the Minnesota court deferred ruling on its motion in limine until after the trial and because UMB successfully objected to such evidence as beyond the scope of the TIP.

Based on the evidence before it, the Minnesota court ruled that "[r]egardless of whether there was an Event of Default, [UMB] was justified in not paying Cost Certification #3."[6] The Minnesota court reasoned as such because One10 HRKC could not truthfully certify that "no event or condition had occurred which, with notice of passage of time or both, would constitute an Event

---

[5] Doc. 291, Ex. 3 at 24.

[6] *Id.* at 22.

of Default under the Development Agreement" without a construction loan in place.[7] In doing so, the Minnesota court rejected One10 HRKC's interpretation of Section 403(b) of the Indentures. As for UMB's request for an exculpatory instruction, the Minnesota court did "not add specific exculpatory language," and instead stated that the court's "Order speaks for itself."[8]

The Minnesota court denied One10 HRKC's request for a new trial. One10 HRKC appealed to the Minnesota Court of Appeals, which affirmed the Minnesota Judgment. The Minnesota Supreme Court denied One10 HRKC's petition for further review on June 25, 2025.[9]

**B.    The Debt Service Reserve Fund Dispute Under the Guaranty Agreement**

While the Minnesota TIP litigation was ongoing, another dispute in this case arose under the Guaranty Agreement. The Debt Service Reserve Fund of the TGT Indenture is required to maintain an amount of $892,404.36 to pay interest and principal of the Bonds as it becomes due. On October 14, 2021, UMB sent Monson and AJJ Trust a written Demand for Payment under the Guaranty Agreement to replenish a $397,972 shortfall in the Debt Service Reserve Fund.

Monson and AJJ Trust did not replenish the funds, contending they are not obligated to do so because the shortfall would not exist if funds were transferred into the Debt Service Reserve Fund from the TGT Project Fund as required by Section 403(e) of the TGT Indenture. Monson and AJJ Trust also contend that UMB improperly used TGT funds to pay expenses of the other Bonds and to fund UMB's extensive litigation. UMB controverts these arguments.

---

[7] *Id.*

[8] *Id.* at 24.

[9] Doc. 295, Ex. A.

The Debt Service Reserve Fund dispute led to the Guaranty Claims before the Court. Monson filed a Counterclaim against UMB on April 11, 2023, including a claim that UMB breached its duty of good faith and fair dealing under the Guaranty Agreement (Count IV). AJJ Trust filed its Second Amended Complaint alleging a similar claim against UMB on October 26, 2023. On May 1, 2024, UMB filed its Amended Complaint to include a claim for breach of the Guaranty Agreement against Monson and AJJ Trust (Count X) and a claim for judicial declaration on Monson's and AJJ Trust's obligation under the Guaranty Agreement (Count XI).

**C.    Contractual Provisions at Issue**

Because UMB's Motion concerns several provisions from various and interrelated contracts, the Court details relevant provisions here before discussing them more generally in the analysis below. In doing so, the Court identifies the relevant parties by name for clarity.

*1.    Relevant Provisions of the DA*

The DA plays a substantial role in the Cost Certification 3 dispute. Section 501 contains the provisions for obtaining reimbursement under the Indentures:

> **Section 501. Reimbursement of Eligible Expenses**. . . .
>
> **(d) Submission of Certification of Expenditures.** [One10 HRKC] shall submit to the City Manager a Certification of Expenditures . . . signed by [One10 HRKC], with supporting documentation identifying the TIF Eligible Expenses, TGT Eligible Expenses, or CID Eligible Expenses for which [One10 HRKC] seeks reimbursement.
>
> . . .
>
> **(g) Conditions Precedent.** As a condition precedent to disbursement of TIF Proceeds, TGT, or CID Sales Tax to [One10 HRKC], [One10 HRKC] must (i) not be, in the reasonable judgment of the City, in material default under this Agreement.

Section 901 and 902 provide what constitutes a breach and an Event of Default under the DA:

-7-

**Section 901. Breach.** [One10 HRKC's] or the City's failure to comply with provisions of this Agreement . . . within the time limits and in the manner for the completion of the TIF Project, TGT Project, and the CID Project as herein or therein stated, except for Permitted Delays, shall constitute a breach of this Agreement . . . .

**Section 902. Events of Default**

**(a)** The following events shall constitute an "Event of Default" under this Agreement:

. . .

(iv) Breach by [One10 HRKC] of the representations and warranties set forth in this Agreement and failure to cure or correct same.

The DA defines Permitted Delay as:

any delay by a party performing its respective obligations hereunder, as a result of a condition or event outside the reasonable control and through no fault of the party so delayed . . . such as natural disasters . . . and similar acts beyond the control of the parties excluding failure of a party to obtain necessary financing, a business decision to delay or withdraw resources to a project or similar acts related to monetary circumstances.

*2.        Relevant Provisions of the Indentures*

The Indentures' provisions are substantially identical, distinct only because they relate to separate bonds issued by the City for the Project. Because the TGT Indenture is the only Indenture specifically at issue, the Court details the TGT Indenture's provisions below.

Section 403 contains provisions relevant to both the Cost Certification 3 dispute and the Debt Service Reserve Fund dispute:

**Section 403. Application of Moneys in the Project Fund.**

(b) ***Disbursements.*** . . .  [UMB] shall disburse moneys to deposit in the Project Fund from time to time to pay or as reimbursement for payment made for the TGT Eligible Expenses (other than Costs of Issuance), in each case within three Business Days after receipt by [UMB] of written disbursement requests of [One10 HRKC] properly completed in all respects and in substantially the form of Exhibit D hereto, signed by the Authorized Owner Representative and approved by the Authorized

Issuer Representative, following satisfaction of all requirements of the Development Agreement for disbursal.

In making payments pursuant to this Section, [UMB] may rely upon such written requests and accompanying certificates and statements and shall not be required to make any independent investigation in connection therewith . . . .

. . .

(e) ***Loss of Entitlement to Distribution of Bond Proceeds.*** If an Authorized Issuer Representative certifies to [UMB] that an event has occurred or a condition exists under the Development Agreement for which [One10 HRKC] has had at least 60 days' notice which (if able to be cured) has not been cured in accordance with the applicable provisions thereof, and which event or condition has as a consequence that [One10 HRKC] is no longer entitled to the distribution of proceeds of the Bonds to be applied to the payment of TGT Eligible Expenses, all subject to any rights which [One10 HRKC] may have under the Development Agreement, then any balance remaining in the Project Fund, shall be transferred to the Redemption Account of the Debt Service Fund and used to redeem the Bonds at the earliest permissible date under **Section 303** of this Indenture.

Section 1004 is relevant to the Debt Service Reserve Fund dispute:

**Section 1004. Compensation and Reimbursement.** [UMB] shall be entitled to payment or reimbursement for the following:

. . .

(b) except as otherwise expressly provided herein, upon its request, for all reasonable expenses, disbursements and advances reasonably incurred or made by [UMB] in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel, as well as extraordinary costs and expenses), except any such expense, disbursement or advance as may be attributable to [UMB]'s negligence or bad faith; and

(c) to indemnify the Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any action, suit, demand, judgment, claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

3. *Relevant Provisions of the Guaranty Agreement*

The following provisions from the Guaranty Agreement are relevant to the Debt Service

Reserve Fund dispute:

**Section 1. Preliminary Statements.** . . . [Monson and AJJ Trust] expect to benefit financially from the issuance of the Bonds and certain related transactions and acknowledge that it is a condition precedent to the issuance of the Bonds that [Monson and AJJ Trust] execute and deliver this Guaranty . . . .

**Section 2. Unconditional Guaranty.** Subject to Section 3 hereof, [Monson and AJJ Trust] unconditionally and irrevocably guarantee to [UMB] for the benefit of the Bondholders the maintenance of the Debt Service Reserve Requirement ($892,404.36) in the Debt Service Reserve Fund under the Indenture from the date of issuance of the Bonds through and including the later of: (i) the fifth anniversary of the date the Hotel is placed in service; or (ii) the first date that Excess TGT Revenues are calculated as exceeding thirty-five percent (35%) of the Debt Service Requirements under the Indenture for the then current calendar year (such guarantee, the "**Obligations**").

[Monson and AJJ Trust] agrees that (to the extent permitted by law) its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Bonds or the Indenture, the absence of any action to enforce the same, any waiver or consent by any Bondholder with respect to any provisions hereof or thereof, any release of any other Guarantor, the recovery of any judgment against the Issuer, any action to enforce the same, whether or not a guaranty is affixed to any particular Bond, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor (other than payment). To the fullest extent permitted by law, [Monson and AJJ Trust] hereby waives the benefit of diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that this Guaranty shall not be discharged except by complete performance of the Obligations contained in this Guaranty . . . .

. . .

**Section 4. Waiver.** [Monson and AJJ Trust] waive promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that [UMB] protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against the Issuer or any other person or entity or any collateral. [Monson and AJJ Trust] further waive notice of [UMB]'s or Bondholders' acceptance of this Guaranty and any rights to demand or require collateral security from the Issuer or any other person.

. . .

**Section 7. Immediate Payment.** [Monson and AJJ Trust] agree to make immediate payment to [UMB] of all Obligations owing or payable upon receipt of a demand for payment therefor by [UMB] to [Monson and AJJ Trust] in writing.

-10-

. . .

**Section 16. Costs and Expenses.** [Monson and AJJ Trust] shall pay on demand by [UMB] any and all reasonable costs, fees and expenses (including, without limitation, reasonable legal fees on a solicitor and client basis) incurred by [UMB], its agents, advisors and counsel or any of the Bondholders in enforcing any of their rights under this Guaranty.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[10] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[11] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[12] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[13] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[14] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[15]

---

[10] Fed. R. Civ. P. 56(a).

[11] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[12] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[13] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[14] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[15] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

### III.    Analysis

Counts I, II, V, VI, VII, and VIII of One10 HRKC's Counterclaim concern the Cost Certification 3 dispute between One10 HRKC and UMB. The Guaranty Claims concern the Debt Service Reserve Fund dispute between UMB, Monson, and AJJ Trust. The Court proceeds first with the parties' arguments and claims concerning the Cost Certification 3 dispute and then turns to the arguments and claims concerning the Debt Service Reserve Fund dispute.

### A.    Count I of One10 HRKC's Counterclaim

UMB first moves for summary judgment on Count I of One10 HRKC's Counterclaim, tortious interference of the Development Agreement. UMB argues Count I is barred under res judicata. Alternatively, UMB argues Count I fails as a matter of law because UMB is not a stranger to the contract; a party must be a stranger to the underlying contract to establish a tortious interference claim under Kansas law.[16] One10 HRKC does not oppose UMB's argument on Count I. Accordingly, the Court grants summary judgment on Count I of the Counterclaim in UMB's favor.

### B.    Counts II and V–VIII of One10 HRKC's Counterclaim

Next, UMB moves for summary judgment on Counts II and V–VIII of the Counterclaim as barred by the Minnesota Judgment against One10 HRKC. Specifically, UMB argues the Minnesota Judgment precludes further litigation by One10 HRKC on these Counts because it

---

[16] *See Diederich v. Yarnevich*, 40 Kan. App. 2d. 801, 196 P.3d 411, 418 (2008) (citing *Macke Laundry Serv. Ltd. P'ship v. Misson Assocs., Ltd.*, 19 Kan. App. 2d 553, 873 P.2d 219, 225 (1994) ("A claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract at the time of the interference between the plaintiff and a third party.")).

adjudicated the issues surrounding Cost Certification 3 in UMB's favor.[17] Because the state court judgment at issue was rendered in Minnesota, the Court applies Minnesota law to determine its preclusive effect.[18]

To establish issue preclusion under Minnesota law, the following elements must be met: "(1) the issue must be identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or was in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue."[19] Because One10 HRKC does not dispute that the Minnesota Judgment involved the same parties or that it is a final judgment on the merits, the Court need only address whether the issues are identical and whether One10 HRKC had a full and fair opportunity to litigate.

### 1.    Identical Issues

For issue preclusion purposes, "issues are identical when 'the issues presented by [the current] litigation are in substance the same as those resolved' in the previous litigation."[20] In the previous litigation—the Minnesota TIP—UMB sought confirmation that it was not required to

---

[17] There is some confusion surrounding which preclusion principle UMB argues under. In its supporting Memorandum, UMB relies on the preclusive principle of res judicata, also known as claim preclusion. *Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn. 2004). One10 HRKC argues that collateral estoppel, also known as issue preclusion, applies instead. *Id.* In its Reply, UMB does not directly address One10 HRKC's argument that issue preclusion is the applicable principle and instead argues that One10 HRKC's argument under issue preclusion fails.

Claim preclusion and issue preclusion are related doctrines, and the terms are often used interchangeably, but each doctrine has a different effect. *Id.* Issue preclusion is narrower than claim preclusion because it "applies to specific legal issues that have been adjudicated." *Id.* Here, because UMB's arguments lie in the specific issues surrounding Cost Certification 3 litigated in the Minnesota TIP, the Court applies issue preclusion principles to determine the Minnesota Judgment's preclusive effect.

[18] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (citing 28 U.S.C. § 1738).

[19] *Hauschildt*, 686 N.W.2d at 837 (citation omitted).

[20] *All Finish Concrete, Inc. v. Erickson*, 899 N.W.2d 557, 567 (2017) (quoting *Montana v. United States*, 440 U.S. 147, 155 (1979)).

make any further disbursements under the Indentures, including Cost Certification 3. The Minnesota court held that UMB was justified in not paying Cost Certification 3. The Minnesota court did so because One10 HRKC could not truthfully certify that no event or condition had occurred which, with notice of passage of time or both, would constitute an Event of Default under the Development Agreement, which is a requirement to obtain a disbursement under Cost Certification 3.

Compared with the current litigation, the Cost Certification 3 issue in the Minnesota TIP is in substance the same as the issue surrounding Cost Certification 3 in Counterclaim Counts II and V–VIII. Previously, the Court dismissed two bases for Counterclaim Count II, leaving only One10 HRKC's basis that UMB breached the DA by refusing to distribute proceeds under Cost Certification 3.[21] Counts V–VIII allege breaches of the TIF and TGT Indentures, and their respective duties of good faith, based on UMB's refusal to disburse proceeds under Cost Certification 3. Counts II and V–VIII necessarily rely on a finding that UMB was not justified in refusing to distribute proceeds under Cost Certification 3. The Minnesota Judgment addressed whether UMB was justified in refusing to disburse proceeds under Cost Certification 3, the very issue at the heart of Counterclaims Counts II and V–VIII.

Attempting to distinguish the issues, One10 HRKC argues that the equitable nature of the Minnesota TIP compared to the nature of the Counterclaim Counts seeking damages in this Court render the issues non-identical. One10 HRKC further quotes the Minnesota Judgment as explicitly declining to grant UMB's requested instruction that its conduct "shall not subject UMB Bank,

---

[21] *UMB Bank, N.A. v. Monson*, 2023 WL 5952161, at *8–9 (D. Kan. Sept. 13, 2023).

N.A., individually or as trustee, to liability." True, the Minnesota court chose to "not add specific exculpatory language," but it stated that the court's "Order speaks for itself." Speaking for itself, the Minnesota Judgment addressed whether UMB was justified in refusing to distribute funds under Cost Certification 3, which is the core substance of One10 HRKC's Counterclaim Counts in this Court. The issue remains the same regardless of the equitable nature of the TIP; one cannot be held liable for damages based on breach of contract or a duty of good faith if there was no breach to begin with. Accordingly, the issues between the Minnesota Judgment and Counterclaim Counts II and V–VIII are identical for issue preclusion purposes.

### 2. *Full and Fair Opportunity to Litigate*

The determination of whether a party had a full and fair opportunity to litigate "generally focuses on 'whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.'"[22] "[A] litigant's disagreement with a legal ruling does not necessarily mean that the court denied the litigant a full and fair opportunity to litigate a matter."[23]

UMB asserts One10 HRKC had a full and fair opportunity to litigate the issue because it presented evidence related to the obligations and procedures under the Indentures, the DA, and Cost Certification 3 at the Minnesota TIP. One10 HRKC disagrees, pointing to the motion in limine it filed in the Minnesota TIP seeking exclusion of evidence relating to alleged events of

---

[22] *State v. Joseph*, 636 N.W.2d 322, 328 (Minn. 2001) (quoting *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990)).

[23] *Id.* at 329 (citation omitted).

default unidentified by UMB's petition. Because the Minnesota court deferred ruling on the motion in limine until after trial, One10 HRKC avoided presenting certain liability related evidence to preserve its objection to the evidence's admissibility. One10 HRKC also points to questions it attempted to ask about uncured events of default that the Minnesota court excluded by sustaining UMB's objections. One10 HRKC asserts that these are significant procedural limitations that denied it a full and fair opportunity to litigate the Cost Certification 3 issue.

But even if One10 HRKC presented liability related evidence at trial, it would not have impacted the outcome of the Minnesota Judgment on UMB's obligation under Cost Certification 3. The Minnesota Judgment held that UMB was justified in refusing to distribute funds under Cost Certification 3 "[r]egardless of whether there was an Event of Default." Thus, presenting evidence of alleged events of default unidentified by UMB's petition would not impact the Minnesota Judgment on the issue or otherwise constitute a significant procedural limitation. Additionally, One10 HRKC appealed the Minnesota Judgment, and the Minnesota Court of Appeals affirmed it. To hold that One10 HRKC was denied a full and fair opportunity to litigate simply because it disagrees with the Minnesota courts' legal rulings would contravene the purposes underlying the doctrine of collateral estoppel.[24] Accordingly, One10 HRKC had a full and fair opportunity to litigate the Cost Certification 3 issue.

3.    *The Court Applies Issue Preclusion to Counterclaims Counts II and V–VIII*

Even though the Court finds all four issue preclusion elements are present, One10 HRKC asks the Court to not apply issue preclusion because doing so would result in injustice. "Once it is

---

[24] *See SIL-FLO, Inc.*, 917 F.2d at 1521.

determined that collateral estoppel is available, the decision to apply the doctrine is left to the district court's discretion."[25] In deciding whether to apply issue preclusion, "the focus is on whether . . . application would work an injustice on the party."[26] As such, the Court is mindful that issue preclusion should not be rigidly applied; instead, it "should be invoked only after careful inquiry because it 'may govern grounds and defenses not previously litigated' and therefore 'blockades unexplored parts that may lead to the truth.'"[27] The Court is also mindful, however, that issue preclusion exists to promote "conservation of judicial resources, preservation of the courts' integrity by preventing inconsistent results, promotion of final judgments, and protection of parties from relitigating the same issues."[28]

One10 HRKC argues injustice would result because the record in the Minnesota TIP is not as developed as it is in this case, which has been ongoing for years, and that One10 HRKC should have an opportunity to present the evidence to a jury. As previously addressed, further development of the record at the Minnesota TIP would not have changed the Minnesota Judgment. Permitting One10 HRKC to relitigate the issue before a jury would only expend more judicial resources than One10 HRKC's Counterclaim Counts already have and could lead to inconsistent results in the face of the final Minnesota Judgment.

---

[25] *Curtis v. Altria Grp., Inc.*, 792 N.W.2d 836, 853 (Minn. Ct. App. 2010), *rev'd on other grounds*, 813 N.W.2d 891 (Minn. 2012) (alterations omitted).

[26] *Hauschildt*, 686 N.W.2d at 837 (citation omitted).

[27] *Id.* (quoting *Brown v. Felsen*, 442 U.S. 127, 132 (1979)).

[28] *Ill. Farmers Ins. Co. v. Reed*, 647 N.W.2d 553, 560 (Minn. App. 2002), *rev'd on other grounds*, 662 N.W.2d 529 (Minn. 2003).

Additionally, One10 HRKC argues injustice would result because there are substantial reasons to doubt the Minnesota court's contractual analysis surrounding Cost Certification 3 and Section 403(b) of the Trust Indentures.[29] In doing so, One10 HRKC reveals its intent to simply relitigate an issue that it has lost, twice, in Minnesota state courts. This is precisely what the principle of issue preclusion seeks to avoid.[30] Accordingly, the Court exercises its discretion to apply issue preclusion to the Cost Certification 3 issue underlying Counterclaim Counts II and V–VIII.

When issue preclusion precludes litigation of an issue, summary judgment on that issue is proper.[31] Issue preclusion precludes One10 HRKC from further litigating UMB's obligation to distribute proceeds under Cost Certification 3, the only remaining basis for Counterclaim Counts II and V–VIII. Therefore, the Court grants summary judgment on Counts II and V–VIII in UMB's favor.

## C.     The Guaranty Claims

Turning to the Debt Service Reserve Fund dispute, UMB seeks summary judgment in its favor on the Guaranty Claims arguing it has established the elements of its own claims under the Guaranty Agreement as a matter of law. UMB also argues that Monson and AJJ Trust waived any

---

[29] One10 HRKC cites the Court's previous ruling at the motion to dismiss stage for support that there is reason to doubt the Minnesota court's interpretation. *UMB Bank, N.A.*, 2023 WL 5552161, at *12. There, the Court interpreted Section 403(b)'s use to the phrase "shall disburse moneys" to determine that One10 HRKC is a third-party beneficiary to the Indentures, concluding "[i]t is difficult to conceive clearer rights-giving language." *Id.* The Court's previous analysis is irrelevant to the determination of whether UMB properly refused to distribute funds under Cost Certification 3, which encompasses other contractual language found in the Indentures that the Court did not consider. *See* Doc. 291, Ex. 3, at 9, 22.

[30] *See SIL-FLO, Inc.*, 917 F.2d at 1521.

[31] *Fain v. Anderson*, 816 N.W.2d 696, 702 (citation omitted).

defenses—including their claims—to the Guaranty Agreement and, alternatively, that Monson and AJJ Trust's claims fail as a matter of law. The Court addresses UMB's Guaranty claims and Monson and AJJ Trust's defenses and counterclaims in turn.

       *1.*     *UMB's Guaranty Claims: Count X and XI of UMB's Amended Complaint*

The parties agree that Kansas law governs the Guaranty Agreement. Under Kansas law, "a guaranty involves a tripartite relationship based on a contract between two or more persons by which one person promises to answer for the debt of a third person."[32] The rules governing the interpretation of contracts generally apply to interpretation of a guaranty.[33] As such, to establish a claim for breach of a guaranty, UMB must establish: (1) the existence of a guaranty between the parties; (2) sufficient consideration to support the guaranty; (3) the plaintiff's performance or willingness to perform in compliance with the guaranty; (4) defendant's breach of the guaranty; and (5) damages suffered due to the breach.[34]

The parties' arguments surrounding UMB's Guaranty claim in Count X first concern whether there was a breach. UMB argues Monson and AJJ Trust breached the Guaranty Agreement by failing to remit payment to the Debt Service Reserve Fund upon receiving UMB's written demand for payment pursuant to Section 7 of the Guaranty Agreement.

Monson and AJJ Trust agree that they did not remit payment upon receiving UMB's written request. But they seemingly argue that they were not obligated to do so because UMB

---

[32] *Kan. State Bank & Tr. Co. v. DeLorean*, 7 Kan. App. 2d 246, 640 P.2d 343, 350 (1983) (citation omitted).

[33] *Botkin v. Sec. State Bank*, 281 Kan. 243, 130 P.3d 92, 96 (2006).

[34] *City of Andover v. Sw. Bell Tel., L.P.*, 37 Kan. App. 2d 358, 153 P.3d 561, 565 (2007) (citation omitted).

breached first. Under the first-to-breach doctrine, "a party is not liable for a material failure of performance if it can show that the other party committed a prior material breach of the contract because in such event, the prior breach discharged the first party's own duty to perform."[35]

Here, Monson and AJJ Trust demonstrate the possibility of UMB's prior breach based on Section 403(e) of the Indentures. Section 403(e) provides that funds shall transfer into the Debt Service Reserve Fund from the TGT Project Fund when an Event of Default of the DA and Indentures occurs. Monson and AJJ Trust argue that UMB's June 19, 2020, notification that a majority of the bondholders directed UMB to declare principal and interest to be immediately due and payable triggered Section 403(e), and that the remaining balance of the TGT Project Fund should have been transferred into the Redemption Account. This did not occur, creating the deficit in the Debt Service Reserve Fund that UMB sent written demand to Monson and AJJ Trust to replenish.

UMB fails to meaningfully reply to Monson and AJJ Trust's first-to-breach argument, distilling it down to "a legal interpretation, not an undisputed fact."[36] UMB does not explain how Monson and AJJ Trust's legal interpretation, however, is incorrect other than to point Section 1004 of the Indentures, which states that UMB is entitled to reimbursement for reasonable expenses. Notably absent from UMB's Section 1004 argument are the portions that excepts reimbursement of expenses attributable to UMB's bad faith, which Monson and AJJ Trust claim UMB acted in

---

[35] *Rojas v. Buildforce Constr., LLC*, 2023 WL 3582845, at *2 (D. Kan. Feb. 28, 2023) (alterations and citations omitted); *see also Alenco, Inc. v. Warrington*, 65 Kan. App. 2d 79, 560 P.3d 586, 596 (2024) ("When a party materially breaches a contract, they are precluded from enforcing the contract against the nonbreaching party until the material breach has been cured.") (citing *Bank of Am. v. Narula*, 46 Kan. App. 2d 142, Syl. ¶ 3, 261 P.3d 898, 902 (2011)).

[36] Doc. 322 at 6.

-20-

by ignoring its own contractual obligations and funding excessive litigation on behalf of the Bonds.[37] Thus, UMB has not met its burden to establish that Monson and AJJ Trust breached the Guaranty Agreement as a matter of law, nor has UMB established that it is entitled to declaratory judgment (Count XI) in its favor on the matter.

       2.    *Monson and AJJ Trust's Guaranty Defenses and Claims: Count IV of Monson's Counterclaim and the Sole Count in AJJ Trust's Second Amended Complaint*

          a.    Waiver

Additionally, Monson and AJJ Trust have not waived their ability to assert their claim for breach of the duty of good faith in the Guaranty Agreement. UMB's argument to the contrary rests in Section 2 of the Guaranty Agreement and in *Bank Midwest, N.A. v. Millard*,[38] both of which UMB raised to the Court at the motion to dismiss stage.[39]

In *Bank Midwest*, the plaintiff sought collection on the "unconditional guaranty" the defendant made, which stated:

> The obligations of Guarantors hereunder are continuing, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Obligations or any of the Loan Documents [. . .] and irrespective of any other circumstance other than payment whatsoever which might

---

[37] In its Reply, UMB suggests the Minnesota Judgment supports a conclusion that UMB's conduct regarding the Debt Service Reserve Fund and funding litigation connected to the Project is within the express contractual scope of its rights under the TGT Indenture and Guaranty Agreement. The Minnesota Judgment, however, only decided that UMB was justified in not distributing funds under Cost Certification 3. The Minnesota Judgment did not address whether UMB was justified in funding the litigation in connection with the Project across all three Indentures, which underlies Monson and AJJ Trust's breach of the duty of good faith against UMB.

[38] 2012 WL 4359060 (D. Kan. Sept. 24, 2012).

[39] *UMB Bank, N.A.*, 2023 WL 5952161, at *10. The Court did not explicitly address *Bank Midwest* at the dismissal stage but generally rejected UMB's waiver argument relying on it. *See id.*; Doc. 153 at 17–18.

otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.[40]

The defendant raised several affirmative defenses in his answer, including the plaintiff's failure to mitigate damages and breach of the duty of good faith and fair dealing.[41]

The district court granted summary judgment in the plaintiff's favor for several reasons.[42] Primarily, the defendant failed to respond to the plaintiff's summary judgment motion or otherwise present evidence on any of his affirmative defenses, warranting summary judgment in the plaintiff's favor.[43] The district court went further to state that the "a guarantor may prospectively waive any defenses to enforcement of the contract, including but not limited to the failure to mitigate damages," concluding that the defendant waived the defense of failure to mitigate.[44] As for breach of the duty of good faith and fair dealing, the district court noted that the defendant "waived any contract defenses under the terms of the unconditional guarantee."[45] But the district court also rejected this affirmative defense because the defendant "neither [pled] a cause of action for breach of contract nor [pointed] to any term in the contract that [plaintiff] allegedly violated."[46]

---

[40] *Bank Midwest, N.A.*, 2012 WL 4359060, at *3, *6.

[41] *Id.* at *6–7.

[42] *Id.*

[43] *Id.* at *6.

[44] *Id.* at *7 (citing *DeLorean*, 640 P.2d at 352–53; *United States v. Healy*, 923 F. Supp. 1424, 1429–30 (D. Kan. 1996)).

[45] *Id.*

[46] *Id.*

Unlike the defendant in *Bank Midwest*, Monson and AJJ Trust responded to UMB's Motion for Partial Summary Judgment with evidence of their affirmative defenses. And although an unconditional guaranty *may* prospectively waive certain defenses,[47] whether Monson and AJJ Trust did so here depends on the language in the Guaranty Agreement before the Court. In interpreting the Guaranty Agreement, the Court must construe its provisions "according to the intention of the parties as determined by a reasonable interpretation of the language used in light of the attendant circumstances" [48] and take care to avoid "[r]esults which vitiate the contract's purpose or reduce the terms of the contract to an absurdity."[49]

The Court concludes that Section 2 of the Guaranty Agreement does not bar Monson and AJJ Trust from bringing claims for breach of the duty of good faith against UMB or raising their affirmative defenses to UMB's Guaranty claim. As the Court previously noted at the dismissal stage, UMB's interpretation of the Section 2 would transform the Guaranty Agreement into a bottomless money well for UMB to use without guardrails. This result is contrary to the parties' intent as evidenced by the Guaranty Agreement's other provisions. Section 1 of the Guaranty Agreement provides that Monson and AJJ Trust "expect to benefit financially from the issuance of the Bonds and certain related transactions." Monson and AJJ Trust could have no reasonable expectation of financial benefit under UMB's interpretation. Section 4, the Guaranty Agreement's waiver provision, enumerates "notice" and "security," amongst others, as waived, but does not

---

[47] *Id.*

[48] *Overland Park Sav. & Loan Ass'n v. Miller*, 243 Kan. 730, 763 P.2d 1092, 1097–98 (1988).

[49] *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 602 P.2d 1299, 1303 (1979) (citation omitted).

waive all potential defenses against UMB under the Guaranty Agreement. Similarly, Section 2 itself enumerates several potential defenses as waived, none of which suggest that Monson and AJJ Trust waived their ability argue UMB breached the duty of good faith.[50]

Section 2 may use the term "unconditional," but the Guaranty Agreement's form alone does not support a holding that Monson and AJJ Trust waived all prospective defenses.[51] To hold otherwise would contravene the parties' intentions and reduce the terms of the Guaranty Agreement to an unending drain on Monson's and AJJ Trust's finances. Accordingly, UMB fails to establish that Monson and AJJ Trust waived their Guaranty Agreement defenses and counterclaims as a matter of law.

b.     Monson and AJJ Trust's Guaranty Claims

Finally, UMB does not establish that Monson and AJJ Trust's Guaranty claims against it fail as a matter of law. UMB first contends that permitting Monson and AJJ Trust's claims that UMB breached of the duty of good faith to go forward is contrary to Kansas law, arguing that Monson and AJJ Trust have failed to "point to a term of the contract which the defendant allegedly violated by failure to abide by the good faith spirit of that term."[52] For support, UMB cites the Court's previous ruling at the motion to dismiss stage that "no provision explicitly prevents them

---

[50] UMB narrowly focuses on Section 2's catch-all phrase of "any other circumstance which might otherwise constitute a legal or equitable discharge or defense" to make its waiver argument. This general enumeration, however, must be "construed to embrace only objects similar in nature" to the specific enumerations before it. *See Woessner v. Labor Max Staffing*, 312 Kan. 36, 471 P.3d 1, 9 (2020) (quotation omitted).

[51] Indeed, "[t]he form of the guaranty (conditional or unconditional) determines only whether the creditor is required to first proceed against the principal obligor" and that "[s]eparate and apart from that issue is the defense a guarantor may raise in an action against him." *DeLorean*, 640 P.2d at 350 (cited by *Bank Midwest, N.A.*, 2012 WL 4359060, at *7).

[52] *LNV Corp. v. Curry*, 2010 WL 11565487, at *7 (D. Kan. Aug. 17, 2010) (citation and internal quotation mark omitted).

-24-

from using the TGT Funds for whatever purpose they choose."[53] But, as the Court also noted in its ruling, Monson and AJJ Trust can point to terms of the Guaranty Agreement that UMB's actions allegedly violate, particularly Section 1 which provides that Monson and AJJ Trust expect to benefit financially from the arrangement.[54] Thus, Monson and AJJ Trust's Guaranty claims do not fail on this ground.

UMB also contends that Monson and AJJ Trust's Guaranty claims fail because UMB did not act in bad faith as a matter of law, arguing that the plain language of the Guaranty Agreement authorizes it to withdraw funds to pay fees and expenses across the Bonds. Again, while the Guaranty Agreement does authorize UMB to withdraw funds, it does not authorize UMB to do so without limit. Monson and AJJ Trust maintain that UMB has violated that limit by incurring unreasonable expenses in bad faith. "Whether the duty of good faith and fair dealing has been violated raises a question of fact."[55] Factual disputes remain regarding UMB's purported bad faith, including whether UMB's expenses are reasonable under the Guaranty Agreement. Accordingly, UMB is not entitled to summary judgment on Monson and AJJ Trust's Guaranty claims.

## IV. Conclusion

Overall, the Minnesota Judgment precludes One10 HRKC from relitigating the Cost Certification 3 issue, thus warranting summary judgment on Counts I, II, V, VI, VII, and VIII of One10 HRKC's Counterclaim in UMB's favor. But UMB fails to establish that it is entitled to

---

[53] *UMB Bank, N.A.*, 2023 WL 5952161, at *10

[54] *Id.*

[55] *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250, 265 (2013).

judgment as a matter of law on the Guaranty Claims. Thus, Counts X and XI of UMB's Amended Complaint, Count IV of Monson's Counterclaim, and AJJ Trust's Second Amended Complaint remain.

**IT IS THEREFORE ORDERED** that UMB's Motion for Partial Summary Judgment (Doc. 287) is **GRANTED in part and DENIED in part.** The Court grants summary judgment in UMB's favor on Counts I, II, V, VI, VII, and VIII of One10 HRKC's Counterclaim and denies summary judgment on the remaining claims challenged by UMB's Motion.

**IT IS SO ORDERED.**

Dated this 2nd day of December, 2025.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE