**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UMB BANK, N.A., solely in its capacity as
successor trustee for the Bonds,

       *Plaintiff/Counter-Defendant*,

v.

D. JON MONSON, et al.,

       *Defendants/Counter-Plaintiffs,*

v.

COLLIERS SECURITIES, LLC, et al.,

       *Third-Party Defendants.*

Case No. 21-2504-EFM

HOWARD YU, solely in his capacity as trus-
tee of the estate of Anthony John Jacobson
Trust,

       *Plaintiff/Counter-Defendant*,

v.

UMB BANK, N.A., solely in its capacity as
successor trustee for the Bonds,

       *Defendant/Counter-Plaintiff*.

**MEMORANDUM AND ORDER**

Before the Court are six summary judgment motions brought by various Defendants in this

complex, consolidated case[1] implicating the claims in Plaintiff/Counter-Defendant UMB Bank,

N.A. ("UMB")'s Amended Complaint and the remaining claim in the Monson Third-Party

---

[1] This case was consolidated with Yu v. UMB Bank, N.A. et al., Case No. 23-2441-DDC-GEB on August 2, 2024, for all purposes. Doc. 244.

Plaintiffs'[2] Third-Party Complaint. Each motion, its relevant parties, and the Court's respective rulings are summarized as follows:

1. The AJJ Trust[3] brings a Motion for Summary Judgment on UMB's claims against them: Counts I–II, IV–VII, and X–XII of UMB's Amended Complaint[4] (Doc. 414). The Court grants in part and denies in part this motion.

2. The Colliers Defendants[5] bring a Motion for Summary Judgment on the Monson Counter-Plaintiffs' breach of contract claim against them (Doc. 415). The Court grants this motion.

3. Defendant Mutual Credit Corporation ("MCC") brings a Motion for Summary Judgment on UMB's claims against it: Counts I–II and XII (Doc. 418). The Court denies this motion.

4. The Vernal Bay Defendants[6] bring a Motion for Summary Judgment against UMB's claims against them: Counts I–II and XII (Doc. 419). The Court grants in part and denies in part this motion.

5. The Monson Defendants[7] bring a Motion for Summary Judgment against UMB's claims against them: Counts I–VII, X and XI (Doc. 420). The Court grants in part and denies in part this motion.

---

[2] The "Monson Third-Party Plaintiffs" include D. Jon Monson; Compass Commodity Group III, LLC; 11 Water LLC; One10 HRKC LLC; and One10 Hotel Holdings LLC.

[3] "AJJ Trust" includes Defendant Howard Yu, solely in his capacity as the discretionary trustee for the Anthony John Jacobson Trust, and Defendant Peak Trust Company, solely in its capacity as the administrative trustee for the Anothony Jacobson Trust.

[4] Counts X and XI of UMB's Amended Complaint now include counts I and II of UMB's amended complaint from the consolidated case, Case No. 23-2441-EFM-BGS. Like the parties do in their briefing, the Court will refer to these claims as set forth in UMB's Amended Complaint in this case, Case No. 21-2504-EFM.

[5] The "Colliers Defendants" include Third Party Defendants Colliers Securities, LLC and Colliers Mortgage, LLC.

[6] The "Vernal Bay Defendants" include Vernal Bay Capital Group, LLC and Vernal Bay Investments, LLC.

[7] The "Monson Defendants" include D. Jon Monson; Compass Commodity Group III LLC; 11 Water LLC; One10 Hotel Holdings LLC; One10 Hotel HRKC LLC; Matthew Stoen; The Landschute Group; Big Sand LLC; HFF Texas LLC; Grayley Fiduciary Management Corporation; Jaren Johnson, as Trustee of the CBB Trust; D. Jon Monson, as Trustee of the CBB 1 Trust, D. Jon Monson, as Trustee of the CBB 2 Trust; and D. Jon Monson, as Trustee of the CBB 3 Trust.

6. Defendants Anthony Jacobson and Robert Boyer bring a Motion for Summary Judgment on UMB's claims against them: Counts I–II and XII (Doc. 421). The Court denies this motion.

With that summation, the Court embarks on the odyssey of explaining its reasoning.

## I.    Factual and Procedural Background[8]

### A.    The Parties

The complex nature of this case and the six summary judgment motions before the Court warrant an introduction of the relevant parties.

Let's begin with this case's namesake Defendant: D. Jon Monson. Monson is part owner and sole manager of One10 Hotel Holdings, LLC ("One10 Holdings"); Compass Commodity Group III, LLC ("Compass"); and 11 Water LLC ("11 Water"). One10 Holdings is the sole owner of One10 Hotel HRKC, LLC ("One10 HRKC"), which Monson manages and controls. Monson is also the sole owner of The Landschute Group ("Landschute") and Big Sand, LLC ("Big Sand"). In addition, Monson is grantor, trustee, and sole current income beneficiary to three revocable trusts: CBB 1 Trust, CBB 2 Trust, and CBB 3 Trust. Further, Monson is grantor of The CBB Trust, an irrevocable trust with Jaren Johnson as its trustee.

Johnson solely owns, manages, and controls HFF Texas LLC ("HFF Texas"), which is a minority owner of Compass. The CBB Trust, which Johnson is trustee to, owns Grayley Fiduciary Management ("Grayley"). Monson's son-in-law, Matthew Stoen, works as a consultant at Grayley. Stoen also works at Monson's other company, Landschute.

---

[8] In accordance with summary judgment procedures, the Court has laid out the uncontroverted material facts. The facts, where controverted, are noted as such.

Like Monson, Defendant Anthony Jacobson is connected to several of the Defendants in this case. Jacobson is a member of One10 HRKC, which (recall) is managed and controlled by Monson. Jacobson owns his own loan financing businesses too; he is the owner of MCC and part owner of Vernal Bay Capital Group ("VBCG") and Vernal Bay Investments ("VBI"). Jacobson's business partner, Robert Boyer, is the other part owner of VBCG and VBI and is also a member of One10 HRKC. In addition, Jacobson is also the beneficiary to the AJJ Trust, an irrevocable family trust originally created by Jacobson's father. Howard Yu is AJJ Trust's discretionary trustee, Peak Trust Company ("Peak") is the AJJ Trust's administrative trustee, and Monson is the AJJ Trust's investment trustee.

Turning to this case's namesake Plaintiff, UMB acquired the corporate trust business from Commerce Trust Company in 2019. As part of the acquisition, UMB became involved as a trustee in an estimated $80 million construction project occurring in the City of Edwardsville, Kansas (the "City"). The City engaged one of the final two Defendants in this case, Colliers Securities, LLC ("Colliers Securities") (formerly Doughtery & Co.) as an underwriter, and One10 HRKC engaged the final Defendant, Colliers Mortgage, LLC ("Colliers Mortgage") (formerly Doughtery Funding) as a broker, all to fund the project.[9] This project, its funding, and its ultimate failure underlies the dispute in this case.

**B.     The Project**

In 2016, the City agreed to create a redevelopment district known as Village South at Edwardsville Redevelopment District ("Village South"). Developers divided Village South into

---

[9] The City originally engaged Dougherty & Co., which was acquired by Colliers Securities. One 10 HRKC originally engaged Dougherty Funding, which was acquired by Colliers Mortgage.

different development areas, including Project Area 1, Project Area 2, and Project Area 3. This case stems from the failure of an estimated $80 million construction project to build a Hard Rock Hotel and adjacent events center in Project Area 2 of Village South (the "Project" or the "Hotel Site"). One10 HRKC eventually became the developer for the Project, which entailed obtaining the Project's funding.

## C.    The Project's Funding

By the end of 2018, there was a large gap in funding needed to complete the Project. To help fund the Project a Development Agreement ("DA")[10] between the City and One10 HRKC[11] set forth various terms for the City to issue certain revenue bonds. These bonds included (1) $10,655,000 in transient guest tax revenue bonds ("TGT Bond"); (2) $11,005,000 in special obligation tax increment revenue bonds ("TIF Bond"); and (3) $1,620,000 in two series of community improvement district revenue bonds ("CID Bond") (collectively the "Bonds"). $17,174,290 of proceeds from the Bonds were allocated to separate bond funds ("Project Funds"), including (1) $7,778,703.77 to the Project Fund of the TGT Bond; (2) $8,230,516.82 to the Project Fund of the TIF Bond; and (3) $1,165,070.41 to the Project Fund of the CID Bond.

Before issuing the Bonds, however, the DA required One10 HRKC to secure other funding and a guaranty. Defendants shared an interest in taking advantage of the significant funds from the Bonds, and emails between Boyer, Jacobson, and Monson indicate that the Bonds became

---

[10] Developers for the Project revised and amended plans several times throughout its course. The DA refers to the Amended and Restated Development Agreement for Project Areas 1, 2, and 3 dated November 1, 2018, as amended by the First Amendment to Amended and Restated Development Agreement dated August 26, 2019.

[11] The DA was originally entered into by the City and Compass. Compass later assigned its rights and obligations under the DA to One10 HRKC.

essential.[12] Thus, Monson, as One10 HRKC's manager, and Jacobson, as beneficiary to AJJ Trust, set out to meet the DA's funding requirements, along with Boyer and Stoen's input.

### 1.     The Construction Loan

One condition to issuing the Bonds was that One10 HRKC secure an approximately $50 million private construction loan (the "Construction Loan"). To do so, One10 HRKC entered in a Construction Loan Agreement with Altos Groups, LLC ("Altos"), an entity proposed by Doughtery Funding, on October 30, 2019. As part of the Construction Loan Agreement, One10 HRKC made a $13,872.943 down payment. This down payment was funded by a $7.7 million bridge loan from Bridgewater Bank, a $3.1 Mezzanine Loan from MCC, and approximately $3 million that had been paid to One10 HRKC by Cost Certifications 1 and 2 (explained below).

Both Monson and Jacobson had a hand in obtaining the funding for the down payment. For the $7.7 million Bridgewater Bank Loan, Monson and the AJJ Trust executed a Guaranty of Payment on October 30, 2019 to secure the Bridgewater Bank Loan, in part ("Bridgewater Bank Guaranty"). Jacobson executed a Limited Guaranty of Payment on October 30, 2019, and deposited $2.5 million into a restricted deposit account to secure the Bridgewater Bank Loan, too. The $3.1 million Mezzanine Loan was provided by MCC—Jacobson's company.

The down payment's third source—the Cost Certifications—requires a technical explanation. As part of the Project, One10 HRKC could obtain reimbursement for eligible expenses. To do so, the DA requires One10 HRKC to submit a signed Certification of Expenditures

---

[12] One June 26, 2019, email from Boyer to Monson and Jacobson discussing notes from "Matt" lists the following comment: "The numbers do not work, so there is no project without the bond proceeds. We only got into this deal because of the bonds and your assurance that those would be part of the economics." Doc. 439-13 at 2.

and supporting documents to the City's Manager, after which the City would either accept or reject the request within 45 days. If the City approved, a Project Fund Written Request is completed and sent to UMB, as the Indentures' Trustee (explained below). Cost Certification 1, dated October 1, 2019, and Cost Certification 2, dated October 25, 2019, were both signed by Monson as chief manager of 11 Water, the managing member of Compass (developer of the Project at the time). Both were approved by the City, and Monson signed the Project Fund Written Requests for both on October 30, 2019, on behalf of One10 HRKC. Commerce, the Prior Trustee, then dispersed $7,541,979.91 from the TIF Trust Estate for Cost Certification 1 and $1,508,694,12 total from the TIF, TGT, and CID Project Funds. Approximately $3 million of these expenses went towards the Construction Loan's down payment.

As a condition precedent to closing the Construction Loan, the Construction Loan Agreement required the total $13,872,943 down payment to be deposited into an escrow account with a particular agreement designated by Altos. The parties dispute whether this condition precedent occurred. Although the parties agree the down payment was subject to various blocked accounts,[13] UMB asserts One10 HRKC and Altos did not both sign—and thus, did not execute— one of the blocked accounts until January 29, 2020. In addition, UMB asserts that approximately $3 million of the down payment was never subject to a blocked account because those funds were not deposited until after October 30, 2019, and went into an account controlled by Altos, not One10

---

[13] The Bridgewater Loan was subject to a Blocked Account Control Agreement ("BACA") for a blocked account ending 5576 ("BACA Account"), the Mezzanine Loan was subject to a Down Payment Deposit Agreement ("DPDA") for a blocked account ending 7275 ("Mezzanine DPDA Account"), and the funds from Cost Certification 1 and 2 was subject to a DPDA for a blocked account ending 2995 ("Cost Certification DPDA Account").

HRKC. Both of UMB's assertions are controverted, and Defendants maintain that the Construction Loan was properly closed.

With the down payment purportedly secured, the next question was whether Altos offered proof it could fund the Construction Loan. The parties dispute whether Altos represented that it had existing warehouse lines of credit through major U.S. financial institutions to fund the Construction Loan. In a February 19, 2019, email thread, Monson expressed concerns about Altos and noted "the important thing is to make sure they actually have the money."[14] And a September 17, 2019, email from Altos's representative to Monson provides that its "program is based on a line of credit once the down payment is in the BACA account."[15]

UMB asserts Monson, Jacobson, Boyer, and Stoen all knew there was no proof of funds and proceeded to get their associated entities involved anyways. Whether true or not, the parties agree that Altos's counsel assured the City that it was able to close on the Construction Loan.[16] And once the Construction Loan was executed, a mortgage was recorded in favor of Altos on the Hotel Site.

### 2. The TGT Guaranty Agreement

In addition to the Construction Loan, the DA also required a guaranty for the obligation to replenish a $892,404.36 Debt Service Reserve Fund ("DSRF") under the TGT Indenture before the City issued the Bonds. This was Jacobson and Monson's task to complete. Initially, Jacobson

---

[14] Doc. 439-5.

[15] Doc. 439-3.

[16] The parties dispute whether Altos's counsel assured that it could fund the loan but agree Altos's counsel assured it could close on it.

was set to personally guarantee the obligation to replenish. Instead, Jacobson directed AJJ Trust to execute a TGT Guaranty Agreement contemporaneously with the issuance of the Bonds about 3–5 days before this occurred.

Due to lack of time to review, Peak expressed hesitations about signing the Guaranty Agreement. Peak, however, signed off on the Guaranty Agreement after Yu sent a letter of direction stating the Yu had reviewed and approved the Guaranty Agreement. Although Yu and Peak are trustees to the AJJ Trust, Jacobson as its beneficiary receives its monthly financial statements, controls settlement issues, and oversees litigation concerning it.[17] Relevant here, Yu relied upon Jacobson's direction when executing the Guaranty Agreement and directing Peak to do the same. According to Yu, he signed the Guaranty Agreement because it was in Jacobson's personal interest. Monson, as investment trustee for the AJJ Trust, also executed the Guaranty Agreement.

Subsequently, AJJ Trust emailed the City with signatures and a finalized TGT Guaranty Agreement on October 30, 2019.

3.    *The Bonds*

On October 30, 2019, after receiving assurances from Altos's counsel and notification of the signed Guaranty Agreement, the City issued the Bonds under three trust indentures: the TGT, TIF, and CID Trust Indentures (collectively the "Indentures"), respectively. UMB, as Trustee, holds and administers the Trust Estates pursuant to the Indentures for the Bonds. The Trust Estates

---

[17] AJJ Trust controverts UMB's characterization of Yu's role as a trustee "only to the extent UMB cherry picks Yu's testimony to imply that Yu did not exercise his discretion as trustee in connection with executing the TGT Guaranty" but does not actually dispute Jacobson's involvement as UMB describes. *See* Doc. 463 at 6.

include proceeds from the sale of the Bonds and the tax revenues to be levied in connection with the Project itself.

Before issuing the Bonds, however, Doughtery & Co. (now Colliers Securities) as underwriter had concerns about Stoen's involvement with the Project. The concern stemmed from Stoen's October 4, 2017, guilty plea to wire fraud in violation of 18 U.S.C. § 1343 for "misappropriate[ing] no more than $2,713,578" of investment funds for his own personal purposes after causing a false financial review of one of his businesses. Some of the funds Stoen pled guilty to misappropriating were used to develop the Project. In addition, to provide restitution to the victims of Stoen's wire fraud conviction, Stoen and Monson created the Tiehack Trust and gave it an ownership interest in and rights to preferred distributions to Compass—the original developer of the Project. Given his history, Doughtery & Co. sought assurance that Stoen would have no ownership control of the Project.

UMB alleges that Monson, Jacobson, Boyer, and Stoen concealed Stoen's involvement in the Hotel Project, and that the Bonds would not have issued or been purchased if his involvement was known. UMB also alleges that Monson, through his various entities, owed substantial debts to VBI and VBCG that he did not disclose on his personal financial statement for review. The Monson Defendants assert that UMB has no evidence that Stoen possessed ownership, decision-making authority, or control over One10 HRKC or One10 Holdings, and that the City knew of his involvement. The Monson Defendants also note that while Monson did not disclose his entities' debts on his personal financial statement, he did disclose his interests in those entities.

Even so, the Bonds issued and One10 HRKC received the funds from Cost Certifications 1 and 2. Recall that only $3 million of Cost Certifications 1 and 2 went towards the Construction

-10-

Loan's down payment. One10 HRKC used the remaining $6 million to purchase the Hotel Site from Compass (the Hotel Site's initial owner), which Altos now held a mortgage on. Compass used the excess sale proceeds to make various payments on outstanding loans, including debts owed to VBI and Landschute. MCC received $50,000 at closing, too. The Project was poised to progress as scheduled, to be completed by July 1, 2021. But by March 2020, the Project ran into a fatal problem.

### D.      The Project's Failure

On March 6, 2020, Altos provided written notice to One10 HRKC that it was unable to advance funds under the Construction Loan. The notice offered two routes: (1) allow Altos to seek alternative funding; or (2) allow Altos to return the down payment. One10 HRKC requested Altos return the down payment (the Bridgewater Loan, Mezzanine Loan, and portions from Cost Certifications 1 and 2). Altos returned Bridgewater Bank's and MCC's contributions to them. But Altos absconded with the remaining approximately $3 million contribution from Cost Certifications 1 and 2.[18]

The parties were left to deal with the fallout of Altos's failure to fund the loan. On March 17, 2020, a voluntary notice was issued on behalf of the City that the Construction Loan failed and the One10 HRKC was suspending the Hotel Project to seek alternative financing. In addition, a

---

[18] The missing $3 million became part of a criminal case before the Hon. Daniel D. Crabtree of the U.S. District Court for the District of Kansas. In *United States v. Ingram*, Case No. 24-CR-20069, Altos's principal, David Ingram, was charged with wire fraud violations under 18 U.S.C. § 1343 stemming from numerous loan agreements Altos entered into, including the one with One10 HRKC. On August 21, 2025, Ingram entered a guilty plea admitting that Altos falsely claimed access to funding for the Construction Loan, accepted deposit funds, failed to fund the Construction Loan, and misappropriated funds from the down payment. Judge Crabtree sentenced Ingram to 46 months' imprisonment and ordered Ingram to pay restitution to One10 HRKC in the amount of $2,600,674.

-11-

Reporting Event Notice was disseminated. Along with refunding the down payment, Altos assigned its mortgage on the Hotel Site to Compass on March 18, 2020.

Despite the Project's halt, One10 HRKC pursued Cost Certification 3. On April 28, 2020, Monson signed Cost Certification 3 seeking reimbursement for $813,073,38 of alleged TGT Eligible Expenses and $16,173.94 of alleged TIF Eligible Expenses. The City approved, but UMB refused to release funds from the Trust Estates. And on June 19, 2020, UMB's Counsel delivered notice to One10 HRKC and the City that it was accelerating the payment of the Bonds pursuant to the DA and Indentures. Later, in a Minnesota Trust Instruction Proceeding ("TIP"), the District Court for the State of Minnesota concluded that One10 HRKC could not truthfully certify it was eligible for reimbursement in Cost Certification 3 due to Altos's failure to fund the Construction Loan.[19]

Then, in December 2020, Monson executed documents on One10 HRKC's behalf to pursue an agricultural property classification on the Hotel Site. One10 HRKC successfully obtained an Ag Exemption through the Kansas Board of Tax Appeals. This allowed Defendants to reduce the assessed value of land within Project Area 2 and eliminate certain property taxes paid that would have otherwise been pledged to pay the debt service of the TIF Bonds.

The same month, several Defendants entered into a "Workout Agreement" detailing their indebtedness due to the Project and modifying it.[20] As part of the Workout Agreement, rights to

---

[19] The Minnesota TIP proceeding was the feature subject of this Court's previous order on UMB's partial motion for summary judgment. *See generally UMB Bank, N.A. v. Monson*, 2025 WL 3458562, at *2–3 (D. Kan. Dec. 2, 2025).

[20] The parties to the Workout Agreement include the "RICO Defendants" as detailed below. *See infra*, Section III.

possible litigation proceeds against Altos were assigned to VBCG and Big Sand. And VBCG obtained title to the Hotel Site via a $2 million credit bid at a sheriff's sale after purchasing liens that had been permitted to be placed on the property (the "Foreclosure").[21] UMB's theory of the Workout Agreement is that these Defendants negotiated the terms to One10 HRKC's detriment to further a scheme of transferring assets to other Defendants instead of returning the funds to the Trust Estates. The Defendants party to the Workout Agreement contend it was an ordinary attempt to address the Project's collapse.

Fast forward to October 14, 2021, when UMB sent Monson and AJJ Trust a written Demand for Payment under the Guaranty Agreement to replenish a $397,972 shortfall in the DSRF by October 21, 2021. Monson and AJJ Trust did not replenish the funds, contending they are not obligated to do so under the terms between them and UMB.

With the Project at a halt at every turn, and millions at stake, it is no surprise that extensive litigation followed.

**E.    The Litigation Thus Far**

There are several lawsuits stemming from the Project's failure. Before this case was filed, One10 HRKC filed a Petition against UMB in the Circuit Court of Jackson County, Missouri on June 18, 2020. One10 HRKC filed a notice of dismissal without prejudice in this case on October 29, 2024. Then, on June 22, 2020, UMB initiated a TIP proceeding in the District Court for the

---

[21] UMB refers to the Foreclosure as the "Friendly Foreclosure," but the Court will employ the more generic term.

State of Minnesota. The Minnesota Court issued its judgment in UMB's favor, and litigation in that case concluded on June 25, 2025.[22]

On November 11, 2021, UMB filed this suit alleging claims under the Securities Act and state law against Monson, Compass, 11 Water, One10 HRKC, and One10 Holdings only. Subsequently, on February 16, 2023, the Monson Third-Party Plaintiffs filed a Third-Party Complaint in this suit against the Colliers Defendants. In addition, Monson, Compass, 11 Water, One10 HRKC, and One10 Holdings filed counterclaims against UMB. Later, on May 1, 2024, UMB filed a significantly Amended Complaint adding the remaining Defendants to this case and alleging Racketeer Influences and Corrupt Organizations Act ("RICO") claims and several state law claims. Eventually, on August 2, 2024, this case was consolidated with Yu's suit against UMB and the Colliers Defendants, originally filed on September 28, 2023.

The Court has issued five orders on dispositive motions in this case over its nearly five-year course.[23] With the present six summary judgment motions fully briefed, the Court may now issue its sixth Order on dispositive motions.

---

[22] The Minnesota Supreme Court denied One10 HRKC's petition for review on June 25, 2025.

[23] *UMB Bank, N.A. v. Monson*, 2022 WL 3910467, at *1 (D. Kan. Aug. 31, 2022) (denying Monson, Compass, 11 Water, One10 HRKC, and One10 Holdings motion to dismiss); *UMB Bank, N.A. v. Monson*, 2023 WL 5956276, at *1 (D. Kan. Sep. 13, 2023) (granting in part and denying in part the Colliers Defendants' motion to dismiss), *clarified on reconsideration*, 2023 WL 8761604 (D. Kan. Dec. 19, 2023); *UMB Bank, N.A. v. Monson*, 2023 WL 5952161, at *1 (D. Kan. Sep. 13, 2023) (granting in part and denying in part UMB's motion to dismiss); *UMB Bank, N.A. v. Monson*, 2025 WL 1580894, at *1 (D. Kan. June 4, 2025) (denying the Monson Defendants' motion to dismiss and Jacobson, Boyers, VBI, VBCG, AJJ Trust, and MCC's motion to dismiss); *UMB Bank, N.A.*, 2025 WL 3458562, at *1 (granting in part and denying in part UMB's partial motion for summary judgment).

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[24] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[25] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[26] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[27] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[28] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[29]

## III.    Analysis

The six subject summary judgment motions of this Order present a complex task before the Court. Not only do the motions implicate several claims in UMB's Amended Complaint against the numerous Defendants, but they also implicate the Monson Third-Party Plaintiffs' claims

---

[24] Fed. R. Civ. P. 56(a).

[25] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[26] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[27] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[28] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[29] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

against the Colliers Defendants. Further complicating matters is that the motions challenge nearly every element, sub element, and sub-sub element of the claims at issue. This Court addresses the motions challenging UMB's claims first and then turns to the motion challenging the Monson Third-Party Plaintiffs' claims. In doing so, the Court endeavors to be as clear and concise as possible, considering the 700+ pages of briefing (not including exhibits) involved in these matters.

The 95-page Pretrial Order categorizes the Defendants to UMB's claims as follows:

- The RICO Defendants: Stoen, Jacobson, Monson, Boyer, Compass, 11Water, One10 Holdings, One10 HRKC, Landschute, Big Sand, HFF Texas, Grayley, MCC, VBI, VBCG, AJJ Trust (Yu and Peak), CBB Trustee, and CBB1–3 Trust;

- The Certifying Defendants: Monson, One10 Holdings, One10 HRKC, Compass, and 11 Water;

- The Guaranty Defendants: Monson and AJJ Trust.

In addressing UMB's claims, the Court will specify individual Defendants when necessary but will largely utilize the Pretrial Order's categories—beginning with the RICO Defendants.

**A.      UMB's Claims Against the RICO Defendants**

UMB brings three counts against the RICO Defendants. Count I is a civil RICO claim under 18 U.S.C. § 1962(c); Count II is a RICO conspiracy claim under 18 U.S.C. § 1962(d); and Count XII is a common law civil conspiracy claim (collectively the "RICO claims"). The RICO Defendants, in their respective summary judgment motions, move for summary judgment in their favor on the RICO claims against them, except some RICO Defendants do not move for summary judgment on Count XII.[30] The Court addresses each of the three RICO claims in turn.

---

[30] Stoen, Monson, Compass, 11Water, One10 Holdings, One10 HRKC, Landschute, Big Sand, HFF Texas, Grayley, CBB Trustee, and CBB1–3 Trust do not move for summary judgment on Count XII. *See* Doc. 420 at 39 (only moving for summary judgment on Counts I–VII and X).

### 1.     Civil RICO (Count I)

When one thinks of RICO, one most likely thinks of organized crime, not necessarily failed development projects. After all, Congress enacted RICO with the purpose to "seek the eradication of organized crime in the United States."[31] But RICO is not limited to conduct associated with organized crime.[32] The statutory scheme contains a private right of action available to "'[a]ny person injured in his business or property by reason of a violation' of the RICO's substantive restrictions."[33] UMB invokes one of RICO's substantive restrictions in its claim against the RICO Defendants: 18 U.S.C. § 1962(c).

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To prove a RICO violation under § 1962(c), a plaintiff must establish that the defendant "(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity."[34] A plaintiff must also establish direct and proximate causation—that is, the plaintiff's injury was sustained "by reason of" the RICO violation.[35]

---

[31] *United States v. Turkette*, 452 U.S. 576, 589 (1981) (citation omitted).

[32] *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989) ("Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime.").

[33] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (1991) (quoting 18 U.S.C. § 1964(c)).

[34] *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016) (citations omitted).

[35] *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (holding a plaintiff must demonstrate both direct and proximate cause of injury in a RICO action brough pursuant to 18 U.S.C. § 1964(c)).

The RICO Defendants assert UMB cannot establish any of these elements against them. UMB asserts it raises a genuine dispute of material fact on the elements to be resolved at trial. The Court addresses each element, beginning with whether UMB can establish the existence of an enterprise.

a.    The Alleged Enterprise

The RICO Defendants collectively argue that UMB cannot establish they were part of a RICO enterprise in this case, although these arguments blur into other RICO elements. Relevant here, an "enterprise" for RICO purposes "includes any . . . group of individuals associated in fact although not a legal entity."[36] "[T]he very concept of an association in fact is expansive."[37] An "association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct."[38] It "need not have a hierarchical structure or a 'chain of command.'"[39] Rather, it need only feature three structural features: (1) "a purpose;" (2) "relationships among those associated with the enterprise;" and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose."[40]

Here, UMB alleges that the RICO enterprise in this case is an association-in-fact enterprise consisting of the RICO Defendants. UMB further alleges that the purported enterprise's common purpose was to fraudulently obtain funds from the Trust Estates. None of the RICO Defendants

---

[36] 18 U.S.C. § 1961(4).

[37] *Boyle v. United States*, 556 U.S. 938, 944 (2009).

[38] *Id.* at 946 (citation and internal quotation marks omitted).

[39] *Id.* at 948.

[40] *Id.* at 946.

dispute their relationships with each other via the Project, nor do they dispute the longevity element. Instead, they dispute the purpose element by arguing that their relationship does not amount to an enterprise because they bear ordinary commercial relationships and that UMB does not have any evidence of fraudulent intent amongst them.

As UMB points out, intent is difficult to prove directly "because intent involves the defendant's state of mind."[41] Thus, it is unsurprising that UMB cannot point to direct, documented evidence where the RICO Defendants explicitly stated they shared a common purpose to commit fraud. But, as explained further on the pattern of racketeering element below,[42] UMB puts forth circumstantial evidence raising a triable issue on whether the RICO Defendants shared a common purpose to fraudulently obtain funds from the Trust Estates. As such, UMB raises a triable issue on the purpose requirement to establish an association-in-fact enterprise amongst the RICO Defendants.[43]

The RICO Defendants' overarching argument against an enterprise is that UMB does nothing more than collect a common set of actors (the RICO Defendants) who all touched the same transaction (the Project) and label them as an enterprise. Arguing this is not enough, several of the RICO Defendants cite a footnote in *Boyle v. United States*[44] that provides "[i]t is easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not

---

[41] *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) (citation omitted).

[42] *See infra* Section III.A.1.c.i.

[43] *See Boyle*, 556 U.S. at 947 ("[T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce' (quoting *Turkette*, 452 U.S. at 583)).

[44] 556 U.S. 938 (2009).

establish the existence of an enterprise."[45] The RICO Defendants, however, omit the remainder of

the footnote informing the *Boyle* Court's point:

> . . . . For example, suppose that several individuals, *independently and without coordination*, engaged in a pattern of crimes listed as RICO predicates—for example, bribery or extortion. Proof of these patterns would not be enough to show that the individuals were members of an enterprise.[46]

Perhaps if the RICO Defendants were wholly independent of each other, *Boyle* may be

dispositive of the enterprise issue. Viewed in the light most favorable to UMB, however, a jury

could conclude that the facts of this case are not those of a group of unconnected individuals and

entities simply providing ordinary services. UMB provides enough evidence to satisfy the

"expansive" definition of an association-in-fact enterprise.[47] Accordingly, the existence of an

association-in-fact enterprise between the RICO Defendants is a triable issue.

> b.    Conducted the Affairs of the Enterprise

Assuming there is an enterprise, the RICO Defendants next collectively argue that UMB

cannot show they conducted the affairs of one. Courts employ the "operation or management" test

to determine whether a defendant has "participated in the conduct" of the RICO enterprise's

affairs.[48] Under this test, a plaintiff must demonstrate a defendant "participated in the operation or

management of the RICO enterprise."[49] It is not necessary for a defendant to have significant

---

[45] *Id.* at 947 n.4.

[46] *Id.* (emphasis added).

[47] *See id.* at 944; *see also infra* Section III.A.1.c.i.

[48] *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1100 (10th Cir. 1999) (citations omitted).

[49] *Id.* (citation omitted).

control or play a significant role, but a defendant must have some part in directing the enterprise's affairs.[50] "Even 'lower rung participants in the enterprise who are under the direction of upper management' may be liable under RICO if they have 'some part' in operating or managing the enterprise's affairs."[51] "Nevertheless, a defendant must do more than simply provide, through its regular course of business, goods and services that ultimately benefit the enterprise."[52]

The RICO Defendants akin their case to the ordinary business dispute found in *BancOklahoma Mortgage Corporation v. Capital Title Company, Inc.*[53] There, BancOklahoma Mortgage Corporation ("BOMC") brought civil RICO claims against multiple individual and entity defendants concerning residential mortgage loan purchases.[54] One defendant included Joseph Iadevito, who was chief executive officer, director, and majority shareholder to Lenders Mortgage Services, Inc. ("LMS").[55] Theresa Janson, Iadevito's wife and co-defendant, was president and sole shareholder of Professional Builder's Closing Services, Inc. ("PBCS").[56] PBCS prepared loan closing documents and conducted closings for LMS.[57] These loans included

---

[50] *See Reves v. Ernst & Young (Reves II)*, 507 U.S. 170, 179 (1993) ("[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." (emphasis in original)).

[51] *George*, 833 F.3d at 1251 (quoting *Reves II*, 507 U.S. at 179) (citing *BancOklahoma*, 194 F.3d at 1100).

[52] *Id.* (citing *BancOklahoma*, 194 F.3d at 1101–02).

[53] 194 F.3d 1089 (10th Cir. 1999).

[54] *Id.* at 1097.

[55] *Id.* at 1095.

[56] *Id.*

[57] *Id.*

approximately 700 loans that BOMC purchased from LMS, 42 of which BOMC later discovered were not properly closed.[58] Iadevito later pled guilty to financial institution fraud, admitting that he caused LMS to defraud BOMC by falsely presenting that the five title companies had served as settlement agent on loans BOMC purchased from LMS.[59]

BOMC sued Iadevito, his wife, and their associated entities.[60] BOMC also sued five different Title Companies that provided services on loans that BOMC purchased from LMS, alleging the title companies were part of a RICO enterprise with the other defendants.[61] The Title Companies sought summary judgment on BOMC's RICO claims, arguing in part that they did not participate in the operation of the alleged RICO enterprise.[62]

The Tenth Circuit held that BOMC failed to establish that the Title Companies participated in the conduct of an alleged RICO enterprise because they "did nothing more than provide their regular services" and there was no admissible evidence in the record to the contrary.[63] While BOMC offered general conclusory statements about the Title Companies, it offered "no specifics as to persons, dates, transactions or amounts" necessary to establish fraud outside of activities they "would have performed in their normal course of business in dealing with all mortgage lenders."[64]

---

[58] *Id.* at 1095.

[59] *Id.* at 1097.

[60] *Id.*

[61] *Id.*

[62] *Id.* at 1100.

[63] *Id.* at 1101.

[64] *Id.* at 1101–02.

-22-

In other words, the Title Companies were mere "[o]utsiders" to the enterprise between Iadevito, his wife, and their companies.[65]

Unlike the wholly unaffiliated Title Companies in *BancOklahoma*, a jury could reasonably find that each of the RICO Defendants—individual and entity alike—are insiders to the alleged enterprise, connected through four natural persons: Jacobson, Boyer, Monson, and Stoen. Recall that "lower rung participants *under the direction of upper management*" may also be liable under RICO, so long as they had "some part" in operating or managing the enterprise's affairs.[66] As explained in the next section, UMB provides sufficient evidence, albeit circumstantial, that each of the RICO Defendants played at least "some part" in the alleged enterprise's affairs, namely by engaging in predicate acts of wire fraud and financial institution fraud.[67] Thus, the Court considers this case distinguishable from *BacnOklahoma* and considers whether the RICO Defendants conducted the affairs of the alleged enterprise a triable issue.

### c.    Pattern of Racketeering Activity

As the Court previously alluded to, the crux of the RICO Defendants argument on Count I lies within whether UMB loses on the "pattern of racketeering activity" element to § 1962(c). To prevail, UMB must provide sufficient evidence demonstrating (1) the RICO Defendants engaged in "predicate acts;" and (2) a "pattern" consisting of at least two predicate acts committed within ten years of each other.[68] The Court addresses each of these sub elements in turn.

---

[65] *Id.* at 1101.

[66] *Reves*, 507 U.S. at 179 (emphasis added).

[67] *Infra* Section III.A.1.c.i.

[68] *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022) (citing 18 U.S.C. §§ 1961(1), (5)).

i.        Predicate Acts

UMB claims the RICO Defendants committed two predicate acts: wire fraud, in violation

of 18 U.S.C. § 1343; and financial institution fraud (a/k/a bank fraud) in violation of 18 U.S.C.

§ 1344. Wire fraud as a predicate act requires proof of three elements: "(1) a scheme to defraud;

(2) an interstate wire communication; and (3) a purpose to use the wire communication to execute

the scheme."[69] Wire fraud against a financial institution, such as UMB Bank, establishes financial

institution fraud as an additional predicate act.[70] The RICO Defendants largely contest the first and

third elements of wire fraud by arguing UMB cannot demonstrate they engaged in a scheme to

defraud, let alone that their wire communications were done with a purpose to execute such a

scheme.

"The central focus of the first element of . . . wire fraud is the existence of a scheme."[71] "A

scheme or artifice to defraud connotes a plan or pattern of conduct which is intended to or is

reasonably calculated to deceive persons of ordinary prudence and comprehension."[72] This "intent

to defraud" requirement may be established "by various means," including circumstantial evidence

such as a defendant's attempt to conceal activity.[73] Further, intent to defraud "may be inferred

---

[69] *United States v. Zar*, 790 F.3d 1036, 1049 (10th Cir. 2015) (citation omitted).

[70] *See* 18 U.S.C. § 1344; *United States v. Rackley*, 986 F.2d 1357, 1360–61 (10th Cir. 1993) (requiring the financial institution for § 1344 purposes be "insured by the Federal Deposit Insurance Corporation" ("FDIC")). UMB is insured by the FDIC, as was Commerce Bank when it served as Trustee.

[71] *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F. 4th 1264, 1282 (10th Cir. 2023) (brackets and citation omitted).

[72] *Id.* (quotation marks and citation omitted).

[73] *Id.*; *Prows*, 118 F.3d at 692 (citation omitted).

-24-

from a defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use."[74]

Here, UMB offers circumstantial evidence that could lead a reasonable jury to infer the RICO Defendants engaged in a scheme to defraud the Trust Estates. There was certainly motivation to obtain the funds from the Bonds, given the gap in the Project's funding. Whether that motivation was illicit or innocent is disputed at several points in the Project.

Consider first the fatal blow to the Project itself—Altos's failure to fund the Construction Loan. UMB contends that the RICO Defendants failed to disclose Altos's inability to fund and close the loan. Emails between the parties demonstrate concerns Monson and Jacobson had over Altos's ability to fund the loan.[75] In addition, Altos itself informed them that its lending program was based on a line of credit after the down payment hit the BACA accounts, which were not fully signed off until *after* October 30, 2019—the day the DA required everything to be finalized for the Bonds to issue. The RICO Defendants' concerns, coupled with the unsigned BACA accounts, constitute circumstantial evidence of their alleged knowledge that Altos falsely represented it could close the Construction Loan by October 30, 2019. From these facts, a jury may infer intent to defraud.[76]

The circumstantial evidence of this purported knowledge of a false statement also implicates Cost Certifications 1 and 2. Like Cost Certification 3, which was at issue in the

---

[74] *Prows*, 118 F.3d at 692 (citation omitted).

[75] *See* Docs. 439-5 & 439-6.

[76] *Id.*

Minnesota TIP proceeding, reimbursement for Cost Certifications 1 and 2 was contingent on the fact that "no event or condition ha[d] occurred which, with notice of passage of time or both, would constitute an Event of Default under the Development Agreement." If the Construction Loan was not properly closed—and a jury concludes the RICO Defendants were aware of that—it follows that they "could not truthfully certify" they were eligible for reimbursement in Cost Certifications 1 and 2 either. Of course, the RICO Defendants assert they fully believed the loan properly closed and would not have proceeded otherwise. But given the circumstantial evidence, the credibility of their asserted belief must be resolved by a jury.[77]

Consider next other pre-issuance information UMB alleges was not received. Of particular concern was Stoen's potential involvement in the Project, given his prior federal conviction of felony wire fraud regarding funds he raised for the Project before the Bonds issued.  UMB provides testimony from the City's retained attorney for the Project that those involved, namely Doughtery & Co. as the then-underwriter, assured the City that Stoen had no ownership or control of the Project. But UMB provides testimony that had the City been aware of the extent of Stoen's involvement, it would not have issued the Bonds. UMB also provides testimony that the bondholders who purchased the bonds would not have done so, either. The RICO Defendants assert that the concern about Stoen's involvement was limited to him not having any ownership or control over the Project, and that UMB does not provide any direct evidence that Stoen had any such authority.

---

[77] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1989) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, no those of a judge.").

Again, however, circumstantial evidence may suffice.[78] And UMB provides several documents and emails demonstrating Stoen's involvement in the Project, both before and after the Altos loan failed, as well as his potential financial benefit from it.[79] In addition, in a March 27, 2020, email, Stoen instructed a Doughtery Funding representative to "drop [him] from all public correspondence," as the parties discussed next steps to take after the Altos loan failed.[80] Further, Stoen's Tiehack Trust was given an ownership interest in and rights to preferred distributions to Compass, the original developer of the Project. UMB offers testimony from witnesses that Doughtery & Co., the City, and the bondholders were not aware of the extent of Stoen's involvement (including the Tiehack Trust connection), although there is competing testimony to these accounts. But viewed in light most favorable to UMB, this circumstantial evidence suggests anywhere from misrepresentation of Stoen's involvement by the RICO Defendants, up to active concealment thereof. Given Stoen's history of committing wire fraud, a jury could infer a scheme to defraud from either scenario.[81]

UMB further asserts that the bondholders would not have purchased the Bonds had the extent of Monson's indebtedness been fully disclosed to the bondholders, particularly his entities' debts to VBI and VBCG. The Monson Defendants, whom this assertion largely pertains to, cite two email chains to argue Monson's indebtedness was fully disclosed to "Doughtery." Both email

---

[78] *Prows*, 118 F.3d at 692 (citation omitted).

[79] *See, e.g.*, Docs. 440-8; 449-10–13. Notably, Monson provided a sworn declaration to the Northern District of Illinois in Stoen's criminal case where he explains what was accomplished in the Project under "Matt's management and at his request." *See* Doc. 448-7 at ¶8.

[80] Doc. 449-11 at 2.

[81] *Prows*, 118 F.3d at 692 (citation omitted).

chains have Murray Kornberg (then-representative of Doughtery Funding) copied onto them, but no representatives from Doughtery & Co. The Monson Defendants assert that sharing this information with Doughtery Funding (as broker) was sufficient to share the information with Doughtery & Co. (as underwriter for the Bonds) because the two entities freely shared information.[82] But UMB points out a more fundamental issue with the cited emails; it is unclear whether they even mention the debts to VBCG and VBI that UMB alleges were not disclosed. The Monson Defendants do not point the Court to anything specific, and the Court declines to hunt through hundreds of pages of briefing and exhibits to verify their argument.[83] Instead, the Court considers the matter a triable issue. And if a jury concludes for UMB on the matter, it serves as possible circumstantial evidence of a scheme to defraud.[84]

The circumstantial evidence continues into events occurring after Altos failed to fund the Construction Loan. Consider the RICO Defendants who pursued Cost Certification 3 to obtain more funds from the Bonds, which the District Court of Minnesota determined they could not truthfully do. And consider the RICO Defendants' successful attempt to pursue the Ag Exemption, which lowered their tax liability. Finally, consider the RICO Defendants who participated in the

---

[82] The Monson Defendants also suggest that UMB's decision to not include either of the Colliers Defendants as part of the alleged RICO enterprise should inform the Court's inquiry. The Court, however, declines to speculate on the reasoning behind UMB's tactical decision on who to sue or consider it as evidence against UMB. *See Amaya v. Bregman*, 2016 WL 10516169, at *4 (D.N.M. Mar. 7, 2016) ("[T]he bottom line is that the Plaintiffs in this case had the right to sue whomever they felt had injured them. The fact that they also might have sued others is irrelevant.").

[83] "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1990).

[84] In its briefing, UMB offers other potential circumstantial evidence that Monson's indebtedness was not fully disclosed by identifying a temporal concern between Monson's Personal Financial Statement and a loan arranged between Jacobson and Boyer's entities immediately after submitting the Statement. *See* Doc. 455 at 38. The statements of fact cited for support, however, do not substantiate this claim, and the Court also declines to go hunting for truffles to UMB's benefit. *Dunkel*, 927 F.2d at 956.

Workout Agreement and the Foreclosure, modifying their debts and allowing others to obtain title to the Hotel Site. These actions could be the RICO Defendants' attempt to salvage the Project, as they assert. Again, however, viewed in light most favorable to UMB—and combined with UMB's circumstantial evidence from before the Construction Loan failed—a jury could interpret these profiting actions as further evidence of a scheme to defraud the Trust Estates.

At this point in its analysis, the Court has determined that UMB definitively raises a genuine dispute of material fact as to the elements of wire and financial institution fraud with respect to the following Defendants: Stoen, Jacobson, Monson, Boyer, Compass, 11Water, One10 Holdings, One10 HRKC, Landschute, Big Sand, HFF Texas, Grayley, CBB Trustee, and CBB1– 3 Trustee. That leaves a few remaining arguments from certain entity RICO Defendants: AJJ Trust, MCC, VBI, and VBCG.[85]

AJJ Trust first argues that UMB does not identify any communications by AJJ Trust demonstrating they engaged in the purported scheme to defraud the Trust Estates.[86] But a wire communication from AJJ Trust is not necessary; RICO merely requires that a defendant commit an act where it can reasonably be foreseen that wire communications (even by others) will follow.[87]

---

[85] Compass, 11Water, One10 Holdings, One10 HRKC, Landschute, Big Sand, HFF Texas, and Grayley do not make any entity-specific arguments, other than their general reliance on *BancOklahoma* as previously addressed. *Supra* Section III.A.1.b.

[86] AJJ Trust also argues that UMB cannot demonstrate any fraudulent intent on their behalf, directing the Court to its argument on Counts VI, VII, and VIII. As explained in this Order's section on Counts VI, VII, and VIII, the Court disagrees. *See infra* Section III.C.1.

[87] *See United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994) (quoting *Pereira v. United States*, 347 U.S. 1, 8– 9 (1954)) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he causes the mails to be used.") (internal quotation marks omitted); *see also Ciminelli v. United States*, 598 U.S. 306, 312 n.2 ("[W]e have construed identical language in wire and mail fraud statutes *in pari materia*." (citation omitted)).

Because AJJ Trust executed the TGT Guaranty Agreement and the Bridgewater Bank Guaranty at Jacobson's direction—despite concerns over lack of time to review—they could reasonably foresee that interstate wire communications would follow given the complex nature of the transaction. In addition, AJJ Trust invokes reverse veil piercing and alter ego principles to argue that UMB cannot attribute RICO liability to them based on Jacobson's direction, but do not do so until their reply brief.[88] Thus, the Court declines to consider AJJ Trust's reverse veil piercing argument.[89]

MCC, however, properly invokes reverse veil piercing principles, albeit in two short, near duplicative paragraphs citing cases that stand for the proposition that individuals and entity defendants should generally be treated separately.[90] UMB's response is similarly brief, but cites *George v. Urban Settlement Services*[91] which indicates an entity-defendant may be found to participate in an alleged enterprise's affairs through the actions of its employees so long as it played "some part" in conducting the enterprise's affairs.[92] Because MCC issued the Mezzanine loan, was immediately repaid upon the Bonds' issuance, and participated in the Workout Agreement, a reasonable jury could find that MCC played some part in conducting the alleged enterprise's affairs. In addition, MCC argues UMB cannot identify any wire communication sent by MCC

---

[88] *See* Doc. 463 at 7.

[89] *Bentz v. City of Marion*, 776 F. Supp. 3d 951, 987 (D. Kan. 2025) (citation omitted) ("Ordinarily, courts don't consider arguments raised for the first time in a reply brief.").

[90] *See* Doc. 418 at 41; Doc. 466 at 9.

[91] 833 F.3d 1242 (10th Cir. 2016).

[92] *Id.* at 1252–53 (discussing *Resolution Trust Corp. v. Stone*, 998 F.2d 1234 (10th Cir. 1993)) (further citations omitted).

itself, much like AJJ Trust's argument on the matter. Because MCC engaged in similarly complex transactions where it was reasonably foreseeable that interstate wire communications would follow, the Court rejects MCC's argument as it did for AJJ Trust.

The Vernal Bay Defendants also argue UMB does not have evidence of any wire communication they participated in. Addressing the reasonably foreseeable use of wire communications argument, both argue UMB must still produce evidence that they caused the wires to be used for the purposes of executing a scheme to defraud, and UMB fails to do so. As for VBI, UMB has evidence its owner-managers, Jacobson and Boyer, arranged for it to receive the funds from Cost Certifications 1 and 2 and that VBI participated in the Workout Agreement, both of which the Court has already concluded constitute circumstantial evidence of a scheme to defraud.[93] VBCG's participation in the Workout Agreement and the Foreclosure similarly constitute evidence of its role in the scheme to defraud.[94]

Finally, both Vernal Bay Defendants quibble with UMB's omission of them from the "Bank Fraud Defendants" in UMB's Amended Complaint, arguing UMB "effectively conceded

---

[93] Like AJJ Trust, the Vernal Bay Defendants also argue UMB cannot impute liability to them through Jacobson and Boyer but do so in their Reply. Accordingly, the Court declines to address this argument except to note it fails under *George* as MCC's argument did. *See George*, 833 F.3d at 1252–53.

[94] VBCG asserts that the Court should not consider evidence from after the Construction Loan's failure against it because UMB offers no evidence that it played a role in its allegation that the RICO Defendants knew Altos could not properly close the Construction Loan. VBCG cites no authority supporting this temporal argument. UMB, however, offers persuasive authority in opposition to VBCG's argument that a defendant need not be part of a RICO enterprise for its entirety to be liable as schemes to defraud may "evolve over time." *See United States v. Tanke*, 743 F.3d 1296, 1305 (9th Cir. 2014) ("[I]t would be overly restrictive to look only at the scope of the plan as it was *originally* conceived." (emphasis in original)); *cf. United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) (holding that the alleged scheme to defraud was a single ongoing conspiracy despite some defendants joining the alleged enterprise later in its existence). Thus, the Court will consider evidence after the Construction Loan's failure as to VBCG for predicate act purposes.

the bank-fraud predicate" in doing so.[95] VBI and VBCG, however, are included as RICO Defendants in the Pretrial Order, which supersedes all pleadings and controls the case.[96] Accordingly, the Court declines to read anything further into UMB's litigation strategy.

With that, the Court concludes UMB raises a triable issue on the predicate acts requirement against all the RICO Defendants.

ii.    Pattern

Next, the parties dispute whether UMB can demonstrate the "pattern" sub element to the pattern of racketeering activity element as to each RICO Defendant. Doing so presents a difficult task,[97] a running theme in this Order. "A 'pattern' of racketeering activity requires at least two racketeering acts committed within ten years of each other."[98] The racketeering acts must "relate to each other and amount to a threat of continued racketeering activity."[99] "No pattern exists without this 'continuity plus relationship.'"[100]

Turning first to the relationship requirement (described as "not a cumbersome one") "[p]redicate acts satisfy the relationship requirement when they make up one common scheme."[101] Relevant factors courts consider include whether the predicate acts have "the same or similar

---

[95] *See* Doc. 201 at 6 n.6; Doc. 419 at 40 n.3; Doc. 465 at 9.

[96] Doc. 409 at 2, 40.

[97] *Johnson*, 56 F. 4th at 858 ("Determining what constitutes a RICO pattern is no easy task.").

[98] *Id.* (quoting 18 U.S.C. § 1961(5)).

[99] *Id.* (citing *H.J. Inc.*, 494 U.S. at 239).

[100] *Id.* (citing *H.J. Inc.*, 494 U.S. at 239).

[101] *Id.* at 859 (citing *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990)).

purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events"[102]

Only AJJ Trust and MCC challenge UMB's ability to establish the relationship sub-sub element. In doing so, they repeat their arguments that UMB has not identified multiple acts attributable to them, arguing they engaged in isolated commercial transactions. But UMB identifies two acts against AJJ Trust—executing the TGT Guaranty Agreement and the Bridgewater Loan Guaranty. And UMB identifies at least three acts against MCC—issuing the Mezzanine Loan, receiving funds from Cost Certifications 1 and 2, and participating in the Workout Agreement. Given the similarities in the alleged purpose, results, participants, and victims in these acts, UMB sufficiently raises a triable issue on the non-cumbersome relationship requirement against AJJ Trust and MCC.

As for the continuity requirement, "[n]o universal standard precisely defining continuity exists because it ultimately depends on the specific facts of each case."[103] Continuity can be open-ended, which consists of "racketeering conduct that threatens future repetition."[104] Or continuity can be closed-ended, and involve "a closed period of repeated, related racketeering acts that do not necessarily threaten future repetition."[105] UMB primarily pursues a closed-ended continuity theory

---

[102] *Id.* (citing *H.J. Inc.*, 492 U.S. at 240).

[103] *Id.* (citing *H.J. Inc.*, 492 U.S. at 241–42) (quotation marks omitted).

[104] *Id.* at 859–60.

[105] *Id.* at 860.

against the RICO Defendants, which requires the Court to consider two factors: (1) "duration of the related predicate acts;" and (2) the "extensiveness of the racketeering scheme."[106]

All RICO Defendants challenge UMB's ability to establish the continuity sub-sub element. To do so, they characterize their individual acts as singular transactions contained within one Project that do not pose any ongoing racketeering threat. This characterization, however, is just that—a characterization, one which a jury could reasonably disagree with given UMB's circumstantial evidence. The duration of UMB's circumstantial evidence takes place over the course of six years, beginning when the RICO Defendants worked to obtain the Construction Loan from Altos back in 2019, up to 2025 when others pursued Cost Certification 3 untruthfully.[107] Six years is more than sufficient to satisfy the duration requirement.[108] In addition, UMB identifies several victim-bondholders, over one hundred wire communications, nearly a dozen perpetrators, and a variety of acts occurring over the course of six years. This is sufficient to satisfy the extensiveness requirement.[109] As such, UMB raises a triable issue on a closed-ended continuity theory and, in turn, raises a triable issue on the pattern sub element to its RICO claim.

---

[106] *Id.* (citation omitted).

[107] UMB also identifies Stoen's history of wire fraud and related litigation to support its closed-ended continuity theory. *See SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) ("[A]llegations of essentially the same scheme perpetrated on unnamed parties may be alleged to support a claim of closed-ended continuity.").

[108] *See Resolution Tr. Corp.*, 998 F.2d at 1544 (finding seven or eight months sufficient to satisfy the duration requirement).

[109] *Id.* (finding the extensiveness requirement met after considering the number of victims, the number and variety of racketeering acts, the number of perpetrators, and the complexity of the scheme).

d.      Proximate Cause

Finally (at least as to Count I) the RICO Defendants argue that UMB cannot establish that their acts proximately caused UMB's purported injury—released trust funds and associated losses. "Proximate cause . . . is  a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case."[110] Even so, proximate cause for RICO purposes requires "some direct relation between the injury asserted and the injurious conduct alleged."[111] "A link that is too remote, purely contingent, or indirect is insufficient."[112] For example, "causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct."[113] In addition, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [i]s generally said to stand at too remote a distance to recover."[114]

Here, the RICO Defendants attempt to distance themselves from UMB's injury by asserting it flows from Altos's independent failure to fund the Construction Loan, not any actions on their part.[115] This assertion, however, requires a jury to accept the RICO Defendants' claim that they engaged in ordinary business transactions. The Court has concluded that a reasonable jury could

---

[110] *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (quotation marks & citation omitted).

[111] *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268).

[112] *Id.* (quotation marks, brackets, and citation omitted).

[113] *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1089 (10th Cir. 2014).

[114] *Holmes*, 503 U.S. at 268–69.

[115] The Monson Defendants' argument on this point is contained in seven subheadings, yet each section boils down to the same argument: Altos caused UMB's injury, not them. *See* Doc. 420 at 33–38 (containing subheadings A–G).

reject this claim and find that several misrepresentations were made instead.[116] If so, a jury could find that the City and bondholders relied on these misrepresentations and otherwise would not have issued or purchased the Bonds. That constitutes "some direct relation" between UMB's alleged injury and the RICO Defendants' alleged misrepresentations.[117]

Certain entity RICO Defendants assert their actions cannot be tied to the alleged misrepresentations.[118] First, AJJ Trust and MCC assert that their actions in executing Guarantees and issuing the Mezzanine Loan, respectively, are too attenuated from Altos's failure to fund the Loan. True, these actions do not fit neatly into one of the misrepresentations that UMB asserts other RICO Defendants made. Yet, the Bonds would not have been issued without the Guarantees or the Mezzanine Loan either, making these actions integral to the purported scheme to defraud. Given the flexible nature of proximate cause, AJJ Trust and MCC's actions are sufficient to satisfy the proximate cause requirement should a jury find a scheme to defraud included them.

The actions UMB attributes to the Vernal Bay Defendants, however, fail the proximate cause requirement. Although UMB provides enough evidence to demonstrate the Vernal Bay Defendants played "some part" in the scheme to defraud, it does nothing to tie any actions by the Vernal Bay Defendants to the misrepresentations it alleges or otherwise describe how they led to the Bonds' issuance and purchase. Indeed, the actions attributable to the Vernal Bay Defendants occurred *after* the Bonds issued, and while UMB alleges the RICO Defendants attempted to

---

[116] *Infra* Section III.A.1.C.i.

[117] *Hemi Grp., LLC*, 559 U.S. at 9.

[118] Compass, 11Water, One10 Holdings, One10 HRKC, Landschute, Big Sand, HFF Texas, and Grayley do not make any entity-specific arguments, other than their repeated argument that Altos proximately caused UMB's injuries instead of them. *See* Doc. 420 at 33–38.

perpetuate the harm by pursuing Cost Certification 3, the Ag Exemption, and the Foreclosure, no further funds from the Bonds were dispersed because of these actions. UMB offers no explanation on how the Vernal Bay Defendants' attributable actions proximately caused UMB's alleged injury. Accordingly, only the Vernal Bay Defendants are entitled to summary judgment on Count I based on lack of proximate cause.

* * *

Admittedly, UMB's civil RICO claim, premised on wire and financial fraud allegations, is complicated, convoluted, and confusing at times. The RICO Defendants rightly note that UMB's theory requires several inferences, particularly concerning the entity RICO Defendants. But juries are permitted to draw inferences in RICO cases based on circumstantial evidence.[119] And the combination of the circumstantial evidence UMB presents could lead a reasonable jury to conclude that something illicit was at play between the RICO Defendants—excepting the Vernal Bay Defendants—including a scheme to defraud the Trust Estates that satisfies each element of § 1962(c).

Accordingly, the Court determines that UMB raises a triable issue on Count I against the RICO Defendants, except for the Vernal Bay Defendants who are entitled to summary judgment on Count I.

### 2.    *RICO Conspiracy (Count II)*

UMB brings its second RICO claim against the RICO Defendants under 18 U.S.C. § 1962(d), alleging that the RICO Defendants conspired to commit the RICO violation asserted in

---

[119] *Prows*, 118 F.3d at 692 (citation omitted).

Count I. The RICO Defendants first assert that this claim fails because Count I itself fails. That is potentially a winning argument for the Vernal Bay Defendants, but not the other RICO Defendants as Count I proceeds to a jury against them.

As for the Vernal Bay Defendants, UMB asserts that a RICO conspiracy claim does not necessarily fail because its § 1962(c) claim fails against them. The Vernal Bay Defendants cite *Tal v. Hogan*[120] for the proposition that "[i]f a plaintiff has *no* viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law."[121] Unlike the *Tal* plaintiff, however, UMB has a viable § 1962(c) claim against the other RICO Defendants, just not against the Vernal Bay Defendants for lack of proximate case. This presents a question that is not easily resolved: may a defendant who is not liable for a substantive RICO violation solely for lack of proximate cause still be liable for RICO conspiracy amongst other defendants?[122] The Vernal Bay Defendants do not address that question or otherwise meet their burden to demonstrate they are entitled to judgment as a matter of law by reason thereof. Instead, the Vernal Bay Defendants pivot to whether UMB can establish the merits of a RICO conspiracy claim against them. The Court follows suit.

---

[120] 453 F.3d 1244 (10th Cir. 2006).

[121] *Id.* at 1270 (emphasis added).

[122] Expansive interpretations of § 1962(d) hold that a defendant may be liable for RICO conspiracy absent a substantive RICO violation. *See Salinas v. United States*, 522 U.S. 52, 62–64 (1997); *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001) ("*Salinas* makes clear that § 1962(c) liability is not a prerequisite to § 1962(d) liability (quotation marks and citation omitted)); *see also Beck v. Prupis*, 529 U.S. 494, 506–07 (2000) ("Under our interpretation, a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962.").

Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To establish a RICO conspiracy claim, a plaintiff must demonstrate "(1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators."[123] "A conspiratorial agreement . . . need not be express so long as its existence can plausibly be inferred from the defendant's words and actions and the interdependence of activities and persons involved."[124] Interdependence exists if "each coconspirators' activities constituted essential and integral steps toward the realization of a common, illicit goal."[125]

The RICO Defendants raise essentially the same argument against Count II as they did against Count I: UMB has no direct evidence of an agreement, knowledge, or interdependence. But UMB offers sufficient circumstantial evidence to support an inference of an illicit scheme to defraud, as previously discussed. And each RICO Defendants' actions were integral to the scheme to obtain funds from the Trust Estates. The Bonds would not have issued without AJJ Trust's and MCC's Guaranty and Mezzanine Loan, respectively, nor would they have issued without the Monson Defendants, Jacobson, and Boyer's role in obtaining Cost Certifications 1 and 2 and their purported misrepresentations concerning Altos's ability to fund the Construction Loan. Further— although the most tenuous of UMB's contentions—a jury could conclude that the Vernal Bay

---

[123] *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) (citation omitted).

[124] *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1211 (10th Cir. 2020) (quotation marks, brackets, and citation omitted).

[125] *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995) (quotation marks and citation omitted).

Defendants' role in receiving funds, engaging in the Workout Agreement, and participating in the Foreclosure constituted "essential and integral steps" towards the alleged scheme to obtain funds from the Trust Estates. As such, the Court rejects the RICO Defendants' arguments as it did above.

Accordingly, the Court determines that UMB raises a triable issue on Count II against all RICO Defendants.

### 3.    State Law Civil Conspiracy (Count XII)

UMB's third RICO claim against the RICO Defendants is for common law civil conspiracy, which requires essentially the same elements as a RICO conspiracy claim.[126] Because the Monson Defendants do not move for summary judgment on Count XII, this claim automatically proceeds to a jury against them. The remaining RICO Defendants—AJJ Trust, MCC, VBI, VBCG, Jacobson, and Boyer— raise the same arguments they did under Count II. The Court rejects these arguments as it did above.

Accordingly, the Court determines that UMB raises a triable issue on Count XII against all RICO Defendants.

### B.    UMB's Claims Against the Certifying Defendants

In addition to the RICO claims, UMB brings three state law claims against the Certifying Defendants—Monson, One10 Holdings, One10 HRKC, Compass, and 11 Water—arising out of their pursuit of Cost Certifications 1 and 2 and the Bonds' subsequent issuance. Count III is for fraudulent inducement, Count IV is for fraudulent concealment, and Count V is for negligent

---

[126] *See Stoldt v. City of Toronto*, 234 Kan. 957, 678 P.2d 153, 161 (1984); *see also Cent. Nat'l Bank v. Est. of Weber*, 408 P.3d 494 (Table), 2017 WL 6547041, at *2 (Kan. Ct. App. Dec. 22, 2017) ("A civil conspiracy basically spreads liability for a civil wrong among the conspirators but is not itself a civil wrong.").

misrepresentation, all three of which are brought under Kansas law. The Certifying Defendants argue each of these claims fail for a myriad of reasons, none of which hold any weight.

First, the Certifying Defendants argue UMB presents no evidence of any "false representations as a statement of existing and material fact"—an element required for both fraudulent inducement and negligent misrepresentation.[127] UMB counters that the Certifying Defendants falsely represented that "no condition has occurred, with notice of passage or time or both, would constitute an Event of Default under the [DA]" when submitting Cost Certifications 1 and 2 because they knew there was no Construction Loan. As disputed in the RICO claim, the Certifying Defendants assert UMB has no evidence that they had such knowledge until after Altos failed to fund the Construction Loan. As previously discussed, however, UMB presents circumstantial evidence of such knowledge. Thus, UMB raises a triable issue on this matter.

Next, the Certifying Defendants assert they were not under any obligation to disclose—an element of fraudulent concealment (a/k/a fraud by silence).[128] Yet UMB identifies several contractual provisions that it argues imposes an obligation to disclose on the Certifying Defendants, including § 1017 "Required Disclosures" in the DA, § 2.4. "Representations and Warranties in Developer Documents" in the closing certificates, and, of course, the Project Fund Written Requests certification that "no event of default" was present.[129] Tellingly, the Certifying

---

[127] *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1096–98 (2013).

[128] *Id.* at 1097.

[129] *See* Doc. 455 at 28, ¶ 96; 53.

Defendants abandon this argument in their Reply, and the Court declines to consider the matter any further.[130]

Turning back to negligent misrepresentation, the Certifying Defendants next argue that because UMB retained independent authority to review the Cost Certifications, its reliance on their purportedly false certification is not reasonable as a matter of law. Any legal citation for that proposition, however, is notably absent. Each Indenture provides that UMB "may rely upon such written requests and accompanying certificates . . . and shall not be required to make any independent investigation in connection therewith." And in line with this provision, the Prior Trustee (Commerce) relied on the Certifying Defendants' alleged misrepresentation in Cost Certifications 1 and 2. Thus, the Court rejects the Certifying Defendants' "not reasonable" reliance argument.

Finally, the Certifying Defendants argue that UMB's negligent misrepresentation claim (but not UMB's other tort claims) fails because it is not independent of UMB's contractual claims, namely UMB's claim of breach of the DA against One10 HRKC in Count IX.[131] Under Kansas law, "when conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies."[132] The conduct UMB identifies could satisfy the elements of negligent

---

[130] The Certifying Defendants "controvert" ¶ 96 by asserting UMB's identified contractual provisions do not establish that any defendant assumed liability for the conduct of other defendants or that the provisions establish a RICO enterprise. But this argument has nothing to do with whether the cited provisions impose a duty to disclose upon the Certifying Defendants.

[131] No one moves for summary judgment on Count IX, so it is not at issue in this Order.

[132] *Burcham v. Unison Bancorp, Inc.*, 276 Kan 393, 77 P.3d 130, 145 (2003) (citation omitted).

representation, and the Certifying Defendants fail to identity any provision of the DA that permits them to make the alleged misrepresentation. Thus, UMB may pursue its negligent misrepresentation claim alongside its breach of contract claim.

\* \* \*

Accordingly, the Court denies the Certifying Defendants' request for summary judgment on Counts III, IV, and V.

## C.    UMB's Claims Against the Guaranty Defendants

UMB's state law tort claims continue against the Guaranty Defendants—Monson and AJJ Trust—for their role surrounding the TGT Guaranty Agreement. UMB also brings contractual claims against the Guaranty Defendants, who seek summary judgment on both the tort and contractual claims: Counts VI–VIII, X, and XI (collectively, the "Guaranty Claims").[133] The Court addresses the Guaranty tort and contract claims in turn.

### 1.    The Guaranty Tort Claims (Counts VI–VIII)

UMB brings Kansas tort claims for fraudulent inducement, fraudulent concealment, and negligent misrepresentation against the Guaranty Defendants for their non-performance surrounding the Guaranty Agreement. In its Response, UMB voluntarily dismisses its negligent

---

[133] Monson, for his part, merely incorporates by reference AJJ Trust's brief on these claims on page 39 of his written argument. This action adds 14 pages to Monson's arguments, rendering his arguments well over the Court's 40-page limitation. D. Kan. R. 7.1(d)(2). Monson did not seek leave for additional pages, nor does he offer any explanation to UMB's argument that this appears to be an improper attempt to avoid page limitations. The Court would be well within its discretion to deny Monson summary judgment on Counts X and XI for this reason alone. *See Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 979 n.14 (10th Cir. 2003); *Thompson v. Howard*, 2025 WL 3229651, at \*1 (D. Kan. Nov. 19, 2025). But AJJ Trust's briefing raises two dispositive arguments against the Guaranty Claims that are not specific to either Defendant. It seems inevitable that the Guaranty Claims against Monson would be resolved on the same grounds. Thus, the Court concludes that judicial economy is better served by considering Monson's incorporated arguments now at the summary judgment stage. The parties are warned, however, that the Court will not tolerate this practice again.

-43-

misrepresentation claim against AJJ Trust, thus the Court grants AJJ Trust summary judgment on this claim. All three of UMB's fraud claims against the Guaranty Defendants, however, are subject to two disputes.

First, the Guaranty Defendants argue that UMB has no evidence that they intended to not perform at the time of executing the Guaranty Agreement, asserting the later non-performance alone cannot evidence such intent.[134] UMB counters with additional circumstantial evidence aside from the Guaranty Defendants' non-performance including Jacobson's direction to AJJ Trust to sign the Guaranty, the rushed nature of the signing, and Yu's Amended Complaint from the consolidated case where he himself asserted he was "fraudulently required to sign [the Guaranty] on the eleventh hour of the closing of a deal."[135] A jury could reasonably infer from this circumstantial evidence that the Guaranty Defendants did not intend to fulfill their obligations under it when signing the Guaranty. Thus, UMB raises a triable issue on the matter.[136]

Although UMB may raise a triable issue on the Guaranty Defendants' intent at signing, it cannot avoid their second argument: the statute of limitations. Under Kansas law, fraud claims are subject to a two-year limitations period.[137] The two-year period begins to run once the fraud

---

[134] *See Andale Equip., Inc.*, 985 F. Supp. at 1045 (citations omitted) ("In order to show that there was fraudulent intent, there must be more than mere nonperformance on the part of defendant").

[135] Case No. 23-2441-DDC-GEB, Doc. 3 at 1.

[136] This also raises a triable issue on the RICO matters against AJJ Trust. *Supra* note 86 and accompanying text.

[137] K.S.A. § 60-513(a)(3).

"becomes reasonably ascertainable to the injured party," that is, the injured party knows or should know of the alleged fraud.[138]

Here, UMB did not bring its state law claims against the Guaranty Defendants until May 1, 2024. AJJ Trust argues that the statute of limitations bars UMB's claims because it began to run on October 21, 2021, the deadline set in UMB's demand letter that the Guaranty Defendants replenish the DSRF. When the Guaranty Defendants did not do so by that date, they argue that UMB knew or should have known of the alleged fraud. For support, the Guaranty Defendants cite *Andale Equipment, Inc. v. Deere & Co.*[139] which provides that "failure to perform a specific promise is generally sufficient to put the promisee on notice of promissory fraud and begin the running of the statute of limitations."[140]

UMB attempts to distinguish *Andale* from this case by arguing that the *Andale* plaintiff explicitly denied and repudiated his contractual obligation whereas the Guaranty Defendants did not explicitly repudiate the Guaranty until it sued UMB in 2023. But UMB's representative testified that Jacobson said "they're not going to pay and they don't owe the money" when UMB made its demand on AJJ Trust.[141] And regardless of how AJJ Trust indicated it would not perform, the result is the same; AJJ Trust did not perform by UMB's set deadline. AJJ Trust's non-performance was sufficient to put UMB on notice of the alleged fraud, triggering the two-year

---

[138] *See Murray v. Miracorp, Inc.*, 318 Kan. 615, 545 P.3d 1009, 1015–16 (2024) (discussing K.S.A. § 60-513(b)'s "reasonably ascertainable" requirement).

[139] 985 F. Supp. 1042 (D. Kan. 1997).

[140] *Id.* at 1046 (citing *City of Ulysses v. Neidert*, 196 Kan. 169, 409 P.2d 800, 803 (1966)).

[141] Doc. 454-8 at 4.

statute of limitations on October 21, 2021.[142] Accordingly, UMB's fraud claims against the Guaranty Defendants are time barred.

### 2.    The Guaranty Contract Claims (Counts X & XI)

UMB brings a breach of contract claim against the Guaranty Defendants for their nonperformance in replenishing the DSRF. UMB also seeks declaration that the Guaranty Defendants have a continuing obligation to replenish the DSRF. UMB previously moved for summary judgment on these claims in its favor, which the Court denied.[143] For brevity's sake, the Court incorporates the portion of its previous order outlining the relevant contract provisions to Counts X and XI.[144] Now, the Guaranty Defendants move for summary judgment on these claims by raising two affirmative defenses: (1) the first to breach doctrine; and (2) the doctrine of frustration of purpose. The Court need only address the first-to-breach argument.

Under Kansas law, "a party is not liable for a material failure of performance if it can show that the other party committed a prior material breach of the contract because in such event, the prior breach discharged the first party's own duty to perform."[145] The Guaranty Defendants' first-

---

[142] UMB suggests that the Guaranty Defendants cannot rely on its mere non-performance for statute of limitations purposes while simultaneously arguing non-performance alone is not enough to establish fraud occurred. But the two inquiries are separate. And all that is required for statute of limitations purposes is that UMB has notice of fraud that "could have been discovered with reasonable diligence." *Andale*, 985 F. Supp. at 1046. UMB offers no explanation for why it could not have discovered the alleged fraud with reasonable diligence after learning of the Guaranty Defendants' non-performance.

[143] *UMB Bank, N.A.*, 2025 WL 3458562, at *10.

[144] *Id.* at *3–6.

[145] *Rojas v. Buildforce Constr., LLC*, 2023 WL 3582845, at *2 (D. Kan. Feb. 28, 2023) (alterations and citations omitted); *see also Alenco, Inc. v. Warrington*, 65 Kan. App. 2d 79, 560 P.3d 586, 596 (2024) ("When a party materially breaches a contract, they are precluded from enforcing the contract against the nonbreaching party until the material breach has been cured.") (citing *Bank of Am. v. Narula*, 46 Kan. App. 2d 142, 261 P.3d 898, 902 (2011)).

to-breach argument begins with UMB's June 19, 2020 notice that the majority of the bondholders directed UMB to declare principal and interest to be immediately due and payable due to an event of default. Upon filing this notice, the Guaranty Defendants argue UMB triggered an obligation to transfer the Project Fund balance to the Redemption Account for the Debt Service Fund under Section 403(e) of the Indentures. Recall that Section 403(e) of the Indentures provides:

> If [the City] certifies to [UMB] that an event has occurred or a condition exists under the Development Agreement for which [One10 HRKC] has had at least 60 days' notice which (if able to be cured) has not been cured in accordance with the applicable provisions thereof, and which event or condition has as a consequence that [One10 HRKC] is no longer entitled to the distribution of proceeds of the Bonds to be applied to the payment of TGT Eligible Expenses, all subject to any rights which [One10 HRKC] may have under the Development Agreement, then *any balance remaining in the Project Fund, shall be transferred to the Redemption Account of the Debt Service Fund and used to redeem the Bonds at the earliest permissible date* under Section 303 of this Indenture.[146]

In addition to not transferring the Project Fund to the Debt Service Fund, AJJ Trust also argues that UMB breached Sections 407 and 907(b)(2) by depleting the DSRF to fund litigation without first exhausting the Debt Service Fund and by failing to redeem the Bonds shortly after providing notice of acceleration, respectively.

The Guaranty Defendants first made their first-to-breach argument in response to UMB's motion for summary judgment on Counts X & XI.[147] In denying UMB's motion, the Court noted that UMB failed to meaningfully reply to the first-to-breach argument.[148] Now, UMB raises seven points in opposition. All seven fail.

---

[146] Doc. 414-17 at 31 (emphasis added).

[147] *UMB Bank, N.A.*, 2025 WL 3458562, at *10.

[148] *Id.*

UMB's first and second arguments concern purportedly unfulfilled conditions-precedent in Section 403(e). First, UMB argues that its obligation under Section 403(e) was not triggered because the City did not formally certify to UMB that "an event has occurred" within Section 403(e)'s meaning. Instead, UMB gave notice of acceleration without waiting for or requesting such a certification from the City. Under UMB's interpretation, its decision to proceed without formal certification would not trigger its obligation to transfer the Project Fund to the Debt Service Fund.

"Contract interpretation is a question of law."[149] Under Kansas law, "[t]he primary rule for interpreting written contracts is to ascertain the parties' intent."[150] And if the terms are clear, intent is determined from the language of the contract itself.[151] Even so, "[a]n interpretation of a contractual provision should not be reached by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners."[152] Kansas law "favors reasonable interpretations, and results which vitiate the purpose of the terms of an agreement to an absurdity should be avoided."[153]

UMB's interpretation isolates the certification condition-precedent in a way that would vitiate the purpose of the Section 403(c)'s terms to an absurdity. Consider what a certification from the City accomplishes. It merely provides notice to UMB that an event of default has occurred, so

---

[149] *Johnson*, 56 F.4th at 863.

[150] *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250, 264 (2013).

[151] *Id.* (citation omitted).

[152] *Levin v. Maw Oil & Gas, LLC*, 290 Kan. 928, 234 P.3d 805, 814 (2010) (quotation omitted).

[153] *Id.* (quotation omitted).

UMB can take appropriate, protective action such as accelerating the Bonds (which it did) and transferring the Project Fund balance to the Debt Service Fund (which it did not). Nothing in the Guaranty suggests certification serves any other purpose. UMB already knew that an event of default occurred when it provided notice of such default to the Guaranty Defendants. Notably, UMB sent the same notice to the City, who did not object to UMB accelerating the loan without a formal certification.

Interpreting UMB's obligation under Section 403(e) to only be triggered if UMB decides to formally request certification from the City despite already knowing an event of default had occurred would be an absurd result. It would permit UMB to reap the benefits of acceleration while shirking any of its own responsibility under the agreements on a technicality fully within its own control. The Court declines to read Section 403(e) in such a way. Thus, UMB's first argument fails.

Second, UMB argues its obligation under Section 403(e) was not triggered based upon the language that One10 HRKC be "no longer entitled to the distribution of proceeds of the Bonds to be applied to the payment of TGT Eligible Expenses." UMB argues that One10 HRKC's pursuit of Cost Certification 3 rendered this condition-precedent unfulfilled because whether One10 HRKC was entitled to proceeds of Bonds was not resolved until the Minnesota TIP proceeding concluded. But the Minnesota TIP proceeding found that One10 HRKC was not entitled to proceeds of the Bonds pursuant to Cost Certification 3. Just as the relevant Defendants are bound by the Minnesota Judgement, so too is UMB. Thus, UMB's second argument fails.

UMB's third and fourth arguments rely on broad provisions in the Guaranty Agreement to avoid the specific provisions the Guaranty Defendants identify.[154] In its third argument, UMB notes that Section 907 begins with providing that any funds collected by UMB "shall be applied in the following order, at the date or dates fixed by [UMB]." Thus, UMB argues it had full discretion to not redeem the TGT Bonds until a later date. Yet, Section 907(b) specifically provides that funds collected "shall be applied" upon acceleration of the Bonds. Read in conjunction with Section 403(e), which provides that the Project Fund transferred to the Debt Service Fund should be "used to redeem the Bonds at the earliest permissible date," the Court declines to read Section 907 as permitting UMB to do nothing for as long as it wants to. To do so would impermissibly render other terms meaningless.[155] Thus, UMB's third argument fails.

UMB's fourth argument points to Section 407(b)'s language that permits UMB to use the DSRF fund "as otherwise provided herein" and other sections permitting it to use funds in the DSRF, including for litigation costs.[156] The more specific term in 407(b), however, provides that "if sufficient moneys therefor are not available," moneys in the DSRF should be disbursed "first, in the Debt Service Fund" That first step is specific, and controls over the general "otherwise provided herein" term. Thus, UMB's fourth argument fails.

---

[154] *See Holiday v. Bank of Am., N.A.*, 819 F. Supp. 3d 1255, 1268 (D. Kan. 2025) ("[U]nder Kansas law, a specific contract provision controls over a general one." (citation omitted)).

[155] *See id.* at 1274 ("[A]n interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." (quotation marks and citation omitted)).

[156] The Guaranty Defendants assert that UMB has breached the implied duty of good faith by utilizing these funds for litigation in Count IV of the Counterclaim and Yu's Second Amended Complaint. Doc. 409 at 49.

Fifth, UMB argues that the Guaranty Defendants do not cite evidence establishing the balance of accounts in the TGT Funds. As the Guaranty Defendants note in reply, the parties stipulate to the balance of accounts in the Pretrial Order.[157] Thus, the Court will not entertain UMB's fifth argument further.

Sixth, UMB attempts to use the Minnesota Judgment to preclude the Guaranty Defendants' argument but mischaracterizes it in the process. The Guaranty Defendants' first-to-breach argument is not that UMB breached by declaring default and refusing to distribute funds for Cost Certification 3 as UMB contends. Rather, the Guaranty Defendants argue that once UMB sent notice of acceleration, the Indentures imposed certain obligations on UMB that UMB did not fulfill. The Minnesota Judgment did not address that issue.[158] Thus, UMB's sixth argument fails.

Seventh, UMB argues that the Guaranty Defendants' first-to-breach theory fails because they benefited from signing the Guaranty via Jacobson when the Bonds issued. UMB's seventh argument speaks to the Guaranty Defendants' frustration of purpose argument, not the first-to-breach argument. Accordingly, UMB's seventh argument fails.

Seven arguments later, nothing has changed. Upon issuing notice of acceleration, UMB was required to take several steps under the Indentures. UMB chose not to do so, leaving an approximately $7 million shortfall in the DSRF that would not otherwise have occurred. That choice was a material breach, which occurred before the Guaranty Defendants' performance was

---

[157] *Id.* at 5, ¶ 19.

[158] The Court noted the limitations of the Minnesota Judgment in its previous order denying UMB's request for summary judgment on Counts X and XI. *UMB Bank, N.A.*, 2025 WL 3458562, at *10 n.37.

due. Accordingly, the Court concludes that the Guaranty Defendants' performance was excused under the first-to-breach doctrine.

* * *

For the reasons stated above, the Court grants the Guaranty Defendants' request for summary judgment on Counts IV–VII, X and XI.

**D.      Monson Third-Party Plaintiffs' Counterclaim Against the Colliers Defendants**

The Monson Third-Party Plaintiffs bring a breach of contract counterclaim against the Colliers Defendants. Recall that the Colliers Defendants consist of both Colliers Securities who acquired Dougherty & Co. (the underwriter to the Bonds) and Colliers Mortgage, who acquired Doughtery Funding (broker for One10 HRKC). For ease of reference, the Court will refer to the Colliers Defendants as their predecessors: Doughtery & Co. and Doughtery Funding.

To demonstrate their breach of contract claim, the Monson Third-Party Plaintiff's must show: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[159] The Monson Third-Party Plaintiff's assert separate breach of contract theories against Doughtery & Co. and Doughtery Funding, who move for summary judgment on each theory. The Court addresses each in turn.

---

[159] *Stechschulte*, 298 P.3d at 1098.

       *1.       Breach of Contract Claim Against Doughtery & Co.*

Doughtery & Co. asserts that the Monson Third-Party Plaintiffs' breach of contract claim fails against them because they cannot demonstrate Doughtery & Co owed them any contractual obligation. The Monson Third-Party Plaintiffs' breach of contract claim against Doughtery & Co. is premised on the one-page Fee Agreement between the parties. The Fee Agreement provides Doughtery & Co. payment for its "work in analyzing and structuring the captioned bond issue." The Monson Third-Party Plaintiffs argue this language imposed an obligation on Doughtery & Co. to properly analyze and structure the bonds, which they allege Doughtery & Co. failed to do. Doughtery & Co. contends that the Fee Agreement is merely an invoice for a portion of its underwriting fee for its service to the City.

These arguments first appeared at the motion to dismiss stage in this case. There, the Court concluded that the Monson Third-Party Plaintiffs sufficiently pled that the Fee Agreement represented a contract between Doughtery & Co. and the Monson Third-Party Plaintiffs separate from Doughtery & Co.'s obligation to the City.[160] The Court also concluded that the terms "analyzing and structuring" are ambiguous, and do not make clear exactly what functions Doughtery & Co. agreed to perform alone.[161] Now, the Monson Third-Party Plaintiffs heavily rely on the Court's conclusions at the motion to dismiss stage to argue summary judgment is inappropriate.

---

[160] *See UMB Bank, N.A.*, 2023 WL 5956276, at *6. The Court misidentified Doughtery & Co. as "Daughter & Funding" in making this conclusion, but the context is clear that the Court's conclusion concerned Doughtery & Co., which is confirmed by the parties' present arguments on the matter. *Id.*

[161] *Id.* at *7.

Importantly, both the Court's previous findings were made "[a]ccepting all of [the Monson Third-Party Plaintiffs'] facts as true," as the Court must do at the motion to dismiss stage.[162] That standard no longer applies, and the Monson Third-Party Plaintiffs must come forward with extrinsic evidence of the contracting parties' intent to support its interpretation of "analyzing and structuring" as used in the Fee Agreement[163]

The Monson Third-Party Plaintiffs fail to do so. They rely on extrinsic evidence that Doughtery & Co. obtained information from them to include in the Official Statements for the Bonds at several points to argue an obligation exists between the parties. But these actions are entirely consistent with Doughtery & Co.'s obligation to the City. And other extrinsic evidence confirms the Fee Agreement does not impose a separate obligation on Doughtery & Co. to the Monson Third-Party Plaintiffs. The Fee Agreement itself is dated September 25, 2019, long after Doughtery & Co. completed its underwriting obligations with the City. Further, Monson himself—who signed the Fee Agreement—characterized the Fee Agreement as a "commission invoice" and an agreement to pay a portion of Doughtery & Co.'s fee as an underwriter.[164]

Based on the extrinsic evidence now present, the Court concludes that the Fee Agreement's reference to Doughtery & Co.'s "work in analyzing and structuring" refers to its obligation to the City. The Fee Agreement, thus, merely confirms the Monson Third-Party Plaintiffs payment for Doughtery & Co.'s work for the City "from proceeds of the sale of the captioned bond issue." It

---

[162] *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[163] *See Waste Connections*, 298 P.3d at 264 ("If . . . the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it.").

[164] Doc. 416-6 at 6.

does not impose a separate obligation on Doughtery & Co. to the Monson Third-Party Plaintiffs. Accordingly, the Monson Third-Party Plaintiffs' breach of contract claim against Doughtery & Co. fails.

### 2.    Breach of Contract Claim Against Doughtery Funding

Doughtery Funding asserts that the Monson Third Party-Plaintiffs' breach of contract claim against it fails because it fully fulfilled its obligations to them. The Monson Third-Party Plaintiffs' breach of contract claim against Doughtery Funding is premised on the Engagement Letter signed by Monson on August 26, 2018, and asserts Doughtery Funding breached the Engagement Letter by failing to properly vet Altos. The Engagement Letter required Doughtery Funding to (1) analyze and value the Hotel Project property; (2) prepare preliminary and detailed investment packages; and (3) solicit commercial real estate lenders and equity investors. Doughtery Funding cites testimony from Monson that Doughtery Funding fulfilled these three obligations.

The Monson Third-Party Plaintiffs do not dispute that Doughtery Funding fulfilled these enumerated obligations, rather they argue that the Engagement Letter is not restricted to these obligations alone. To do so, they rely on the Engagement Letter's language that Doughtery Funding's "responsibilities may include" the listed items and argue the Court should interpret the Engagement Letter as including more than what is listed.

But the Third-Party Plaintiff's ignore the Engagement Letter's merger clause denoting it contains "the entire agreement among the parties," precluding any parol evidence of possible additional agreements.[165] In addition, the Engagement Letter's language granted One10 HRKC

---

[165] *Eucalyptus Real Est., LLC v. Innovative Work Comp. Sols., LLC*, 676 F. Supp. 3d 938, 960 (D. Kan. 2023) (citations omitted) (applying Kansas contract law).

sole discretion to "accept or reject any proposal relating to the Construction Financing" and placed final responsibility on One10 HRKC "for ensuring that the terms and conditions of any proposals or definitive documents relating to the Construction Financing are satisfactory." Even if the Court considered possible other obligations, it is clear from the Engagement Letter that the Monson Third-Party Plaintiffs retained final vetting responsibility for any lender proposed by Doughtery Funding. This was not an obligation of Doughtery Funding's under the Engagement Letter, and it is undisputed that Doughtery Funding fulfilled the enumerated obligations it did have. Accordingly, the Monson Third-Party Plaintiffs' breach of contract claim against Doughtery & Funding fails.

\* \* \*

For the reasons stated above, the Court grants the Colliers Defendants' Motion for Summary Judgment on the Monson Third-Party Plaintiffs' remaining breach of contract counterclaim against them.

## IV.    Conclusion

Each summary judgment motion before the Court introduces this case by noting it involves a business deal gone sideways. The Court notes in conclusion that this puts the situation rather lightly. After this Order, the following Counts brought by UMB remain for a jury to resolve:

- Count I brought against the RICO Defendants, except not against the Vernal Bay Defendants;
- Count II brought against all the RICO Defendants;
- Count III against the Certifying Defendants;
- Count IV against the Certifying Defendants;
- Count V against the Certifying Defendants; and
- Count XII against all the RICO Defendants.

With these claims and others remaining, the odyssey that is this case is not yet complete. In the words of one infamous Greek: "Add this to the total—bring the trial on!"[166]

**IT IS THEREFORE ORDERED** that Defendant AJJ Trust's Motion for Summary Judgment (Doc. 414) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that the Colliers Defendants' Motion for Summary Judgment (Doc. 415) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Mutual Credit Corporation's Motion for Summary Judgment (Doc. 418) is **DENIED**.

**IT IS FURTHER ORDERED** that the Vernal Bay Defendants' Motion for Summary Judgment (Doc. 419) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that the Monson Defendants' Motion for Summary Judgment (Doc. 420) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Defendant Jacobson and Boyer's Motion for Summary Judgment (Doc. 421) is **DENIED**.

**IT IS FURTHER ORDERED** that Third-Party Defendants Colliers Securities, LLC and Colliers Mortgage, LLC are terminated from the case.

---

[166] Homer, The Odyssey, Book V, p. 159 (Robert Fagels trans. 1996), *available at* https://archive.org/details/TheOdysseyArchaBook.

**IT IS SO ORDERED.**

Dated this 31st day of July, 2026.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE