**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UMB BANK N.A., not individually but solely in its capacity as Successor Trustee for the Bonds,<br><br>*Plaintiff/Counter-Defendant,*<br><br>vs.<br><br>D. JON MONSON, et al.,<br><br>*Defendants/Counter-Plaintiffs,*<br><br>vs.<br><br>COLLIERS SECURITIES, LLC, et al.,<br><br>*Third-Party Defendants.* | Case No. 2:21-CV-2504-EFM-BGS |
| HOWARD YU, solely in his capacity as Trustee of the Estate of Anthony John Jacobson Family Trust,<br><br>*Plaintiff/Counter-Defendant,*<br><br>vs.<br><br>UMB BANK N.A., solely in its capacity as Successor Trustee for the Bonds,<br><br>*Defendant/Counter-Plaintiff.* | Case No. 23-cv-2441<br>Consolidated with and into<br>No. 21-cv-2504-EFM-BGS |

**VERNAL BAY DEFENDANTS' MOTION FOR WRIT OF HABEAS CORPUS AD TESTIFICANDUM FOR DAVID INGRAM; IN THE ALTERNATIVE, MOTION FOR LIVE VIDEO TESTIMONY UNDER FED. R. CIV. P. 43(a); IN THE ALTERNATIVE, MOTION TO TAKE TRIAL DEPOSITION; AND BRIEF IN SUPPORT**

Defendants Anthony Jacobson, Robert Boyer, Mutual Credit Corporation, Howard Yu (as the investment and discretionary trustee of the Anthony John Jacobson Trust), Peak Trust Company (as the administrative trustee of the Anthony John Jacobson Trust), Vernal Bay Investments LLC, and Vernal Bay Capital Group, LLC (collectively, the "Vernal Bay Defendants"

or "Defendants") move under 28 U.S.C. § 2241(c)(5) for a writ of habeas corpus ad testificandum directing the Warden of the low security Federal Correctional Institution in Butner, North Carolina, and the United States Marshals Service to produce David Ingram (USM No. 07493-033) to testify in person at the trial of this matter, which is set to begin on December 8, 2026. In the alternative, Defendants request under Federal Rule of Civil Procedure 43(a) that the Court order Ingram be made available to testify by contemporaneous live videoconference from his facility. In the further alternative, should the Court deny both the writ and live video testimony, Defendants request leave to take Ingram's trial deposition for use at trial under Federal Rule of Civil Procedure 32(a)(4).

**BACKGROUND**

David Ingram is a material witness in this civil RICO case. He was the principal and owner of AltosGroups, LLC ("Altos"), the construction lender whose failure to fund the approximately $52 million Construction Loan for the Hard Rock Hotel Project lies at the heart of the claims and defenses in this case. On August 21, 2025, Ingram pleaded guilty in this District to wire fraud in violation of 18 U.S.C. § 1343. *United States v. Ingram*, No. 2:24-cr-20069-DDC (D. Kan.); (Doc. 409, Pretrial Order, Stipulated Fact ¶ 39.) In the factual basis for his plea, he admitted that he falsely told borrowers Altos had warehouse lines of credit with major financial institutions and required them to make "deposits" that would supposedly trigger those lines; that in reality Altos "had no warehouse lending relationship with JPMorgan Chase or Bank of America"; that the deposits "were not kept in a dedicated account, but rather used for the defendant and his wife's personal expenses, other business purposes, or transferred to other accounts"; and that he "failed to fund the loans and did not return the deposits to the victims." (Doc. 409 ¶ 40.)

The United States identified One10 Hotel HRKC, LLC ("One10 HRKC"), a defendant in this action and the borrower on the Construction Loan, as a victim of Ingram's crime. Ingram was

sentenced to 46 months' imprisonment and ordered to pay One10 HRKC $2,600,674 in restitution. (*Id.* ¶¶ 41–42.) According to the Bureau of Prisons' inmate locator, Ingram, now 74 years old, is serving his sentence at the low-security Federal Correctional Institution in Butner, North Carolina, with a projected release date of January 29, 2029.[1]

This matter is set for a multi-week jury trial beginning December 8, 2026. Defendants' core defense is that the failure of Altos to fund the Construction Loan (and not any conspiracy among the Defendants) was the but-for cause of the Hotel Project's collapse. UMB also alleges that Defendants engaged in RICO activity based on their alleged knowledge that Altos did not have lines of credit to fund the Construction Loan and that Defendants falsely represented that the Construction Loan had closed. Defendants allege they relied on Ingram and his counsel's representations that Altos had lines of credit and that the Construction Loan did in fact close. Ingram's personal knowledge of the loan, his representations regarding Altos's funding, the loan closing, and why the loan failed are essential to the key facts that underpin both sides' theories of the case, and the Vernal Bay Defendants should be permitted to question Ingram before the jury.

## ARGUMENTS AND AUTHORITIES

### I. The Court Should Issue a Writ of Habeas Corpus Ad Testificandum or, Alternatively, Permit Live Video Testimony.

#### A. Legal Standard

A federal court may issue a writ of habeas corpus ad testificandum when "[i]t is necessary to bring [a prisoner] into court to testify or for trial." 28 U.S.C. § 2241(c)(5). Such a writ "is the normal substitute for a subpoena when [a] witness is incarcerated." *Draper v. Rosario*, 836 F.3d 1072, 1081 (9th Cir. 2016). *See also Gilmore v. United States*, 129 F.2d 199, 202 (10th Cir. 1942).

[1] *See* https://www.bop.gov/inmateloc/?os=vb.&ref=app.

The party requesting the writ must show the testimony sought is "relevant, necessary, and non-cumulative" by describing its general scope, indicating whether other witnesses will testify to the same facts, and explaining its relevance to the claims or defenses. *Smith Bey v. Gibson*, No. 04-cv-01050, 2007 WL 622289, at *1 (D. Colo. Feb. 23, 2007). In determining whether to grant the writ, the Court must also weigh the need for the testimony against concerns of expense, security, logistics, and docket control. *Hawkins v. Maynard*, 89 F.3d 850 (table), 1996 WL 335234, at *1 (10th Cir. 1996) (unpublished); *Kocsis v. Kendall*, No. 14-2167-EFM, 2016 WL 7852315, at *1 (D. Kan. June 2, 2016).[2] Issuance "rests in the sound discretion of the trial court." *Brady v. United States*, 433 F.2d 924, 925 (10th Cir. 1970).

**B. Ingram's Testimony Is Relevant, Necessary, and Non-cumulative.**

**1. Ingram Is the Central Actor in the Construction Loan Failure.**

By his own admission, Ingram induced One10 HRKC into the Construction Loan Agreement by falsely representing that Altos had warehouse lines of credit; required a $13,872,943 deposit that he claimed would "trigger" those lines; never funded a draw; and absconded with the developer's $3,000,674, wiring it to a Mexican financial institution. (Doc. 409 ¶¶ 22–23, 33, 38–42 & at p. 30.) Altos's default was the event that triggered the Hotel Project's collapse. As the Vernal Bay Defendants have maintained throughout, "the obvious explanation for the bondholders' loss is that Altos was a fraud." (*Id.* at p. 30.) In order to pivot around this obvious but-for cause, UMB argues that Defendants knew Altos did not have lines of credit to fund the loan, thus the closing on the Construction Loan was not in fact a closing, and that Defendants failed to disclose the foregoing to bondholders who would not have purchased the bonds had they known. (*Id.* at p. 16–17, 20, 22.) The general scope of Ingram's anticipated testimony therefore

[2] These standards apply regardless of whether the witness is a party or a nonparty to the underlying suit. *See Hawkins*, 1996 WL 335234, at *1.

includes: (1) Altos's representations to One10 HRKC, its owners, Dougherty Funding (One10's agent responsible for sourcing the construction loan), and the City's bond counsel regarding Altos's lines of credit and its readiness to close and fund; (2) Altos's actual funding capacity, or lack of it, at and after the October 30, 2019 closing; (3) what Altos disclosed to the developer parties; (4) the handling and disposition of the down payment deposit, including the $3,000,674 that was never returned; and (5) the reasons for Altos's missed first draw and its March 6, 2020 notice of non-funding.

**2. The Testimony Goes to the Heart of the Defense.**

UMB's theory is that Defendants knew Altos would not have funds dedicated to the project at closing and concealed from the trustee and bondholders "the fact that a funded Construction Loan never existed for the Hotel Project." (*Id.* at p. 19–20.) Defendants respond that any misrepresentation about funding originated with Altos; that One10 HRKC and the developer parties relied on Altos's representation that it had existing lines of credit; and that Altos's independent criminal fraud (and not any act of the Defendants) proximately caused UMB's injury. (*See id.* at p. 43–45.) Indeed, "[t]here is zero evidence that any Defendant knew prior to Altos's default and failure to lend that Altos did not, in fact, have available funds through its represented lines of credit"; Defendants "had no direct communications with either Bond Trustee or bondholders prior to the October 30, 2019 closing"; and "[b]oth Dougherty and the City had full knowledge of Altos's identity, the fact it would fund the loan pursuant to a draw schedule, and that Altos was utilizing lines of credit to fund the loan." (Doc. 409 at p. 31, 33.)

Ingram can testify to what, if anything, he told the developer parties about the true state of Altos's finances. Without him, the jury would be asked to decide what the developer parties knew about Altos while the person who designed and executed the deception remains absent from the courtroom, leaving the jury to speculate about the very matters UMB contends were known to the

developer parties and concealed from the bond trustee. The relevance and necessity of Ingram's testimony is therefore straightforward. It speaks to whether the developer parties knew, or could have known, that Altos lacked funding, and it enables the Defendants to show the jury that they had no part in the alleged scheme and were instead among its victims.

#### 3. No Other Witness or Exhibit Can Substitute for Ingram's Testimony.

Ingram's testimony is not cumulative. The other trial witnesses can describe only what Ingram and Altos told them and how they reacted; none can testify to Altos's internal operations or Ingram's intent. Nor are the documents an adequate substitute. The plea agreement's factual basis does not address this project's specific communications or what any of these particular Defendants knew. (Doc. 409 ¶ 40.) And the March 6, 2020 notice that Altos was unable to advance funds under the Construction Loan offers explanations (an illness and Altos's "funding source") that his subsequent plea shows to have been false. (Doc. 414-18; Doc. 409 ¶ 40.) Only live testimony, subject to cross-examination, can test those matters and allow the jury to judge Ingram's credibility. The Vernal Bay Defendants have satisfied each element of the *Smith Bey* showing.

### C. On Balance, the Factors of Security, Expense, Logistics, and Docket Control Favor Issuance of the Writ.

Because Ingram's testimony is relevant, necessary, and non-cumulative, the question is whether that need outweighs "concerns of expense, security, logistics, and docket control." On balance, it does.

#### 1. Security concerns are minimal given Ingram's age and non-violent criminal history.

Producing Ingram presents minimal security concerns. He is a 74-year-old, nonviolent offender convicted of a white-collar fraud offense and housed in a low-security facility. Courts recognize that such witnesses present little security risk. *See, e.g.*, *In re Zamora-Quezada*, No. 16-70270, 2022 WL 17684325, at *2 (Bankr. S.D. Tex. Oct. 25, 2022) (little security risk presented

by witness convicted of white-collar offenses). *Cf. Jordan v. Pugh*, 484 F. Supp. 2d 1185, 1187 (D. Colo. 2007) (finding "significant security concerns" where witness was housed in the most secure federal facility and had been convicted of murdering another inmate). Any residual concern can be fully addressed by the Marshals Service's standard protocols. *See Kocsis*, 2016 WL 7852315, at *1. This factor weighs decisively in favor of the writ.

**2. The expense factor favors the writ because Defendants will bear the reasonable costs of production.**

Defendants will bear the costs associated with producing Ingram. Where the movant agrees to pay these costs, the expense factor favors the writ. *Miranda v. Utah*, No. 03-CV-1097, 2009 WL 464526, at *2 (D. Utah Feb. 24, 2009) ("The Court does not find the costs of transport to be dispositive because this is a civil case and Plaintiff has represented that he is willing to pay the costs up-front as required by the Prison"); *Crawford v. City of Kansas City*, No. 95-2336, 1996 WL 666781, at *1 (D. Kan. Sept. 30, 1996) (granting writ where defendants agreed "to pay any reasonable costs associated with transporting" the witness).

**3. Docket control favors the writ because Ingram will not be released until years after the trial.**

Granting the writ will not disrupt the Court's docket. The docket-control factor asks whether the case can reasonably wait until the prisoner is released. *See Valdez v. Motyka*, No. 15-cv-0109, 2021 WL 1216525, at *3 (D. Colo. Mar. 31, 2021) (finding it "not practical to delay the trial" until incarcerated witnesses were released). Ingram's projected release date is January 29, 2029—more than two years after the December 8, 2026 trial setting. Delaying a case pending since 2021 to await his release would serve neither the Court nor the parties. Indeed, this Court has itself recognized that "live testimony is best suited to preventing any disruption to the Court's docket." *Kocsis*, 2016 WL 7852315, at *1. Like the prior two factors, docket control weighs in favor of the writ.

**4. The logistics of producing Ingram are manageable.**

Defendants acknowledge that producing Ingram in person would require the Marshals Service to transport him from North Carolina to Kansas. That burden is real but manageable. The Marshals Service "ha[s] considerable expertise in transporting prisoners to federal courts" and does so routinely. *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 49–50 (1985) (Stevens, J., dissenting). Ingram's low-security classification further simplifies the process, and the trial date is set far enough in advance to allow orderly arrangements. Moreover, the Defendants do not need Ingram for the entire multi-week trial, but only for a single day of testimony. Defendants will coordinate with opposing counsel, the Court, the Marshals Service, and the Federal Correctional Institution in Butner to minimize the time he is held locally. The logistics factor therefore does not outweigh the need for Ingram's testimony.

* * *

On balance, the factors of security, expense, logistics, and docket control weigh in favor of issuing the writ. To the extent the Court concludes that the burdens of interstate transport are nonetheless too great, those concerns can be eliminated entirely by permitting Ingram to testify by live videoconference from his current facility, as discussed below.

**D. Alternatively, the Court Should Permit Ingram to Testify via Live Videoconference under Rule 43(a).**

Fed. R. Civ. P. 43(a) provides that "witness[] testimony must be taken in open court," but, "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." If the Court concludes the burdens of in-person production outweigh the need for Ingram's physical presence, Defendants request under Fed. R. Civ. P. 43(a) that the Court order Ingram be made available to testify by contemporaneous live videoconference from his facility. *See Montes v.*

*Rafalowski*, No. C 09-0976, 2012 WL 2395273, at *2 (N.D. Cal. June 25, 2012) (explaining "district and circuit courts are increasingly looking to videoconferencing as a viable alternative to live testimony" when the factors counsel against issuing a writ). Courts routinely grant this relief when they decline to order in-person production. *See Twitty v. Ashcroft*, 712 F. Supp. 2d 30, 33 (D. Conn. 2009) (denying writ but granting request to appear by videoconference); *Jordan*, 484 F. Supp. 2d at 1187 (same). *See also Miranda*, 2009 WL 464526, at *2 (issuing writ directing prisoner to be "brought to the place within the Prison that is designated for video conferencing for the purpose of giving his evidence"); *Valdez*, 2021 WL 1216525, at *3 (granting "motion for writ of habeas corpus ad testificandum via video conference or, alternatively, in person").

Good cause in compelling circumstances exists here. Ingram is incarcerated multiple states away from this Court, he cannot be compelled by ordinary subpoena, and his testimony is indispensable to a fair adjudication of the claims against the Defendants. Ingram can testify via live videoconferencing under oath, in real time, subject to full cross-examination by every party, and the jury would be able to observe his demeanor and assess his credibility. Although the Defendants prefer Ingram testify in person and will bear the costs of producing him, live video testimony would eliminate the logistical burdens of interstate transport altogether. In the further alternative, Defendants request leave to take Ingram's trial deposition at his correctional facility, or by remote means, for use at trial under Fed. R. Civ. P. 32(a)(4).

## II. In the Further Alternative, the Court Should Permit Defendants to Take Ingram's Trial Deposition under Rule 32(a)(4).

### A. Legal Standard

*De bene esse* depositions, also known as preservation depositions, "are essentially trial depositions used in place of a witness' live testimony" under Federal Rule of Civil Procedure 32(a)(4). *Murphy v. Schaible, Russo & Co., C.P.A.'s, LLP*, No. 19-cv-02808, 2022 WL 309697,

at *3 (D. Colo. Feb. 1, 2022) (quotation omitted). Rule 32(a)(4)(C) provides that "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness cannot attend [trial] because of . . . imprisonment." The purpose of a preservation deposition "is to perpetuate testimony where there is a bona fide concern that, if not taken, the testimony to be obtained at the deposition will be lost due to the unavailability of the witness at trial." *Murphy*, 2022 WL 309697, at *3 (quotation omitted).

The Federal Rules generally do not distinguish between "discovery depositions" and "trial depositions." *Clay v. Bd. of Trs. of Neosho Cnty. Cmty. Coll.*, No. 94-2282, 1995 WL 646817, at *1 (D. Kan. Sept. 26, 1995). But, as a practical matter, many courts do. *See, e.g.*, *Murphy*, 2022 WL 309697, at *3. As such, many courts within the Tenth Circuit have found that "there 'is a practical distinction between a trial deposition and a discovery deposition' and thus preservation depositions do not constitute discovery." *Id.* (citation modified) (collecting cases). *See also, e.g.*, *Estenfelder v. Gates Corp.*, 199 F.R.D. 351, 356 (D. Colo. 2001) ("Because these are trial, or preservation, depositions, I am not persuaded that the restrictions of the scheduling order, including the expiration of the discovery deadline, should apply to them."); *Pena v. Hawes*, No. CV 12-0622, 2014 WL 12796896, at *1 (D.N.M. Apr. 18, 2014) ("Trial lawyers understand this distinction, even if some courts do not.").

In determining whether a trial deposition is appropriate, courts within the Tenth Circuit generally consider four factors:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Estenfelder*, 199 F.R.D. at 356; *Kaufman v. Cent. RV, Inc.*, No. 21-2007-EFM, 2022 WL 3975212, at *1 (D. Kan. Sept. 1, 2022) (permitting four trial depositions roughly one month before trial).[3]

**B. Each Factor Is Met.**

**1. UMB Will Suffer No Unfair Prejudice or Surprise.**

UMB cannot claim surprise. The Vernal Bay Defendants listed Ingram in their initial disclosures and he has been a central character throughout this epic. His role as the principal of Altos, his guilty plea and its factual basis, and the restitution order in favor of One10 HRKC are stipulated facts in the Pretrial Order. (Doc. 409 ¶¶ 39–42.) UMB has known throughout this case that Ingram and Altos's failure to fund the construction loan is central to Defendants' defense. Although participating in a deposition before trial may impose some burden, the burden of a single additional deposition is minimal, and the testimony will come as no surprise to any party. Nor have Defendants acted unreasonably in the timing of this request. Defendants' primary request is for Ingram to testify at trial in person or by live videoconference. Were he not incarcerated, Defendants could simply subpoena him for trial. Defendants seek a trial deposition only out of an abundance of caution, should the Court find both a writ and live videoconferencing improper. *See Debuhr v. Hern*, No. 15-cv-02613, 2017 WL 11368447, at *2 (D. Colo. Nov. 1, 2017) (noting prejudice minimal where moving party did not act unreasonably and opposing party would not be surprised by request given posture of case).

[3] At least one court within the Tenth Circuit has instead asked, first, "whether the witness in question is essential to the trial" and, second, "whether a preservation deposition is the only effective way to present the witness' testimony." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 13-cv-00769, 2016 WL 2983741, at *3–4 (D. Colo. May 24, 2016). Ingram's testimony is essential for the reasons explained above, and if the Court denies both a writ and live videoconference testimony, a trial deposition will be the only effective way to present it.

**2. Any Prejudice Is Easily Cured.**

Trial is almost two months out. Every party may attend and fully cross-examine Ingram. Defendants will coordinate scheduling with opposing counsel and the facility and proceed promptly after the Court rules. Because Plaintiff would not be substantially prejudiced by the trial deposition, there is no prejudice to cure. *Kaufman*, 2022 WL 3975212, at *2. To the extent Plaintiff is concerned about additional costs of attending the deposition, the deposition can occur remotely or Plaintiff can appear remotely. *See Prince Lionheart, Inc. v. Halo Innovations, Inc.*, No. 06–cv–00324, 2007 WL 2935818, at *2 (D. Colo. Oct. 5, 2007).

**3. A Trial Deposition Will Not Disrupt Trial.**

A trial deposition will not disrupt the orderly and efficient trial of this case or of other cases on the Court's docket. A trial deposition could be presented whenever the Court directs. Taken promptly after the Court rules, it leaves the parties adequate time to prepare for the December 8, 2026 trial. *See Debuhr*, 2017 WL 11368447, at *2 (no disruption where parties had "over six weeks to prepare for trial"); *Kaufman*, 2022 WL 3975212, at *1 (this Court permitting trial depositions roughly one month before trial).

**4. There Is No Bad Faith or Willful Noncompliance.**

The Vernal Bay Defendants have not acted in bad faith or willfully disregarded any order of the Court. Defendants' primary requests are for Ingram to testify at trial in person or by live videoconference. They seek a trial deposition only as a last-resort alternative to preserve evidence essential to their defense. This is not an effort to reopen discovery or gain a tactical advantage. Defendants already know what Ingram's testimony will cover and seek only to preserve it for the jury. *See Estenfelder*, 199 F.R.D. at 354–55 (distinguishing discovery depositions, which uncover what a witness knows, from trial depositions, which preserve testimony a party already knows the witness will give). Were Ingram not incarcerated, Defendants could simply subpoena him for trial.

Because he is in federal custody, however, an ordinary trial subpoena cannot compel his attendance. If the Court denies both the writ and live videoconferencing, Defendants will have no other way to obtain his testimony. Defendants' request is not made in bad faith.

## CONCLUSION

The Vernal Bay Defendants respectfully request the Court issue a writ of habeas corpus ad testificandum directing the Warden of Butner Low Federal Correctional Institution and the United States Marshals Service to produce David Ingram (USM No. 07493-033) for in-person testimony at trial. Alternatively, Defendants request that the Court order Ingram be made available to testify by contemporaneous live videoconference from his correctional facility. In the further alternative, Defendants request leave to take Ingram's preservation deposition for use at trial.

Respectfully submitted,

*/s/ Todd A. Nelson*
Todd A. Nelson, KS #16028
R. Trent Shores, admitted pro hac vice
Barrett L. Powers, admitted pro hac vice
Rick M. Cella, admitted pro hac vice
GABLEGOTWALS
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120
T: 918-595-4800 | F: 918-595-4990
tshores@gablelaw.com
bpowers@gablelaw.com
tnelson@gablelaw.com
rcella@gablelaw.com

and

Robert G. McCampbell, admitted pro hac vice
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
T: 405-235-5500 | F: 405-235-2875
rmccampbell@gablelaw.com

***Counsel for Anthony Jacobson, Robert Boyer, Mutual Credit Corporation, Howard Yu (as the investment and discretionary trustee of the Anthony John Jacobson Trust), Peak Trust Company (as the administrative trustee of the Anthony John Jacobson Trust), Vernal Bay Investments LLC, and Vernal Bay Capital Group, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of October, 2026, a true and correct copy of the above and foregoing document was filed using the Court's e-Filing System with notice to be automatically provided to all counsel of record.

*/s/ Todd A. Nelson*
Todd A. Nelson